Marc A. Karlin, Esq. (SBN 137558)
karlinlaw@msn.com
KARLIN & KARLIN
3701 Wilshire Blvd., Ste. 1035
Los Angeles, California 90010-2804
Tel:  (213) 365-1555
Fax: (213) 383-1166

Attorneys for Defendant Doe 1
And Third-Party Michael J. Schroeder

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARMEET K. DHILLON, an individual,<br><br>              Plaintiff,<br><br>    vs.<br><br>DOE 1, an unknown individual, and DOES 2 through 10,<br><br>              Defendants. | Case No. 13-cv-01465 SI<br><br>MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANT DOE 1 AND THIRD-PARTY MICHAEL J. SCHROEDER IN OPPOSITION TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE TO TAKE LIMITED DISCOVERY PRIOR TO A RULE 26(f) CONFERENCE<br><br>[Concurrently filed with Declaration of Rick A. Cigel] |

1

## TABLE OF CONTENTS

1.  INTRODUCTION AND FACTUAL BACKGROUND ............................................................. 1

    A. THE MUNGER GAMES IS A WIDELY READ SOURCE OF POLITICAL
       COMMENTARY AND NEWS........................................................................................ 4

    B. IN AN EFFORT TO LEARN THE IDENTITY OF THE ANONYMOUS BLOGGER,
       AND TO ENGAGE IN OTHER AND IMPROPER DISCOVERY, DHILLON
       WANTS TO SERVE NUMEROUS SUBPOENAS AROUND THE STATE .................... 5

2.  BOTH DOE 1 AND SCHROEDER HAVE STANDING TO OPPOSE THE
    ADMINISTRATIVE MOTIONS................................................................................................ 7

3.  THE SPEECH AND IDENTITY OF DOE 1, AS WELL AS ANYONE ELSE
    CONNECTED WITH THE MUNGER GAMES, ARE PROTECTED BY THE FIRST
    AMENDMENT ........................................................................................................................... 8

4.  THE FIRST AMENDMENT RIGHTS OF DOE 1 AND EVERYONE ELSE AT THE
    MUNBER GAMES OUTWEIGH DHILLON'S PURPORTED NEED FOR
    DISCLOSURE ......................................................................................................................... 11

5.  DHILLON FAILED TO MAKE ANY SHOWING OF INFRINGEMENT IN LIGHT
    OF THE "FAIR USE" DOCTRINE......................................................................................... 17

    A. PURPOSE AND CHARACTER OF THE USE.................................................................. 18

    B. NATURE OF THE COPYRIGHTED WORK ................................................................... 21

    C. AMOUNT AND SUBSTANTIALITY OF PORTION USED............................................ 22

    D. EFFECT OF THE USE UPON THE POTENTIAL MARKET FOR OR VALUE OF
       THE COPYRIGHTED WORK ......................................................................................... 22

6.  DOE 1, AND ANY OTHERS ASSOCIATED WITH THE MUNGER GAMES, WOULD
    SUFFER GREAT HARM IF THEIR IDENTITY WERE DISCLOSED.................................. 23

7.  CONCLUSION ..........................................................................................................................25

- ii -

1

## **TABLE OF AUTHORITIES**

2

### Cases

3

Arista Records, LLC v. Doe 3, 604 F.3d 110 (2010) ................................................................... 11, 15

4

Art of Living Found. v. Does 1-10, 2011 WL 5444622 (N.D. Cal. Nov. 9, 2011) ..................... passim

5

Ascend Healthcare Corp. v. Wells, Slip Copy, 2013 WL 1010589 (E.D.N.C. 2013)........................ 20

6

Baraban v. Time Warner Inc., 54 USPQ2d 1759 (S.D.N.Y. 2000)...................................................... 20

7

Blotzer v. L-3 Communications Corp., 287 F.R.D. 507 (D. Ariz. 2012) ............................................ 8

8

Broadcort Capital Corp. v. Flagler Sec., 149 F.R.D. 626 (D. Colo. 1993)........................................... 7

9

Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994). ............................................................. 18

10

Chaplinsky v. State of New Hampshire, 315 U.S. 568 (1942). ......................................................... 14

11

Crispin v. Christian Audigier, Inc., 717 F.Supp.2d 965 (C.D. Cal. 2010) .......................................... 8

12

Doe v. 2TheMart.com Inc., 140 F. Supp. 2d 1088 (W.D. Wash. 2001)........................................... 8, 9

13

Doe v. Cahill, 884 A.2d 451 (Del.2005)...................................................................................... passim

14

Dr. Seuss Enters., L.P v. Penguin Books USA, Inc., 109 F. 3d 1394 (9th Cir. 1997)........................ 18

15

Eldred v. Ashcroft, 537 U.S. 186, 219–20 (2003) .............................................................................. 17

16

Elvis Presley Enters. v. Passport Video, 349 F.3d 622 (9th Cir.2003)............................................... 17

17

Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340 (1991) ................................. 17

18

Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539 (1985) ........................................... 21

19

Highfields Capital Management, L.P v. Doe, 385 F. Supp. 2d 969

20

(N.D. Cal. 2005) ......................................................................................................... 10, 15, 16, 23

21

Hustler Magazine, Inc. v. Moral Majority, Inc.,606 F.Supp. 1526

22

(C.D. Cal. 1985), aff'd, 796 F.2d 1148 (9th Cir. 1986) ................................................................. 19

23

In re Anonymous Online Speakers, 661 F.3d 1168 (9th Cir. 2011) ........................................... passim

24

Keep Thomson Governor Committee v. Citizens for Gallen Committee,

25

457 F.Supp. 957 (D.N.H. 1978)...................................................................................................... 19

26

Kelly v. Arriba Soft Corp., 336 F. 3d 811 (9th Cir. 2003) ......................................................... passim

27

28

OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE
TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

1  Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League,

2     89 F.R.D. 489 (C.D. Cal.1981) ........................................................................................... 11

3     McIntyre v. Ohio Elections Comm'n, 514 U.S. 334 (1995) ......................................... 8, 9, 10

4     Meyer v. Grant, 486 U.S. 414 (1988) ..................................................................................... 9

5     NAACP v. Alabama ex rel. Patterson, 357 U.S. 449 (1958) ............................................... 11

6     New Era Publications Intern., ApS v. Carol Pub. Group, 904 F.2d 152 (2d Cir.1990).................... 20

7     Northland Family Planning Clinic, Inc. v. Center for Bio-Ethical Reform,

8     868 F.Supp.2d 962 (C.D. Cal. 2012). ................................................................................... 19

9     Perry v. Schwarzenegger, 591 F.3d 1147 (9th Cir. 2010) ................................................... 10

10    Reno v. ACLU, 521 U.S. 844 (1997) ...................................................................................... 9

11    Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2d Cir. 1966) ............ 24

12    SaleHoo Grp., Ltd. v. ABC Co., 722 F. Supp. 2d 1210 (W.D. Wash. 2010) ........................ 11, 15, 23

13    Sedgwick Claims Mgmt. Servs., Inc. v. Delsman, 2009 WL 2157573 (N.D. Cal. 2009) ................ 20

14    SI03, Inc. v. Bodybuilding.com, LLC, 441 F. App'x 431 (9th Cir. 2011).......................... 13

15    Snedigar v. Hoddersen, 114 Wash.2d 153, 786 P.2d 781 (1990) ....................................... 11

16    Sony Music Entertainment Inc. v. Does 1 – 40, 326 F. Supp. 2d 556 (S.D.N.Y. 2004) .................. 15

17    Talley v. California, 362 U.S. 60, 64 (1960) ......................................................................... 8

18    UMG Recordings, Inc. v. Augusto, 628 F.3d 1175, 1178 (9th Cir.2011).............................17

19

20                                               Statutes

21    17 U.S.C. § 107...................................................................................................................... 18

22    17 U.S.C. § 412...................................................................................................................... 24

23    17 U.S.C. § 501(a) ................................................................................................................. 17

24    Fed. R. Civ. P. 45(c) ............................................................................................................... 7

25    Fed. R. Civ. P. 45(c)(3)(A) ................................................................................................... 11

26

27

28

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2    1.    INTRODUCTION AND FACTUAL BACKGROUND

3    This is a lawsuit over $250 in alleged damages.

4    That trivial amount is what Plaintiff Harmeet Dhillon ("Dhillon") seeks as a "license fee"

5    because a political internet blog, The Munger Games, allegedly used her five-year-old publicity

6    headshot photo to accompany a critical article it ran on her.  As Dhillon claims in Paragraph 22 of

7    her complaint:

8

9          20.    Pursuant to 17 U.S.C. §504, Ms. Dhillon is entitled to recover the
actual damages suffered by her as a result of Defendants' infringement, **in the**

10   **amount of $250, which represents the reasonable license fee to use the Headshot
Photograph**.  (emphasis added)

11

12   As Dhillon confesses in her complaint, she had not even registered a copyright on the

13   photograph when it was supposedly used on February 12, 2013.  As she revealed in Paragraph 17,

14   Dhillon rushed out to register the photograph on February 21, 2013, and then filed the lawsuit

15   shortly thereafter.   Her motivation to register the photo before suing is self-evident.

16   No one spends the time and money to orchestrate an aggressive federal lawsuit regarding a

17   purported copyright violation for a mere $250.  That is especially true where the plaintiff is a public

18   figure.  Dhillon boasts in Paragraphs 8 and 9 of the Complaint that she is:  the founder of her San

19   Francisco law firm; the Vice Chairman of the California Republican Party; the Chairman of the San

20   Francisco Republican Party; and a twice-unsuccessful candidate for public office.  The allegedly

21   infringed work is nothing more than an out-of-date publicity photograph that has absolutely no

22   commercial value.

23   The real reason for this lawsuit is far different and completely improper.  It is why Dhillon

24   seeks discovery throughout the state regarding the identity of the blog's authors.  It is also precisely

25   the reason why this opposition brief is crucial to the protection of fundamental First Amendment

26   rights.

27

28   - 1 -

1    The sole purpose of this suit is to silence The Munger Games, which was formed earlier this
2  year and is located on the internet at www.mungergames.net. (Cigel Decl., Exhibit "A"). The
3  Munger Games reports anonymously on the political activity and consequences of Charles Munger,
4  Jr. ("Munger"). Munger, the chairman of the Santa Clara County Republican Party, is perhaps the
5  richest activist in California politics. Since January 1, 2012, Munger reportedly spent more than
6  $42,000,000 in his political projects, as he donated heavily to support the passage of two statewide
7  propositions. He also is a substantial contributor to local politicians, including Dhillon[1].

8    Munger is the son and heir of Charles Munger, the billionaire Vice Chairman of Warren
9  Buffet's company, Berkshire Hathaway Corporation. Many people believe that Munger has used
10  his enormous family fortune to do great damage to California and to its politics. Munger has the
11  reputation of being a bully in his political activities. One of the most widely-read political blogs on
12  California politics calls him "the most divisive figure in California Republican politics today."[2]

13    Munger is a client of Dhillon's law firm. Dhillon filed this lawsuit specifically to permit
14  discovery about the identity of the anonymous authors at The Munger Games. That is why Dhillon
15  is moving so aggressively to subpoena 1) records from non-party Michael J. Schroeder, who is an
16  attorney[3] in Orange, California (Cigel Decl. at ¶ 3) and is a former Chairman of the California
17  Republican Party; 2) records from Google, the largest internet search engine in the world, in
18  Sacramento, California; and 3) records from New Dream Network, LLC, the Los Angeles company

19

20  [1] In 2012, Munger was Dhillon's single largest political contributor, donating $7,500 to her failed
    election for a state senate seat. Attached hereto as Exhibit "C" is a true and correct copy of a report
21  from the website www.votesmart.org. It shows Charles Thomas Munger, Jr. as the top contributor
    to Dhillon's 2012 campaign finances at $7,500.00.
22

23  [2] The Flash Report, www.flashreport.org, February 12, 2013.

24  [3] The proposed subpoena to Schroeder is attached as Exhibit 2 to the August 22, 2013 motion (Doc.
    20). It not only asks for documents regarding the individual "responsible for" allegedly posting the
25  blog article about Dhillon, it incredibly asks for "any communication between you and such
    individual" at any time since February 12, 2013. Dhillon has no right to ask for seven months of
26  communications, especially with no regard for possible attorney-client privileges.
27

                                                 - 2 -
28

1 that hosts the website for The Munger Games[4].  The subpoenas seek the identity of the anonymous
2 author who writes the blog articles about Munger and Dhillon, and the owner of email addresses
3 used by the blog.

4      Munger does not like the blog's articles and wants them stopped.  He is not shy to use his
5 overwhelming wealth to serve his political interests[5].  However, he cannot punish the authors until
6 he learns who they are.  That is where Dhillon's suit and the instant motion comes into play.

7      Dhillon's discovery is not proper and her administrative motion should be denied.  Doe 1
8 has done nothing more than exercise his[6] First Amendment right to free speech.  Courts in the past
9 several years have consistently held that internet speech is entitled to the same protection as any
10 other kind of speech.  Political speech receives the highest level of First Amendment protection
11 regardless of the forum.  Courts have also recognized that a person has First Amendment rights to
12 remain anonymous in critical speech.

13      Due to these stringent constitutional protections, courts have required that anyone seeking to
14 compel disclosure of an anonymous political speaker's identity must make a strong evidentiary
15 showing of each and every element of a cause of action before disclosure will be ordered.  Most
16 recently, the Ninth Circuit has adopted the "summary judgment" standard of proof in the context of
17 political speech.

18      As is discussed below, Dhillon cannot meet this standard of proof in her copyright action,
19 because Mungergames.net's use of her headshot photograph is "Fair Use".  Thus, Doe 1 and

20

21 [4] The Munger Games filed a motion in the Central District of California on September 20, 2013 to
22 quash that subpoena.  The motion, identified as Case No. CV13-07003 JFW (MANx), will be heard
on October 22, 2013. (Cigel Decl., Exhibit "H").

23

24 [5] Munger has already demonstrated that he uses his enormous wealth to crush political
commentators and adversaries, as he is pursing nearly $250,000 in attorney's fees against a political
25 critic who has an annual salary of $6,000.

26 [6] To protect Doe 1's anonymity, the singular pronoun "he" will be used without regard for whether
Doe 1 is male or female, or whether there is more than one person. (Cigel Decl. at ¶ 2)
27

- 3 -
28 OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE
TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

1  Schroeder respectfully request that this Court deny Dhillon's two pending motion, the August 22,
2  2013 motion (Document 20) and the August 26, 2013 motion (Document 24).  Dhillon is not
3  serving Doe 1 or Schroeder with any of these papers, and is not explaining the status or intention of
4  these motions, so it appears that both are still pending with the Court.

5      A. THE MUNGER GAMES IS A WIDELY READ SOURCE OF POLITICAL
6          COMMENTARY AND NEWS

7      As explained in the concurrently-filed Declaration of Rick A. Cigel, The Munger Games
8  exclusively contains political commentary and news.  It is not a commercial site.  There is
9  unrestricted access to its content and there is no charge for viewing the articles.  There is nothing for
10  sale. (Cigel Decl. at ¶ 5).

11     Other internet blogs comment on or repost articles run on The Munger Games.  Some of
12  those sites include The Flash Report, at www.flashreport.org, and Stephen Frank's California
13  Political News & Views, at capoliticalnews.com.  Through the combined viewership of the three
14  sites, hundreds of thousands of Californians learn about political issues, news and commentary.

15     Just recently, the Flash Report website published an article criticizing this very lawsuit,
16  which sparked debate and commentary by those reading it.  On September 29, 2013, the Flash
17  Report posted an article entitled, "Whether Critical of King George, or Charles Munger, Jr.,
18  Anonymous Speech Should Be Protected."  (Cigel Decl., Exhibit "J").  The article discussed the
19  value of anonymous political speech and urged Plaintiff to drop this "questionable and certainly
20  unfortunate lawsuit."  Id. at p.1.

21     Within hours, the Flash Report article started receiving comments regarding the value of free
22  speech, the choice of anonymity, and political issues across a broad spectrum.  The article on Flash
23  Report was in turn commented on by an article on the capoliticalnews.com website.  In summary,
24  the Munger Games website is not just a one-on-one match between the anonymous blogger and
25  Munger.  It is a widely read forum that sparks political debate and the free exchange of ideas, and
26  which extends broadly into issues that affect a wide population.

27

28

- 4 -

OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE
TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

1    This is pure First Amendment speech. The political content of these sites is a cornerstone of

2    our democracy and deserves the highest of Constitutional protection.

3    ## B. IN AN EFFORT TO LEARN THE IDENTITY OF THE ANONYMOUS BLOGGER,

4    ## AND TO ENGAGE IN OTHER AND IMPROPER DISCOVERY, DHILLON WANTS

5    ## TO SERVE NUMEROUS SUBPOENAS AROUND THE STATE

6    Once Dhillon filed her suit, she quickly and aggressively started her push to force the

7    bloggers to reveal their identity.

8    First, Dhillon served a subpoena on New Dream Network, LLC, the Southern California

9    company that hosts the website for Mungergames.net. The subpoena was issued on April 11, 2013

10   and commanded the production of "Documents sufficient to identify the account information for the

11   domain name "Mungergames.net," hosted by DreamHost, including the names, addresses, telephone

12   numbers, and e-mail addresses of the owner(s) of the domain name "Mungergames.net." The

13   subpoena was issued from the Northern District of California and was addressed to New Dream

14   Network, LLC at a Los Angeles, California address. However, it instructed New Dream Network,

15   LLC to produce the documents at Dhillon's office in San Francisco. Cigel Decl., Exhibit "E";

16   Dhillon filed an unsuccessful administrative motion to compel compliance with that

17   subpoena. On July 21, 2013, this Court denied the motion because it had no jurisdiction under

18   F.R.C.P. 45 to enforce a subpoena against a Southern California company. (Cigel Decl., Exhibit

19   "F", Doc. 19). This Court instructed Dhillon that she should seek a subpoena from the Central

20   District of California that directs production of documents in Los Angeles.

21   On July 22, 2013, Dhillon had another subpoena issued against New Dream Network, LLC,

22   but this time it was issued out of the Central District of California. (Cigel Decl., Exhibit "G"). Doe

23   1 filed a motion to quash the subpoena on the First Amendment grounds stated herein. The motion

24   is set for hearing on October 22, 2013. (Cigel Decl., Exhibit "H").

25   On August 22, 2013, Dhillon filed one of the two pending Administrative Motions for leave

26   to take discovery. She attached two subpoenas that she wanted approval to have issued. She stated

27

28   - 5 -
     OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE
     TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

1  the urgent need to have subpoenas issued against Google, Inc. in Sacramento, California and
2  Schroeder in Orange, California. The Google subpoena seeks a wide swath of information, well
3  beyond merely the identity of the blog author. It commands production of:

4      "Documents sufficient to identify the account information for the email
5      address mungerwatch@gmail.com, including the name, address and telephone
6      number of the owner of this email address and the IP addres(es) from which the user
7      created the account and signed in and signed out, with dates and times. You are to
8      comply with this subpoena pursuant to the terms set forth in the Order attached
9      hereto as Attachment B."

10     From this wide list of documents, which is unlimited as to time, Dhillon wants a precise
11 record of every time that anyone "signed in and signed out" of the account, with the exact dates and
12 times of usage. Under the guise of simply and merely learning the identity of individuals, she wants
13 to track everyone's precise movement regarding the website up to the day of production of the
14 information.

15     The proposed subpoena to Schroeder also seeks an impermissible range of documents:

16     "Documents sufficient to identify any individual(s) responsible for posting
17     the "Meet Harmeet" blog at www.mungergames.net on 2/12/2013, including the
18     name, address, phone number and email address of any such individual, and any
19     communication between you and any such individual concerning the "Meet
20     Harmeet" post, from 2/12/2013 to present. You are ordered to comply with this
21     subpoena pursuant to the terms set forth in the order attached hereto as Attachment
22     B."

23     Once again, Dhillon is asking for extensive discovery that goes well beyond the identity of a
24 blog author. She even wants all communications from Schroeder, an attorney, to anyone
25 "responsible for posting" the internet blog from February to the present day, with no regard for the
26 attorney-client privilege. The date range and breadth of this proposed subpoena demonstrates that
27

- 6 -
28 OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE
   TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

1  its true intention is not merely to identify Doe defendants.   If that were the case, she would not have
2  asked for nine months of communications, up to the present day. Those communications have
3  absolutely no bearing on the identification of a possible defendant in February 2013.

4      On August 26, 2013, Dhillon filed yet another Administrative Motion (Document 24), and
5  again gave no notice of the filing to anyone. In this motion, she claims she learned of a second
6  email address that is being used in connection with The Munger Games blog, and that the email
7  address is being used "to send to a list of undisclosed recipients information and updates about the
8  Munger Games blog, including links directly to the Munger Games website." Motion, p. 3:20-24.
9  Under the guise of learning the identity of Doe defendants allegedly responsible for the single
10  posting in February 2013 of Dhillon's photograph, she now wants to force Google to surrender the
11  following grossly overreaching information:

12          "Documents sufficient to identify the account information for the email
13          addresses themungergames@gmail.com and mungerwatch@gmail.com, including
14          the name, address and phone number of the owner(s) of these email addresses, and
15          the IP address(es) from which the user(s) created the accounts and signed in and
16          signed out, with dates and times. You are to comply with this subpoena pursuant to
17          the terms set forth the Order attached hereto as Attachment 1."

18      Once again, Dhillon is fishing for any information about the people and process by which
19  critical articles are written about her client, Munger.

20  2. BOTH DOE 1 AND SCHROEDER HAVE STANDING TO OPPOSE THE
21  ADMINISTRATIVE MOTIONS

22      F.R.C.P. 45(c) requires this Court to "protect *all persons* from undue burden imposed by the
23  use of the subpoena power." Id., Advisory Committee Notes to 1991 Amendments (emphasis
24  added); Broadcort Capital Corp. v. Flagler Sec., 149 F.R.D. 626, 628 (D. Colo. 1993).  As a
25  defendant, albeit an unnamed one, DOE 1 certainly has standing to contest the Administrative
26  Motions and the subpoenas.

27

28  - 7 -
OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE
TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

1    Schroeder also has the right to file this opposition. A third party whose privacy interests are

2  affected by the subpoena thus has standing to assert the Rule 45(c) rights. Id. See also, Blotzer v. L-

3  3 Communications Corp., 287 F.R.D. 507, 509 (D. Ariz. 2012) (A person has standing to challenge

4  a subpoena served on another entity if he can show he has a personal right or privilege regarding the

5  subject matter of the subpoena); Crispin v. Christian Audigier, Inc., 717 F.Supp.2d 965, 974 (C.D.

6  Cal. 2010). In this case, Dhillon seeks discovery of information that may include Schroeder's

7  personal and law-related emails. His privacy rights and the attorney-client privilege are seriously

8  implicated, and he has standing to challenge this subpoena.

9    Dhillon had no right to fail to give notice of these motions to Schroeder. Her statement in

10  the motions that there was no one upon which to serve the motion is baseless. Dhillon knows

11  Schroeder personally and professionally, and has his personal contact information that is reflected

12  on the proposed subpoena, including his business address, email address and telephone number.

13  Her attempt to obtain these subpoenas without proper notice is improper.

14  3.   THE SPEECH AND IDENTITY OF DOE 1, AS WELL AS ANYONE ELSE CONNECTED

15       WITH THE MUNGER GAMES, ARE PROTECTED BY THE FIRST AMENDMENT

16    It is well established that the First Amendment protects the right to anonymous speech.

17  McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 342 (1995) ("An author's decision to remain

18  anonymous, like other decisions concerning omissions or additions to the content of a publication, is

19  an aspect of the freedom of speech protected by the First Amendment."). The U.S. Supreme Court

20  stressed that "Anonymous pamphlets, leaflets, brochures and even books have played an important

21  role in the progress of mankind. Persecuted groups and sects from time to time throughout history

22  have been able to criticize oppressive practices and laws either anonymously or not at all." Talley v.

23  California, 362 U.S. 60, 64 (1960). "Anonymous speech is a great tradition that is woven into the

24  fabric of this nation's history." Doe v. 2TheMart.com Inc., 140 F. Supp. 2d 1088, 1092 (W.D.

25  Wash. 2001) (referring to the Federalist Papers).

26

27

28
- 8 -
OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE
TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

In the context of political speech, the Supreme Court has recognized that First Amendment protection is especially critical. "Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent. Anonymity is a shield from the tyranny of the majority. It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 357 (1995) (citations omitted).

"When speech touches on matters of public political life, such as debate over the qualifications of candidates, discussion of governmental or political affairs, discussion of political campaigns, and advocacy of controversial points of view, such speech has been described as the "core" or "essence" of the First Amendment." Doe v. 2TheMart.com Inc., supra, 140 F. Supp. at 1092-93 (emphasis added), citing, McIntyre, supra, 514 U.S. at 346-47.

The Ninth Circuit agrees that it is crucial to protect political speech. "Given the importance of political speech in the history of this country, it is not surprising that courts afford political speech the highest level of protection." In re Anonymous Online Speakers, 661 F.3d 1168, 1173 (9th Cir. 2011), citing, Meyer v. Grant, 486 U.S. 414, 422, 425 (1988). The Court stressed that the First Amendment protection of "core political speech" is "at its zenith".

This fundamental right enjoys the same protections whether the context for speech is a political leaflet or an Internet blog. Reno v. ACLU, 521 U.S. 844, 870 (1997) (there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to" the Internet). In fact, the value of the internet as a source of news is growing enormously. A recent study by the Pew Research Center for the People & the Press revealed that "the internet is slowly closing in on television as Americans' main source of national and international news." Http://www.people-press.org/2011/01/04/internet-gains-on-television-as-publics-main-news-source. (Cigel Decl., Exhibit "I"). The study found that for adults aged 18 to 29, the number of people citing the internet as their main source of news has nearly doubled from 34% to 65%. Id.

- 9 -

1    The First Amendment protects not only the content of the political speech, but the identity of

2  the speaker. "As with other forms of expression, the ability to speak anonymously on the Internet

3  promotes the robust exchange of ideas and allows individuals to express themselves freely without

4  'fear of economic or official retaliation ... [or] concern about social ostracism.' " Anonymous

5  Online Speakers, supra, 661 F.3d. at 1173 (citing McIntyre, supra, 514 U.S. at 341–42).

6         As stated in Art of Living Foundation v. Does 1 – 10, 2011 WL 5444622 (N.D. Cal. 2011):

7       First, to the extent that [the speaker's] anonymity facilitates free speech, the
        disclosure of his identity is itself an irreparable harm. See, Perry v. Schwarzenegger,
8       591 F.3d 1147, 1158 (9th Cir. 2010)("One injury to Proponents' First Amendment
        rights is the disclosure itself. Regardless of whether they prevail at trial, this injury
9       will not be remediable on appeal."). As the Supreme Court has explained, "an
        advocate may believe her ideas will be more persuasive if her readers are unaware of
10      her identity. Anonymity thereby provides a way for a writer who may be personally
        unpopular to ensure that readers will not prejudge her message simply because they
11      do not like its proponent." McIntyre, supra, 514 U.S. at 342. The Highfields court put
        it more succinctly: "Anonymity liberates." Highfields Capital Management, L.P v.
12      Doe, 385 F. Supp. 2d 969 (N.D. Cal. 2005). Insofar as [the speaker] may garner a
        larger audience by employing a pseudonym, unveiling his true identity diminishes
13      the free exchange of ideas guaranteed by the Constitution.
14
15      Art of Living, supra, 2011 WL 5444622 at *9.

16      In this case, there is no question that the content of The Munger Games is political speech.

17  The blog discusses qualifications of political candidates, political activity and campaigns, and

18  addresses controversial issues of public interest. As such, it is the very essence of the First

19  Amendment, and subject to its most rigorous protections. In turn, the identity of the author of any

20  posts on The Munger Games is protected by the First Amendment.

21      This Court therefore should not permit a subpoena seeking the author's identity without first

22  addressing the constitutional implications. As discussed in detail in the next section, this Court

23  should first require Dhillon to produce evidence establishing each and every element of her alleged

24  copyright claim. The Court should then engage in the required balancing test and deny the pending

25  motions.

26

27

28

4. THE FIRST AMENDMENT RIGHTS OF DOE 1 AND EVERYONE ELSE AT THE
   MUNGER GAMES OUTWEIGH DHILLON'S PURPORTED NEED FOR DISCLOSURE

Because anonymity is protected by the First Amendment, a court should quash or modify a subpoena designed to breach anonymity. See Fed. R. Civ. P. 45(c)(3)(A) (the "issuing court must quash or modify a subpoena" when it "requires disclosure of privileged or other protected matter, if no exception or waiver applies"). Arista Records, LLC v. Doe 3, 604 F.3d 110, 118 (2d Cir. 2010).

Numerous cases have discussed the limitations on the subpoena power when that power is invoked in such a manner that it impacts First Amendment rights. See, e.g., NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 461 (1958) (discussing the First Amendment implications of a civil subpoena to disclose the membership list for the NAACP); Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League, 89 F.R.D. 489 (C.D. Cal.1981) (discussing the First Amendment implications of a civil subpoena to disclose the names of confidential journalistic sources); Snedigar v. Hoddersen, 114 Wash.2d 153, 786 P.2d 781 (1990) (discussing the First Amendment implications of a civil subpoena to disclose the meeting minutes of a political association).

The subject of anonymous internet speech was discussed in SaleHoo Grp., Ltd. v. ABC Co., 722 F. Supp. 2d 1210, 1213-14 (W.D. Wash. 2010). That court acknowledged that while federal district courts have adopted different standards regarding the issue, the common theme is that the plaintiff must make a factual showing that the case has merit before a court will enforce a subpoena that infringes First Amendment rights.

Since the time of SaleHoo, the Ninth Circuit has addressed the issue and stressed the highest standard of proof when political speech is concerned. In Anonymous Online Speakers, the Ninth Circuit stated, "the many federal district and state courts that have dealt with this issue have employed a variety of standards to benchmark whether an anonymous speaker's identity should be revealed." Anonymous Online Speakers, supra, 661 F.3d. at 1175. In order to avoid compromising First Amendment rights in a baseless lawsuit, the Ninth Circuit discussed the many standards of

- 11 -

proof courts have employed, ranging from a good faith showing, to a prima facie showing, to a motion to dismiss standard. The court then stated:

> The district court in this case applied the most exacting standard, established by the Delaware Supreme Court in Doe v. Cahill, 884 A.2d 451 (Del.2005). The Cahill standard requires plaintiffs to be able to survive a hypothetical motion for summary judgment and give, or attempt to give, notice to the speaker before discovering the anonymous speaker's identity. Id. at 461. The court in Cahill therefore required that the city councilman plaintiff " 'submit sufficient evidence to establish a *prima facie* case for each essential element' " of his defamation claim. Id. at 463 (citation omitted). The court pointed to its "concern[ ] that setting the standard too low will chill potential posters from exercising their First Amendment right to speak anonymously," Id. at 457, and reasoned that "the summary judgment standard more appropriately balances a defamation plaintiff's right to protect his reputation and a defendant's right to speak anonymously." Id. at 462.

Anonymous Online Speakers, supra, 661 F.3d at 1175 – 76.

The Ninth Circuit further held "that the nature of the speech should be a driving force in choosing a standard by which to balance the rights of anonymous speakers in discovery disputes." Id. at 1177 (emphasis added). The court noted that the speech at issue in Anonymous Online Speakers was purely commercial speech, and thus "should be afforded less protection than political, religious, or literary speech." Id.

In the end, the Anonymous Online Speakers court affirmed the lower court's order to disclose some of the anonymous identities, and not to disclose some of the other anonymous identities. The court emphasized that its ruling was based primarily on the extremely limited nature of appellate review under a writ of mandamus, which is an "'extraordinary' remedy limited to 'extraordinary' causes." Id. at 1173. That highly deferential standard, combined with the lower protection for commercial speech, guided the appellate decision to let the disclosure order stand. Id. at 1177.

However, the Anonymous Online Speakers did make an important pronouncement regarding the standard for political speech, which is at issue in the present case. The court noted that the district court applied the Cahill test, "which elevates the bar to disclosure to the highest level. Because *Cahill* involved political speech, that court's imposition of a heightened standard is

- 12 -

1  understandable." Id. at 1177 (emphasis added).

2      Thus, the Ninth Circuit essentially adopted the Cahill holding that when the speech at issue
3  is political, a plaintiff seeking to force disclosure of an anonymous speaker's identity must establish
4  each element of her cause of action under the rigorous summary judgment standard.[7]  This
5  conclusion was echoed in the more recent case of SI03, Inc. v. Bodybuilding.com, LLC, 441 F.
6  App'x 431, 432 (9th Cir. 2011), ("We have recently explained that the rigorous Cahill standard is
7  'understandable" in a case 'involv[ing] political speech.'") (quoting Anonymous online Speakers).

8      Based on this Ninth Circuit ruling, this Court should also apply the Cahill test to determine
9  that Dhillon's motions should be denied.   The Cahill case concerned a defamation action brought
10  by an elected town council member and his wife. The John Doe defendant had anonymously posted
11  statements criticizing the councilman on an internet blog, and plaintiffs sought to compel disclosure
12  of John Doe's identity by serving a deposition subpoena on the owner of John Doe's internet IP
13  address. The Cahill case had facts nearly identical to this case: Doe 1 anonymously posted critical
14  comments on an internet blog regarding Dhillon and Munger, and Dhillon now seeks to discover the
15  identity of Doe 1 and any others who are associated with The Munger Games.

16      The Cahill court first addressed its grave concerns over the chilling effect of ordering
17  disclosure of the speaker's identity, stating that "Internet speech is often anonymous. . . . For better
18  or worse, then 'the audience must evaluate [a] speaker's ideas based on her words alone. . . .  This
19  unique feature of the [the internet] promises to make public debate in cyberspace less hierarchical
20  and discriminatory' than in the real world because it disguises status indicators such as race, class
21  and age." Doe v. Cahill, supra, 884 A.2d at 455 – 56 (citations omitted).

22      Noting that "in general, our society accords greater weight to the value of free speech than to
23  the dangers of its misuse," the Cahill court held "that a defamation plaintiff must satisfy a 'summary

24

25      [7] Interestingly, the court also stated, "Even if the speech was commercial, the district court's
26  choice of the Cahill test did not constitute clear error." Id.

27

28

1   judgment' standard before obtaining the identity of an anonymous defendant. We are concerned
2   that setting the standard too low will chill potential posters from exercising their First Amendment
3   right to speak anonymously." Id. at 457. Thus, to obtain discovery of an anonymous defendant's
4   identity under the summary judgment standard, the Cahill court required plaintiff to "submit
5   sufficient evidence to establish a *prima facie* case for each essential element of the claim in
6   question. In other words, the defamation plaintiff . . . must introduce evidence creating a genuine
7   issue of material fact for all elements . . . ." Id. at 463. The Cahill court found plaintiff had not
8   done so.

9           Notably, the Cahill case concerned alleged defamation rather than alleged copyright
10  infringement.    Defamatory speech is not entitled to First Amendment protection. Chaplinsky v.
11  State of New Hampshire, 315 U.S. 568, 572 (1942). Copyright law, however, contains certain
12  exceptions to alleged infringement, including the "Fair Use" doctrine discussed later in this brief.
13  Thus, the Cahill reasoning applies with even greater force to a claim of copyright infringement,
14  which is less harmful and more protected than defamatory speech. In addition, several courts that
15  have addressed this issue in the copyright context have also held plaintiff to this heightened standard
16  of proof before an anonymous speaker's identity will be disclosed.

17          To date, the Second Circuit is the only federal circuit court that has addressed this issue in
18  the copyright context. In Arista Records, LLC v. Doe 3, 604 F.3d 110 (2010), plaintiff sought the
19  identity of individuals who had illegally downloaded music recordings by serving a subpoena on the
20  common ISP.    Noting that the First Amendment does not "provide a license for copyright
21  infringement", the Arista court adopted a five-part test for quashing the subpoena that was set forth
22  in Sony Music Entertainment Inc. v. Does 1 – 40, 326 F. Supp. 2d 556 (S.D.N.Y. 2004), which is:

23          1 – the concreteness of the plaintiff's showing of a prima facie claim of actionable harm,

24          2 – the specificity of the discovery request,

25          3 – the absence of alternative means to obtain the subpoenaed information,

26          4 – the need for subpoenaed information to advance the claim, and

27

- 14 -
28  OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE
    TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

1      5 – the objecting party's expectation of privacy.

2 Arista, supra, 604 F.2d at 119, quoting, Sony Music, supra, 326 F. Supp. at 564 – 65 (emphasis
3 added). Thus, the Arista court also required a prima facie showing of each element of the cause of
4 action.

5      A number of district courts have required the same in the intellectual property context,
6 including several from the Northern District of California. See, e.g., Highfields, supra, 385 F. Supp.
7 2d 969 (N.D. Cal. 2011) (granting a motion to quash, stating plaintiff seeking to discover identity of
8 anonymous internet speaker must show there is real evidentiary basis for claim, including trademark
9 infringement); SaleHoo, supra, 722 F. Supp. 2d 1210, 1213-14 (W.D. Wash. 2010) (granting a
10 motion to quash, and stating "plaintiff must, in general allege a facially valid cause of action and
11 produce prima facie evidence to support all of the elements of the cause of action within his or her
12 control").

13      One particularly instructive case is Art of Living Found. v. Does 1-10, 2011 WL 5444622
14 (N.D. Cal. Nov. 9, 2011). In Art of Living, an anonymous internet poster sharply criticized the Art
15 of Living Foundation ("AOLF"), which styled itself an "international 'educational and
16 humanitarian' organization dedicated to teaching the spiritual lessons of 'His Holiness Ravi
17 Shankar.'" Id. at *1. The Doe defendants published postings that called AOLF a manipulative and
18 abusive cult, and also allegedly published AOLF's "Breate Water Sound Manual." Doe defendants
19 claimed they published the manual to "debunk the notion that Ravi Shankar is an enlightened
20 being", and that they removed the manual shortly after receiving a DMCA takedown notice. Id.
21 Plaintiff sued for copyright infringement and other claims.

22      The Art of Living court adopted the foregoing Highfields standard of proof, based on the
23 nature of the speech at issue, and quashed the subpoena. The court stated, "In choosing the proper
24 standard to apply, the district court should focus on the "nature" of the speech conducted by the
25 defendant, rather than the cause of action alleged by the plaintiff. . . . For example, a more rigorous
26 standard may be applicable where the defendant's speech is political, religious or literary, while

27

28

1  commercial speech should be subject to a lesser standard." Id. at *5. (emphasis added).

2  The court found that defendants' speech in Art of Living raised substantial First Amendment

3  concerns because it was commentary on a public issue. It thus was subject to the most rigorous

4  protections, and the Highfields standard was appropriate:

5
       Highfields establishes a two-part test for determining whether to allow discovery
6      seeking the identity of an anonymous defendant: (1) The plaintiff must produce
       competent evidence supporting a finding of each fact that is essential to a given
7      cause of action; and (2) if the plaintiff makes a sufficient evidentiary showing, the
       court must compare the magnitude of the harms that would be caused to the
8      competing interests by a ruling in favor of the plaintiff and by a ruling in favor of the
       defendant. Id. 975–76.
9

10  Art of Living, supra, 2011 WL 5444622 at * 7.

11  The Highfields court explained these two prongs as follows:

12
       It is not enough for a plaintiff simply to plead and pray. Allegation and speculation
13     are insufficient. The standards that inform Rule 8 and Rule 12(b)(6) offer too little
       protection to the defendant's competing interests. Thus, the plaintiff must adduce
14     competent evidence-and the evidence plaintiff adduces must address all of the
       inferences of fact that plaintiff would need to prove in order to prevail under at least
15     one of the causes of action plaintiff asserts. In other words, the evidence that plaintiff
       adduces must, if unrebutted, tend to support a finding of each fact that is essential to
16     a given cause of action. The court may not enforce the subpoena if, under plaintiff's
17     showing, any essential fact or finding lacks the requisite evidentiary support.

18     . . .

19     The court proceeds to the second component of the test if, but only if, the plaintiff
       makes an evidentiary showing sufficient to satisfy the court in the first component of
20     the test. If reached, the second component of the test requires the court to assess and
       compare the magnitude of the harms that would be caused to the competing interests
21     by a ruling in favor of plaintiff and by a ruling in favor of defendant.

22  Highfields, supra, 385 F. Supp. 2d at 974-76.

23  Based on this standard, the Art of Living court found that the chilling impact of disclosing

24  defendants' identities would create a substantial cost to the public. As stated in Highfields, "When

25  word gets out that the price tag of effective sardonic speech [includes disclosure of the speaker's

26  identity], that speech likely will disappear." Art of Living, supra, 2011 WL 5444622 at * 7

27

28

1   (quoting, Highfields, 385 F. Supp. 2d at 981).  The Art of Living case is squarely applicable to the
2   present case, and this court should follow its persuasive and well-supported reasoning.

3          In the instant case, as discussed in the next section, Dhillon certainly has not made such an
4   evidentiary showing.  The fair use doctrine serves as an absolute defense to copyright infringement
5   in this case.  Therefore, this Court should deny the motions and should not permit the issuance of
6   the subpoenas.

7   5.  DHILLON FAILED TO MAKE ANY SHOWING OF INFRINGEMENT IN LIGHT OF THE
8        "FAIR USE" DOCTRINE

9          To establish infringement of copyright, "two elements must be proven: (1) ownership of a
10  valid copyright, and (2) copying of constituent elements of the work that are original."  Feist
11  Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d
12  358 (1991).  See also, 17 U.S.C. § 501(a). In UMG Recordings, Inc. v. Augusto, 628 F.3d 1175,
13  1178 (9th Cir.2011), the court phrased the second element as "violation by the alleged infringer of
14  at least one of the exclusive rights granted to copyright owners by the Copyright Act."  Dhillon
15  cannot meet her burden of proof on these elements. Specifically, she cannot present sufficient
16  evidence of actual infringement.  She alleges that Doe 1 used her headshot publicity photograph in
17  an article entitled "Meet Harmeet" on The Munger Games political blog. (Cigel Decl., Exh. "D")

18         Under the "Fair Use" doctrine, this is not infringement of a copyrighted work.  As stated in
19  the Art of Living case, supra:

20

21          [E]vidence of copyright infringement does not *automatically* remove the
        speech at issue from the scope of the First Amendment. While "the First Amendment
22      does not shield copyright infringement," (citation omitted) "copyright law contains
        built-in First Amendment accommodations." Eldred v. Ashcroft, 537 U.S. 186, 219–
23      20 (2003).  Perhaps the most important is the doctrine of fair use . . . . 17 U.S.C. §
        107; see also, Elvis Presley Enters. v. Passport Video, 349 F.3d 622, 626 (9th
24      Cir.2003) ("First Amendment concerns in copyright cases are subsumed within the
        fair use inquiry.").
25

26          Art of Living, supra, 2011 WL 5444622 at *6.

27
                                              - 17 -
28  OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE
    TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

1    The "fair use" of a copyrighted work "for purposes such as criticism, comment, news

2    reporting, teaching (including multiple copies for classroom use), scholarship, or research" is not an

3    infringement of copyright.  In determining whether the use made of a work in any particular case is

4    a fair use the factors to be considered shall include--

5        **(1)** the purpose and character of the use, including whether such use is of a commercial

6        nature or is for nonprofit educational purposes;

7        **(2)** the nature of the copyrighted work;

8        **(3)** the amount and substantiality of the portion used in relation to the copyrighted work as a

9        whole; and

10       **(4)** the effect of the use upon the potential market for or value of the copyrighted work.

11   The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made

12   upon consideration of all the above factors. 17 U.S.C. § 107.

13       This exception "permits courts to avoid rigid application of the copyright statute when, on

14   occasion, it would stifle the very creativity which that law is designed to foster."  Kelly v. Arriba

15   Soft Corp., 336 F. 3d 811, 817 (9th Cir. 2003), quoting, Dr. Seuss Enters., L.P v. Penguin Books

16   USA, Inc., 109 F. 3d 1394, 1399 (9th Cir. 1997).  The Arriba Soft court also stated, "We must

17   balance these factors in light of the objectives of copyright law, rather than view them as definitive

18   or determinative tests." Arriba Soft, supra, 109 F.3d at 1399.

19       Each of these four elements will now be discussed in the following subsections.

20   A. PURPOSE AND CHARACTER OF THE USE

21       The question regarding this factor is "whether the new work merely supersede[s] the objects

22   of the original creation, or instead adds something new, with a further purpose of different

23   character, altering the first with new expression, meaning, or message; it asks, in other words,

24   whether and to what extent the new work is transformative." Campbell v. Acuff-Rose Music, Inc.,

25   510 U.S. 569, 579 (1994).  The more transformative the new work, the less important the other

26   factors, including commercialism, become." Id.  "Typically, a work created for commercial use is

27

28   - 18 -
OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE
TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

1   less likely to bear fair use protection; however, the commercial/non-commercial distinction is less
2   significant the more transformative the work is." Northland Family Planning Clinic, Inc. v. Center
3   for Bio-Ethical Reform, 868 F.Supp.2d 962, 970 (C.D. Cal. 2012).

4          Cases have consistently held that reproducing a photographic image for purposes of
5   criticism or commentary is transformative, and thus cannot constitute copyright infringement.  In
6   the Ninth Circuit Arriba Soft case, defendant was an internet search engine that displayed search
7   results in the form of thumbnail photographic images.  Plaintiff was a photographer whose photos of
8   the American West appeared in defendant's search engine results.

9          The court focused on the fact that the search engine's images served an entirely different
10  function that the original photographic images, and found no infringement. While the
11  photographer's "images are used to portray scenes . . . in an aesthetic manner, . . . Arriba's search
12  engine functions as a tool to help index and improve access to images . . . ." Arriba Soft, supra, 336
13  F.3d at 818.

14         In Hustler Magazine, Inc. v. Moral Majority, Inc.,606 F.Supp. 1526, 1536 (C.D. Cal. 1985),
15  aff'd, 796 F.2d 1148 (9th Cir. 1986), Hustler magazine brought an infringement action against a
16  fundamentalist minister for reproducing the magazine's parody ads that prominently featured the
17  minister.  The court found that the minister had reproduced the ad as part of a "broader, continuing
18  debate over pornography and other social issues" between the magazine and the minister. The court
19  found no infringement and granted summary judgment in favor of the minister.

20         The court stated, "[W]hen an act of copying occurs in the course of a political, social or
21  moral debate, the public interest in free expression is one factor favoring a finding of fair use." Id.
22  See also, Keep Thomson Governor Committee v. Citizens for Gallen Committee, 457 F.Supp. 957,
23  959–60 (D.N.H. 1978) (political committee's use of a portion of rival candidate's musical
24  composition amounted to fair use in light of public interest in full debate over election and absence
25  of injury to plaintiff).

26

27

- 19 -
28

1    The recent <u>Art of Living</u> case also discussed the fair use doctrine in the context of
2  reproducing an entire pamphlet for purposes of criticizing its author as a sham and a fraud.
3  Although the <u>Art of Living</u> court stated it did not need to decide whether the copying was fair use,
4  "the circumstances here create a substantial question as to whether the doctrine applies." <u>Art of
5  Living</u>, supra, 2011 WL 5444622 at *5. <u>See also</u>, <u>New Era Publications Intern., ApS v. Carol Pub.
6  Group</u>, 904 F.2d 152 (2d Cir.1990) (the use of copyrighted quotations in a biography of Church of
7  Scientology founder L. Ron. Hubbard was protected where the intended purpose of the work was to
8  show that "Hubbard was a charlatan and the Church a dangerous cult").

9    Several other recent district court opinions have found that using a photo for purposes of
10  criticizing the subject of the photo is fair use.  See <u>Sedgwick Claims Mgmt. Servs., Inc. v. Delsman</u>,
11  2009 WL 2157573, at *5 (N.D. Cal. 2009) (finding that defendant's use of photographs of two of
12  plaintiff's executives as a vehicle for criticizing plaintiff's alleged business practices was
13  "fundamentally different" than the original promotional reason), <u>aff'd</u>, 422 F. App'x 651 (9th Cir.
14  2011); <u>Ascend Healthcare Corp. v. Wells</u>, Slip Copy, 2013 WL 1010589 (E.D.N.C. 2013) (finding
15  use of two entire photographs fair use, on a blog criticizing the mental hospital shown in the
16  photographs); <u>Baraban v. Time Warner Inc.</u>, 54 USPQ2d 1759 (S.D.N.Y. 2000) (granting summary
17  judgment for accused infringer, which had taken an entire photograph of a nuclear plant and used it
18  in a chapter of a book criticizing the nuclear industry's and the government's portrayal of nuclear
19  power as safe).

20    In the present case, the use of Dhillon's photograph was clearly transformative.  Dhillon's
21  stated original purpose of the photo was for publicity for a political campaign, whereas The Munger
22  Games used the photo for purposes of criticizing Ms. Dhillon's political activities.  These two
23  purposes could not be more different.

24    In addition, The Munger Games did not use the photo for any commercial purpose
25  whatsoever, which increases the inference of fair use.  Instead, The Munger Games posted the photo
26  on a free internet blog for purposes of engaging in political debate over an issue of public concern.

27

- 20 -
28  OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE
   TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

1  The Munger Games' use is, therefore, is at the very core of the First Amendment. It is subject to the
2  most rigorous protection.

3  ## B. NATURE OF THE COPYRIGHTED WORK

4  The Ninth Circuit has described this factor well in the Arriba Soft case, stating:

5  Works that are creative in nature are closer to the core of intended copyright
6  protection than are more fact-based works." Photographs that are meant to be viewed
   by the public for informative and aesthetic purposes . . . are generally creative in
7  nature. The fact that a work is published or unpublished also is a critical element of
   its nature. Published works are more likely to qualify as fair use because the first
8  appearance of the artist's expression has already occurred.

9  Arriba Soft, supra, 336 F.3d at 820, quoting, Harper & Row Publishers, Inc. v. Nation Enters., 471
10 U.S. 539, 564 (1985) (noting that the scope of fair use is narrower with respect to unpublished
11 works because the author's right to control the first public appearance of his work weighs against
12 the use of his work before its release).

13     In this case, Dhillon has, by her own allegations, extensively published and released her
14 publicity headshot photo to the general public over the course of the past several years. As she
15 freely admits in Paragraph 14 of her Complaint, "Ms. Dhillon has used the 2008 Photograph,
16 including the Headshot Photograph, in connection with her campaign for Member of the State
17 Assembly, beginning in or around June 2008, as well as in connection with her subsequent
18 campaigns, political activities, and various professional marketing efforts." (Complaint at ¶ 14,
19 Doc. 1).

20     Therefore, the single isolated use of Dhillon's widely published headshot publicity is more
21 likely to be fair use than not, especially because she is a political public figure. In addition,
22 although a photographer's use of lighting or angle or setting sometimes may be deemed "creative",
23 Dhillon's purpose in commissioning the photo (which seems to have been taken outside with her
24 standing in sunlight next to a building) was for campaign publicity. (Complaint at ¶ 11, Doc. 1).
25 The subject photo was obviously for the purpose of identification and face recognition rather than
26 creative aesthetics. Thus, this factor weighs in The Munger Games' favor as well.

27

28
OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE
TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

1

C. AMOUNT AND SUBSTANTIALITY OF PORTION USED

2       As stated in Arriba Soft, "the extent of permissible copying varies with the purpose and
3   character of the use. (citation omitted) If the secondary user only copies as much as is necessary for
4   his or her intended use, then this factor will not weigh against him or her." Arriba Soft, supra, 336
5   F.3d at 820 – 821. The Arriba Soft court continued, "It was necessary for Arriba to copy the entire
6   image to allow users to recognize the image and decide whether to pursue more information. . . . If
7   Arriba only copied part of the image, it would be more difficult to identify it, thereby reducing the
8   usefulness of the visual search engine." Id. at 821.

9       In the present case, the purpose of The Munger Games' use of the photograph was to allow
10  readers to identify Dhillon, the subject of the political blog article. It is impossible to use only a
11  portion of that tightly-cropped headshot photograph. It should be beyond dispute that The Munger
12  Games copied only as much of the photo as was necessary.

13

D. EFFECT OF THE USE UPON THE POTENTIAL MARKET FOR OR VALUE OF THE
14          COPYRIGHTED WORK

15      In discussing this factor, the Arriba Soft court stated that courts should consider whether the
16  alleged copying harmed the copyright owner's market, or would have a substantial adverse impact
17  on the potential market for the original. Id. at 821. In this case, there simply is no market for
18  Dhillon's widely-used and now out-of-date publicity headshot photograph. She cannot identify any
19  market and has never alleged that she sells her publicity headshot for profit. On the contrary, as
20  already stated, she widely used the photo in political campaigns and in marketing efforts.

21      Doe 1 cannot conceive of any market that is harmed by copying a widely published publicity
22  headshot into a political blog for purposes of political debate. By its nature, a publicity photo is
23  distributed free and in mass for purposes of generating media attention and notoriety. In addition,
24  that photograph has been removed from the "Meet Harmeet" article on mungergames.net. (Cigel
25  Decl., Exhibit "D"). Thus, this factor weighs in mungergames.net's favor as well.

26

27

- 22 -

28  OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE
    TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

1    In summary, each of the four "Fair Use" factors weigh heavily in finding that there was no
2  copyright infringement. The photo was used for First Amendment political commentary, a purpose
3  very different from the original purpose of campaign publicity, and therefore "transformative." The
4  photo had been widely distributed and published prior to its appearance on mungergames.net, which
5  copied only as much of the photo as was necessary, and there was no impact on any potential
6  market for a photo that was used for publicity rather than sold.

7    Thus, because The Munger Games' alleged copying was "Fair Use", there is no copyright
8  infringement as a matter of law. Dhillon cannot present any evidence to counter a finding of fair
9  use, and she could not withstand a motion for summary judgment as required for political speech.

10  6.  DOE 1, AND ANY OTHERS ASSOCIATED WITH THE MUNGER GAMES, WOULD

11      SUFFER GREAT HARM IF THEIR IDENTITY WERE DISCLOSED

12    As stated in the cases discussed above, even if a plaintiff submits sufficient evidence of
13  infringement, courts should still balance the potential harm to the defendant against the plaintiff's
14  need for disclosure of his identity. See, e.g., SaleHoo, supra, 722 F. Supp. 2d at 1216-17;
15  Highfields, supra, 385 F.Supp.2d at 975 – 76 (court should "assess and compare the magnitude of
16  the harms that would be caused to the competing interests by a ruling in favor of plaintiff and by a
17  ruling in favor of defendant.")

18    As noted by the Cahill court, a plaintiff could bring a non-meritorious action against an
19  anonymous defendant, knowing they will lose, but still be successful in their main goal: unmasking
20  their critic's identity. "After obtaining the identity of an anonymous critic through the compulsory
21  discovery process, a . . . plaintiff who either loses on the merits or fails to pursue a lawsuit is still
22  free to engage in extra-judicial self-help remedies; more bluntly, the plaintiff can simply seek
23  revenge or retribution." Cahill, supra, 884 A.2d at 457 (emphasis added). That is one of the
24  primary reasons the Cahill court adopted a "summary judgment" standard of proof for political
25  speech, rather than the lower good faith standard. Id.

26

27

28

1    Similarly, in this case, Dhillon's $250 copyright infringement claim does not appear sincere.
2  It is merely a vehicle to serve multiple subpoenas to unmask the identity of the Doe defendants, and
3  thereby chill free speech under the First Amendment. In addition, as Dhillon certainly knows, she
4  is not even entitled to the attorneys' fees she seeks in her Complaint, nor to any statutory damages.
5  Mungergames.net's alleged infringement occurred on February 12, 2013. However, Dhillon did not
6  seek to register her copyright until February 21, 2013, when she submitted her complete application.
7  (Complaint at ¶¶ 15, 17, Doc. 1).

8    Where a copyright owner fails to register its work within three months of publication and the
9  purported infringement occurs prior to registration, the copyright owner is not entitled to statutory
10  damages or attorney's fees. 17 U.S.C. § 412.

11    Thus, this case cannot be about a true interest in protecting a copyright, or seeking
12  compensation. Instead, this case consist entirely of improper intent to seek the identity of, and then
13  seek revenge against, someone who is critical of Dhillon's and Munger's politics. "The spirit of the
14  First Amendment applies to the copyright laws at least to the extent that the courts should not
15  tolerate any attempted interference with the public's right to be informed regarding matters of
16  general interest when anyone seeks to use the copyright statute which was designed to protect
17  interests of quite a different nature." Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d
18  303, 311 (2d Cir. 1966) (Lombard, J. and Hays, J., concurring).

19    In the Rosemont case, the Court of Appeals reversed the grant of an injunction, on copyright
20  grounds, to a Howard Hughes-owned entity that had sought to prevent publication of a biography
21  that was critical of Hughes. Id. The concurring Justices found it significant that the record "pointed
22  to the existence of a scheme developed by Hughes and his attorneys and employees to prevent the
23  publication of any biography of Hughes and, in particular, the [critical] biography. Id. at 311 - 12.

24    Similarly, in this case, the reasonable inference from Dhillon's complaint is that this matter
25  is not about copyright infringement at all. Dhillon was not selling her headshot, but was instead
26  publishing it freely to anyone who would give her campaign publicity. Even so, Dhillon is so

27

- 24 -

28  OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE
     TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

determined to find out who is behind The Munger Games blog that she is now seeking a subpoena against Google in Sacramento and subpoena against Schroeder in Orange.

Thus, the potential harm to Doe 1 and others is great. By contrast, the potential harm to Dhillon if the Administrative Motions are denied is nonexistent. The cost to Dhillon of pursuing this matter to judgment is exponentially greater than the \$250 in damages she seeks. Balancing these competing interests, this Court should deny the motions.

7.  CONCLUSION

For all the foregoing reasons, Doe 1 and Schroeder respectfully request this Court to deny both Administrative Motions. Dhillon should not be allowed to use this lawsuit, and her invasive subpoenas against anonymous political bloggers, as a tool to further Munger's intention in squashing vital political discourse.

Dated: October 1, 2013          **KARLIN & KARLIN**

By: _____
Marc A. Karlin
Attorneys for
DEFENDANT DOE 1 AND THIRD-PARTY
MICHAEL J. SCHROEDER

- 25 -
OPPOSITION OF DOE 1 AND MICHAEL J. SCHROEDER TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE TO TAKE LIMITED DISCOVERY, Case No. 13-cv-01465 SI

1    PROOF OF SERVICE

2    UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    CASE NAME:  **HARMEET K. DHILLON v. DOE 1**
4    CASE NO.      **C 13-1465 SI**

5         The undersigned declares: I am a resident of the United States and am employed in the
6    City and County of Los Angeles, State of California; I am over the age of eighteen years and
     not a party to the within action; my business address is 10866 Wilshire Boulevard, Suite 400,
7    Los Angeles, California 90024.

8         On October 1, 2013, I served the following documents:

9    1.   **DECLARATION OF RICK A. CIGEL**

10   2.   **MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANT DOE 1  AND
          THIRD-PARTY MICHAEL J. SCHROEDER IN OPPOSITION TO PLAINTIFF'S**
11        **ADMINISTRATIVE MOTIONS FOR LEAVE TO TAKE LIMITED DISCOVERY PRIOR
          TO A RULE 26(f) CONFERENCE**
12
13   3.   **CERTIFICATTION OF INTERESTED ENTITIES OR PERSONS**

14   By serving in the manner described below to the interested parties herein and addressed to:

15   Harold P. Smith                          Joel Voelzke
     Krista L. Shoquist                       Intellectual Property Law Office of Joel Voelzke
16   Dhillon & Smith, LLP                     24772 W. Saddle Peak Road
     177 Post Street, Suite 700               Malibu, CA 90265-3042
17   San Francisco, CA 94108
                                              *Attorney for New Dream Network*
18   *Attorneys for Dhillon*

19   ☒   **ELECTRONIC MAILING:** I emailed copies of all documents to the above party(s) at their
20       respective email addresses as shown above.

21   ☒   **MAIL:** I caused such envelope(s) to be deposited in the mail at my business address, with
         postage thereon fully prepaid, addressed to the addressee(s) designated. I am readily familiar
22       with the business practice of collecting and processing correspondence to be deposited with the
         United States Postal Service on that same day in the ordinary course of business.
23
24   ☒   **(FEDERAL):** I declare that I am employed by the office of a member of the bar of this court at
         whose direction the service was made.

25       Executed on October 1, 2013 at Los Angeles, California.
26
27                                                        _____
                                                          Michael B. Kadish
28

                                              1
                                        Proof of Service