# EXHIBIT H

Rick A. Cigel, Esq. (SBN 105424)
THE CIGEL LAW GROUP, P.C.
10866 Wilshire Blvd., Suite 400
Los Angeles, California 90024
Tel: (424) 901-8513
Fax:  (424) 901-8514

Attorneys for Defendant
DOE 1



FILED
CLERK, U.S. DISTRICT COURT

SEP 2 0 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

CV 13-07003- JFW
(MANx)

| | |
|---|---|
| HARMEET K. DHILLON, an individual,<br><br>                    Plaintiff,<br><br>          vs.<br><br>DOE 1, an unknown individual, and DOES 2 through 10,<br><br>                    Defendants. | NOTICE OF MOTION AND MOTION BY DEFENDANT DOE 1 TO QUASH SUBPOENA ISSUED IN CENTRAL DISTRICT OF CALIFORNIA TO NEW DREAM NETWORK, LLC<br><br>[Concurrently filed with Declaration of Rick A. Cigel]<br><br>(Action pending in the Northern District of California: Case No.13-cv-01465-JCS)<br>Date : 10 31 2013<br>Time: 1:30 pm<br>Place  Courtroom 16 |

TO ALL PARTIES HEREIN AND TO THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE** that Defendant DOE 1, an anonymous and
unserved party, hereby moves pursuant to F.R.C.P. 45(c) to quash a subpoena served
on non-party New Dream Network, LLC.  The subpoena was issued in the Central
District of California on July 22, 2013 regarding an action that is pending in the
Northern District of California.  Doe 1 files this motion under the fictitious name
because his or her anonymity is critical to the political blog that is the subject of this
lawsuit.

This Motion is based upon this Notice of Motion and Motion to Quash, the
accompanying Memorandum of Points and Authorities, the Declaration of Rick A.

Cigel, the Proposed Order, all pleadings and papers on file in this action, and upon such other matters as may be presented to the Court at the time of the hearing.

Dated:  September 20, 2013            **THE CIGEL LAW GROUP, P.C.**


By: _____
    Rick A. Cigel
    Attorneys For Defendant
    DOE 1

1

# TABLE OF CONTENTS

2

3    I.   INTRODUCTION AND FACTUAL BACKGROUND ......................................... 1

4    II. MEET AND CONFER REQUIREMENTS HAVE BEEN MET ........................... 4

5    III. DOE 1 HAS STANDING TO BRING THIS MOTION ......................................... 5

6

7    IV. THIS COURT SHOULD QUASH A SUBPOENA THAT REQUIRES
     DISCLOSURE OF PROTECTED INFORMATION ............................................... 5

8

9    V. THE SPEECH AND IDENTITY OF DOE 1 ARE PROTECTED BY THE
     FIRST AMENDMENT ............................................................................................ 6

10

11   VI. DOE 1'S FIRST AMENDMENT RIGHTS OUTWEIGH DHILLON'S
     PURPORTED NEED FOR DISCLOSURE ............................................................. 8

12

13   VII. DHILLON FAILED TO MAKE A SUFFICIENT SHOWING OF
     INFRINGEMENT IN LIGHT OF THE "FAIR USE" DOCTRINE ................... 16

14

15       A. PURPOSE AND CHARACTER OF THE USE. .............................................. 17

16       B. NATURE OF THE COPYRIGHTED WORK .................................................. 20

17       C. AMOUNT AND SUBSTANTIALITY OF PORTION USED ....................... 21

18

19       D. EFFECT OF THE USE UPON THE POTENTIAL MARKET FOR OR
         VALUE OF THE COPYRIGHTED WORK ..................................................... 21

20

21   VIII. DOE 1 WOULD SUFFER GREAT HARM IF HIS IDENTITY WERE
     DISCLOSED ........................................................................................................... 22

22

23   IX. CONCLUSION ......................................................................................................... 24

24

25

26

27

28

EXHIBIT H Page 3

1

**TABLE OF AUTHORITIES**

2

Cases

3    Arista Records, LLC v. Doe 3, 604 F.3d 110 (2d Cir. 2010) .............................8, 12, 13

4    Art of Living Found. v. Does 1-10, 2011 WL 5444622 (N.D. Cal. 2011) .......... passim

5    Ascend Healthcare Corp. v. Wells, 2013 WL 1010589 (E.D.N.C. 2013) ....................19

6    Baraban v. Time Warner Inc., 54 USPQ2d 1759 (S.D.N.Y. 2000) ............................19

7    Broadcort Capital Corp. v. Flagler Sec., 149 F.R.D. 626 (D. Colo. 1993) ...................5

8    Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994). .......................................17

9    Chaplinsky v. State of New Hampshire, 315 U.S. 568 (1942). ...................................12

10   Doe v. 2TheMart.com Inc., 140 F. Supp. 2d 1088 (W.D. Wash. 2001) ....................6, 7

11   Doe v. Cahill, 884 A.2d 451 (Del.2005) .............................................................9, 12, 23

12   Dr. Seuss Enters., L.P v. Penguin Books USA, Inc., 109 F. 3d 1394

13      (9th Cir. 1997) .....................................................................................................17

14   Eldred v. Ashcroft, 537 U.S. 186 (2003) .....................................................................16

15   Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340 (1991) ...........16

16   Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539 (1985) .....................20

17   Highfields Capital Management, L.P v. Doe, 385 F. Supp. 2d 969

18      (N.D. Cal. 2005) ................................................................................ ..5, 8, 13, 15, 22

19   Hustler Magazine, Inc. v. Moral Majority, Inc., 606 F.Supp. 1526

20      (C.D. Cal. 1985) ....................................................................................................18

21   In re Anonymous Online Speakers, 661 F.3d 1168 (9th Cir. 2011) ...............7, 9, 10, 11

22   UMG Recordings, Inc. v. Augusto, 628 F.3d 1175 (9th Cir.2011) .............................16

23   Keep Thomson Governor Committee v. Citizens for Gallen Committee,

24      457 F.Supp. 957 (D.N.H. 1978) ............................................................................18

25   Kelly v. Arriba Soft Corp., 336 F. 3d 811 (9th Cir. 2003) ....................... 17, 18, 20, 21

26

27

28

1   Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League,

2       89 F.R.D. 489 (C.D. Cal.1981)..................................................................9

3   McIntyre v. Ohio Elections Comm'n, 514 U.S. 334 (1995)................................6, 7, 8

4   Meyer v. Grant, 486 U.S. 414 (1988) ..........................................................7

5   NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 461 (1958)...................9

6   New Era Publications Intern., ApS v. Carol Pub. Group, 904 F.2d 152

7       (2d Cir.1990)............................................................................................19

8   Northland Family Planning Clinic, Inc. v. Center for Bio-Ethical Reform,

9       868 F.Supp.2d 962 (C.D. Cal. 2012). ........................................................18

10  Perry v. Schwarzenegger,  591 F.3d 1147 (9th Cir. 2010) ...........................7

11  Reno v. ACLU, 521 U.S. 844 (1997).............................................................7

12  Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303

13      (2d Cir. 1966)............................................................................................23

14  SaleHoo Grp., Ltd. v. ABC Co., 722 F. Supp. 2d 1210

15      (W.D. Wash. 2010) ...........................................................................9, 13, 22

16  Sedgwick Claims Mgmt. Servs., Inc. v. Delsman, 2009 WL 2157573

17      (N.D. Cal. 2009)........................................................................................19

18  SI03, Inc. v. Bodybuilding.com, LLC, 441 F. App'x 431 (9th Cir. 2011)...................11

19  Snedigar v. Hoddersen, 114 Wash.2d 153 (1990) ........................................9

20  Sony Music Entertainment Inc. v. Does 1 – 40, 326 F. Supp. 2d 556

21      (S.D.N.Y. 2004)........................................................................................13

22  Talley v. California, 362 U.S. 60 (1960).........................................................6

23  Zito v. Steeplechase Films, Inc. 267 F. Supp. 2d 1022 (N.D. Cal. 2003) ...................16

24

25  Statutes

26  17 U.S.C. § 107 ...............................................................................................17

27  17 U.S.C. § 412 ...............................................................................................23

28  17 U.S.C. § 501(a)..........................................................................................16

1    F.R.C.P. 45(c)...............................................................................................................5

2    F.R.C.P. 45(c)(3)(A)(iii) ..............................................................................................5

3    Fed. R. Civ. P. 45(c)(3)(A)...........................................................................................8

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## **MEMORANDUM OF POINTS AND AUTHORITIES**

2

I. INTRODUCTION AND FACTUAL BACKGROUND

3      Although this lawsuit is held out as an ordinary copyright infringement case, its
4   existence and narrow agenda are quite sinister.  The suit has a single purpose:  to
5   harass and bully anonymous political commentators who write critical articles on an
6   internet blog.  Plaintiff Harmeet Dhillon ("Dhillon"), a San Francisco litigation
7   attorney, filed the suit so that she can serve subpoenas forcing these anonymous
8   bloggers to reveal their identities.  The authors would then be subjected to financial
9   and political retaliation for their articles.   Dhillon's actions are the quintessential
10   conduct that is banned by California's anti-SLAPP law.

11      These political bloggers are writing revealing articles about one of the richest
12   activists in California politics, Charles Munger, Jr.[1]  Munger is the chairman of the
13   Santa Clara County Republican Party.  Since January 1, 2012, Munger reportedly
14   donated more than $42,000,000 on his political projects.

15      Many people believe that Munger has used his enormous family fortune to do
16   great damage to California and to its politics.  A political blog was created in January
17   2013 to educate readers about Munger's activities.  The blog is called "The Munger
18   Games" [2] and is located on the internet at www.mungergames.net.  The blog is a pure
19   exercise of First Amendment rights to write anonymously regarding Munger's
20   political tactics and the harm they are causing to California.  Munger does not like

21

22

23   [1] Munger is the son of Charles Munger, the billionaire Vice-Chairman of Warren
24   Buffet's company, Berkshire Hathaway Corporation.  A true and correct copy of the
     inaugural article written about Munger is attached to the concurrently-filed
25   Declaration of Rick A. Cigel ("Cigel Dec.") as Exhibits "A" and "B".

26

27   [2] This motion offers no information about the number or gender of bloggers or other
     individuals involved in The Munger Games.  The use of plural references and male
28   pronouns in this brief has no significance.

EXHIBIT H Page 7

1   the articles and wants them stopped.  However, he cannot punish the authors until he
2   learns their identities.

3       In order to learn the bloggers' identity, this lawsuit was filed by his attorney,
4   Dhillon.  Dhillon is the current Vice Chairperson of the California Republican Party
5   and a long time unsuccessful candidate for public office.[3]

6       Mungergames.net ran an article about Dhillon on February 12, 2013 and posted
7   a publicity headshot photograph of her that was found on the internet from a previous
8   political campaign.  Cigel Decl, Exhibit "D".  Dhillon and Munger formed the
9   strategy that she would sue the website in order to learn the identities of its bloggers.
10  However, Dhillon knew she had not registered a copyright on the photograph.  In
11  order to heighten the indignation in her pleadings, she delayed her filing for a short
12  time while she rushed out to register the copyright.  She then filed her copyright
13  lawsuit on April 2, 2013 in the United States District Court for the Northern District
14  of California.  The suit was filed by Dhillon's own San Francisco law firm, Dhillon &
15  Smith LLP.  Cigel Decl, Exhibit "E".

16  **Despite all of Dhillon's indignation in her pleadings, she knows that she**
17  **has a de minims damage claim.  Dhillon spent all the time and money to sue in**
18  **federal court for actual damages of only $250.00.**

19      Once the suit was filed, Dhillon and Munger quickly and aggressively revealed
20  the real reason for filing this lawsuit, which is to force the bloggers to reveal their
21  identity:

22          1) Dhillon served a subpoena on New Dream Network, LLC, the
23      Southern California company that hosts the website for Mungergames.net.  The
24

25  [3] In 2012, Munger was Dhillon's single largest political contributor, donating $7,500
26  to her failed election for a state senate seat.  Attached hereto as Exhibit "C" is a true
27  and correct copy of a report from the website www.votesmart.org.  It shows Charles
    Thomas Munger, Jr. as the top contributor to Dhillon's 2012 campaign finances at
28  $7,500.00.

1    subpoena was issued on April 11, 2013 and commands the production of all

2    information identifying the Doe defendants. Cigel Decl., Exhibit "F";

3        2) Dhillon filed an unsuccessful administrative motion to compel

4    compliance with that subpoena. The Court denied the motion because it had no

5    jurisdiction under F.R.C.P. 45 to enforce a subpoena against a Southern

6    California company. Cigel Decl., Exhibit "G";

7        3) On July 22, 2013, Dhillon had the instant subpoena issued out of the

8    Central District of California against New Dream Network, LLC. This is the

9    subpoena that is the subject of this motion. Cigel Decl., Exhibit "H";

10       4) On August 26, 2013, in her Northern District of California lawsuit,

11   Dhillon filed an Administrative Motion For Leave To Take Limited Discovery

12   On Google, Inc. Prior To A Rule 26(f) Conference. In that motion, she stated

13   the urgent need to have the Court issue subpoenas against Google, Inc. and

14   Michael John Schroeder, a former chairman of the California Republican Party.

15   The subpoenas address not only the identity of the individuals at

16   Mungergames.net, but also all account information for two email addresses she

17   believes are associated with Mungergames.net. The proposed subpoena

18   commands production of "the name, address and phone number of the

19   owner(s) of these email addresses, and the IP address(es) from which the

20   user(s) created the accounts and signed in and signed out, with dates and

21   times." Cigel Decl., Exhibit "I"

22       5) Dhillon not only wants the identity of the persons associated with the

23   IP addresses, she wants to force Mr. Schroeder to produce "any communication

24   between Schroeder and any such individual concerning the "Meet Harmeet"

25   post, from February 12, 2013 to present." Under the guise of innocently

26   needing to learn the identity of Doe defendants, Dhillon now wants to conduct

27   sweeping discovery regarding nine months of communications. Cigel Decl.,

28   Exhibit "J".

- 3 -
DEFENDANT DOE 1's MOTION TO QUASH SUBPOENA

1    Dhillon plainly is using this lawsuit as an artifice to conduct that discovery, and
2  will deliver any such information to Munger for his use. Munger has already
3  demonstrated that he uses his enormous wealth to crush political commentators and
4  adversaries, as he is pursing nearly $250,000 in attorney's fees against a political
5  critic who has an annual salary of $6,000.

6    Dhillon's tactics are not proper and the subpoena should be quashed. Doe 1
7  has done nothing more than exercise his[4] First Amendment right to free speech.
8  Courts in the past several years have consistently held that internet speech is entitled
9  to the same protection as any other kind of speech. Political speech receives the
10 highest level of First Amendment protection regardless of the forum. Courts have
11 also recognized that a person has First Amendment rights to remain anonymous in
12 critical speech.

13    Due to these stringent constitutional protections, courts have required that
14 anyone seeking to compel disclosure of an anonymous political speaker's identity
15 must make a strong evidentiary showing of each and every element of a cause of
16 action before disclosure will be ordered. Most recently, the Ninth Circuit has adopted
17 the "summary judgment" standard of proof in the context of political speech.

18    As is discussed below, Dhillon cannot meet this standard of proof in her
19 copyright action, because Mungergames.net's use of her headshot photograph is "Fair
20 Use". Thus, Doe 1 respectfully requests that this Court quash this subpoena.

21    II. <u>MEET AND CONFER REQUIREMENTS HAVE BEEN MET</u>

22    This motion is made following the conference of counsel pursuant to Local
23 Rule 7-3 which took place on July 18 and 19, 2013. Counsel for New Dream
24 Network sent a letter to Dhillon's counsel stating that a motion to quash this subpoena
25 would be filed. Dhillon's counsel replied by letter that New Dream Network "has
26

27 [4] To further protect Doe 1's anonymity, the pronoun "he" will be used without regard
28 for whether Doe 1 is male or female.

- 4 -
DEFENDANT DOE 1's MOTION TO QUASH SUBPOENA

EXHIBIT H Page 10

been properly served with a Court-approved subpoena and we expect and will insist on compliance." (Cigel Decl., Exhs. "K" and "L").

## III. DOE 1 HAS STANDING TO BRING THIS MOTION

F.R.C.P. 45(c) requires this Court to "protect *all persons* from undue burden imposed by the use of the subpoena power." Id., Advisory Committee Notes to 1991 Amendments (emphasis added); Broadcort Capital Corp. v. Flagler Sec., 149 F.R.D. 626, 628 (D. Colo. 1993). A third party whose privacy interests are affected by the subpoena thus has standing to assert the privilege by motion to quash. Id.

The First Amendment confers just such a privacy interest – a constitutional right to speak anonymously. Therefore, an anonymous speaker who claims that disclosure of his identity would violate his First Amendment right to anonymity has standing to move to quash that discovery. Highfields Capital Management, L.P v. Doe, 385 F. Supp. 2d 969, 971 (N.D. Cal. 2005) (granting anonymous speaker's motion to quash subpoena to ISP).

## IV. THIS COURT SHOULD QUASH A SUBPOENA THAT REQUIRES DISCLOSURE OF PROTECTED INFORMATION

F.R.C.P. 45(c)(3)(A)(iii) states that, on timely motion, the issuing court *must* quash or modify a subpoena that . . . requires disclosure of privileged or other protected matter, if no exception or waiver applies." Doe 1 has brought this motion within the time frame set forth in the Amended Order Granting Plaintiff's *Ex Parte* Application, which required New Dream Network to serve the subpoena on mungergames.net within 30 days, and allowed an additional 30 days for the filing of any motion contesting the subpoena. (Cigel Decl., Exhibit "H", attached to subpoena).

The subpoena is dated July 22, 2013. Although it is not clear when Dhillon served New Dream Network, this motion is timely filed within 60 days of the subpoena date.

In addition, this motion to quash raises important privacy considerations

- 5 -
DEFENDANT DOE 1's MOTION TO QUASH SUBPOENA

EXHIBIT H Page 11

implicated by the First Amendment's protection of free speech, including the identity of an anonymous speaker. Thus, this motion falls within the mandatory provisions of the motion to quash statute.

## V. THE SPEECH AND IDENTITY OF DOE 1 ARE PROTECTED BY THE FIRST AMENDMENT

It is well established that the First Amendment protects the right to anonymous speech. McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 342 (1995) ("An author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment."). The U.S. Supreme Court stressed that "Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all." Talley v. California, 362 U.S. 60, 64 (1960). "Anonymous speech is a great tradition that is woven into the fabric of this nation's history." Doe v. 2TheMart.com Inc., 140 F. Supp. 2d 1088, 1092 (W.D. Wash. 2001) (referring to the Federalist Papers).

In the context of political speech, the Supreme Court has recognized that First Amendment protection is especially critical. "Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent. Anonymity is a shield from the tyranny of the majority. It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 357 (1995) (citations omitted).

"When speech touches on matters of public political life, such as debate over the qualifications of candidates, discussion of governmental or political affairs, discussion of political campaigns, and advocacy of controversial points of view, such speech has been described as the "core" or "essence" of the First Amendment." Doe

1  v. 2TheMart.com Inc., supra, 140 F. Supp. at 1092-93 (emphasis added), citing,
2  McIntyre, supra, 514 U.S. at 346–47.

3       The Ninth Circuit agrees that it is crucial to protect political speech. "Given
4  the importance of political speech in the history of this country, it is not surprising
5  that courts afford political speech the highest level of protection." In re Anonymous
6  Online Speakers, 661 F.3d 1168, 1173 (9th Cir. 2011), citing, Meyer v. Grant, 486
7  U.S. 414, 422, 425 (1988).  The Court stressed that the First Amendment protection
8  of "core political speech" is "at its zenith".

9       This fundamental right enjoys the same protections whether the context for
10  speech is a political leaflet or an Internet blog.  Reno v. ACLU, 521 U.S. 844, 870
11  (1997) (there is "no basis for qualifying the level of First Amendment scrutiny that
12  should be applied to" the Internet).

13       The First Amendment protects not only the content of the political speech, but
14  the identity of the speaker.  "As with other forms of expression, the ability to speak
15  anonymously on the Internet promotes the robust exchange of ideas and allows
16  individuals to express themselves freely without 'fear of economic or official
17  retaliation ... [or] concern about social ostracism.' " Anonymous Online Speakers,
18  supra, 661 F.3d. at 1173 (citing McIntyre, supra, 514 U.S. at 341–42).

19       As stated in Art of Living Foundation v. Does 1 – 10, 2011 WL 5444622
20  (N.D. Cal. 2011):

21       First, to the extent that [the speaker's] anonymity facilitates free speech,
22       the disclosure of his identity is itself an irreparable harm. See, Perry v.
23       Schwarzenegger,  591 F.3d 1147, 1158 (9th Cir. 2010)("One injury to
24       Proponents' First Amendment rights is the disclosure itself. Regardless
25       of whether they prevail at trial, this injury will not be remediable on
26       appeal."). As the Supreme Court has explained, "an advocate may
27       believe her ideas will be more persuasive if her readers are unaware of
28       her identity. Anonymity thereby provides a way for a writer who may be

1    personally unpopular to ensure that readers will not prejudge her
2    message simply because they do not like its proponent." McIntyre, supra,
3    514 U.S. at 342. The Highfields court put it more succinctly:
4    "Anonymity liberates." Highfields Capital Management, L.P v. Doe, 385
5    F. Supp. 2d 969 (N.D. Cal. 2005). Insofar as [the speaker] may garner a
6    larger audience by employing a pseudonym, unveiling his true identity
7    diminishes the free exchange of ideas guaranteed by the Constitution.
8    Art of Living, supra, 2011 WL 5444622 at *9.

9    In this case, there is no question that the content of Mungergames.net is
10   political speech. The blog discusses qualifications of political candidates, political
11   activity and campaigns, and addresses controversial issues of public interest. As
12   such, it is the very essence of the First Amendment, and subject to its most rigorous
13   protections. In turn, the identity of the author of Mungergames.net is protected by the
14   First Amendment.

15   This Court therefore should not enforce a subpoena seeking the author's
16   identity without first addressing the constitutional implications. As discussed in
17   detail in the next section, this Court should first require Dhillon to produce evidence
18   establishing each and every element of her alleged copyright claim. The Court should
19   then engage in the required balancing test and quash the subpoena served on New
20   Dream Network, LLC.

21   VI. DOE 1'S FIRST AMENDMENT RIGHTS OUTWEIGH DHILLON'S
22   PURPORTED NEED FOR DISCLOSURE

23   Because anonymity is protected by the First Amendment, a court should quash
24   or modify a subpoena designed to breach anonymity. See Fed. R. Civ. P. 45(c)(3)(A)
25   (the "issuing court must quash or modify a subpoena" when it "requires disclosure of
26   privileged or other protected matter, if no exception or waiver applies"). Arista
27   Records, LLC v. Doe 3, 604 F.3d 110, 118 (2d Cir. 2010).

28

1   Numerous cases have discussed the limitations on the subpoena power when
2   that power is invoked in such a manner that it impacts First Amendment rights. See,
3   e.g., NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 461 (1958) (discussing the
4   First Amendment implications of a civil subpoena to disclose the membership list for
5   the NAACP); Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League, 89
6   F.R.D. 489 (C.D. Cal.1981) (discussing the First Amendment implications of a civil
7   subpoena to disclose the names of confidential journalistic sources); Snedigar v.
8   Hoddersen, 114 Wash.2d 153, 786 P.2d 781 (1990) (discussing the First Amendment
9   implications of a civil subpoena to disclose the meeting minutes of a political
10  association).

11  The subject of anonymous internet speech was discussed in SaleHoo Grp., Ltd.
12  v. ABC Co., 722 F. Supp. 2d 1210, 1213-14 (W.D. Wash. 2010).   That court
13  acknowledged that while federal district courts have adopted different standards
14  regarding the issue, the common theme is that the plaintiff must make a factual
15  showing that the case has merit before a court will enforce a subpoena that infringes
16  First Amendment rights.

17  Since the time of SaleHoo, the Ninth Circuit has addressed the issue and given
18  a nod to the highest standard of proof when political speech is concerned.   In
19  Anonymous Online Speakers, the Ninth Circuit stated, "the many federal district and
20  state courts that have dealt with this issue have employed a variety of standards to
21  benchmark whether an anonymous speaker's identity should be revealed." Supra at
22  1175.   In order to avoid compromising First Amendment rights in a baseless lawsuit,
23  the Ninth Circuit discussed the many standards of proof courts have employed,
24  ranging from a good faith showing, to a prima facie showing, to a motion to dismiss
25  standard.  The court then stated:

26      The district court in this case applied the most exacting standard,
27      established by the Delaware Supreme Court in Doe v. Cahill, 884 A.2d
28      451 (Del.2005). The Cahill standard requires plaintiffs to be able to

1  survive a hypothetical motion for summary judgment and give, or
2  attempt to give, notice to the speaker before discovering the anonymous
3  speaker's identity. Id. at 461. The court in Cahill therefore required that
4  the city councilman plaintiff " 'submit sufficient evidence to establish a
5  *prima facie* case for each essential element' " of his defamation claim.
6  Id. at 463 (citation omitted). The court pointed to its "concern[ ] that
7  setting the standard too low will chill potential posters from exercising
8  their First Amendment right to speak anonymously," Id. at 457, and
9  reasoned that "the summary judgment standard more appropriately
10  balances a defamation plaintiff's right to protect his reputation and a
11  defendant's right to speak anonymously." Id. at 462.

12  Anonymous Online Speakers, supra, 661 F.3d at 1175 – 76.

13  The Ninth Circuit further held "that the nature of the speech should be a driving
14  force in choosing a standard by which to balance the rights of anonymous speakers in
15  discovery disputes." Id. at 1177. The court noted that the speech at issue in
16  Anonymous Online Speakers was purely commercial speech, and thus "should be
17  afforded less protection than political, religious, or literary speech." Id.

18  In the end, the Anonymous Online Speakers court affirmed the lower court's
19  order to disclose some of the anonymous identities, and not to disclose some of the
20  other anonymous identities. The court emphasized that its ruling was based primarily
21  on the extremely limited nature of appellate review under a writ of mandamus, which
22  is an "'extraordinary' remedy limited to 'extraordinary' causes." Id. at 1173. That
23  highly deferential standard, combined with the lower protection for commercial
24  speech, guided the appellate decision to let the disclosure order stand. Id. at 1177.

25  However, the Anonymous Online Speakers did make an important
26  pronouncement regarding the standard for political speech, which is at issue in the
27  present case. The court noted that the district court applied the Cahill test, "which
28  elevates the bar to disclosure to the highest level. Because *Cahill* involved political

speech, that court's imposition of a heightened standard is understandable." Id. at 1177 (emphasis added).

Thus, the Ninth Circuit essentially adopted the Cahill holding that when the speech at issue is political, a plaintiff seeking to force disclosure of an anonymous speaker's identity must establish each element of her cause of action under the rigorous summary judgment standard.[5] This conclusion was echoed in the more recent case of SI03, Inc. v. Bodybuilding.com, LLC, 441 F. App'x 431, 432 (9th Cir. 2011), ("We have recently explained that the rigorous Cahill standard is 'understandable" in a case 'involv[ing] political speech.'") (quoting Anonymous online Speakers).

Based on this Ninth Circuit ruling, this court should also apply the Cahill test to determine that Dhillon's subpoena should be quashed. The Cahill case concerned a defamation action brought by an elected town council member and his wife. The John Doe defendant had anonymously posted statements criticizing the councilman on an internet blog, and plaintiffs sought to compel disclosure of John Doe's identity by serving a deposition subpoena on the owner of John Doe's internet IP address. The Cahill case had facts nearly identical to this case: Doe 1 anonymously posted critical comments on an internet blog regarding Dhillon and Munger, and Plaintiff now seeks to discovery Doe 1's identity by serving a subpoena on Doe 1's internet host.

The Cahill court first addressed its grave concerns over the chilling effect of ordering disclosure of the speaker's identity, stating that "Internet speech is often anonymous. . . . For better or worse, then 'the audience must evaluate [a] speaker's ideas based on her words alone. . . . This unique feature of the [the internet] promises to make public debate in cyberspace less hierarchical and discriminatory' than in the

---

[5] Interestingly, the court also stated, "Even if the speech was commercial, the district court's choice of the Cahill test did not constitute clear error." Id.

- 11 -
DEFENDANT DOE 1's MOTION TO QUASH SUBPOENA

EXHIBIT H Page 17

1  real world because it disguises status indicators such as race, class and age." <u>Doe v.</u>
2  <u>Cahill</u>, <u>supra</u>, 884 A.2d at 455 – 56 (citations omitted).

3       Noting that "in general, our society accords greater weight to the value of free
4  speech than to the dangers of its misuse," the <u>Cahill</u> court held "that a defamation
5  plaintiff must satisfy a 'summary judgment' standard before obtaining the identity of
6  an anonymous defendant.  We are concerned that setting the standard too low will
7  chill potential posters from exercising their First Amendment right to speak
8  anonymously." <u>Id.</u> at 457.  Thus, to obtain discovery of an anonymous defendant's
9  identity under the summary judgment standard, the <u>Cahill</u> court required plaintiff to
10 "submit sufficient evidence to establish a *prima facie* case for each essential element
11 of the claim in question.  In other words, the defamation plaintiff . . . must introduce
12 evidence creating a genuine issue of material fact for all elements . . . ." <u>Id.</u> at 463.
13 The <u>Cahill</u> court found plaintiff had not done so.

14      Notably, the <u>Cahill</u> case concerned alleged defamation rather than alleged
15 copyright infringement.     Defamatory speech is not entitled to First Amendment
16 protection.   <u>Chaplinsky v. State of New Hampshire</u>, 315 U.S. 568, 572 (1942).
17 Copyright law, however, contains certain exceptions to alleged infringement,
18 including the "Fair Use" doctrine discussed later in this brief.  Thus, the <u>Cahill</u>
19 reasoning applies with even greater force to a claim of copyright infringement, which
20 is less harmful and more protected than defamatory speech.

21      In addition, several courts that have addressed this issue in the copyright
22 context have also held plaintiff to this heightened standard of proof before an
23 anonymous speaker's identity will be disclosed.  To date, the Second Circuit is the
24 only federal circuit court that has addressed this issue in the copyright context.  In
25 <u>Arista Records, LLC v. Doe 3</u>, 604 F.3d 110 (2010), plaintiff sought the identity of
26 individuals who had illegally downloaded music recordings by serving a subpoena on
27 the common ISP.  Noting that the First Amendment does not "provide a license for
28 copyright infringement", the <u>Arista</u> court adopted a five-part test for quashing the

1   subpoena that was set forth in <u>Sony Music Entertainment Inc. v. Does 1 – 40,</u> 326 F.
2   Supp. 2d 556 (S.D.N.Y. 2004), which is:

3       1 – the concreteness of the plaintiff's showing of <u>a prima facie claim</u> of
4   actionable harm,

5       2 – the specificity of the discovery request,

6       3 – the absence of alternative means to obtain the subpoenaed information,

7       4 – the need for subpoenaed information to advance the claim, and

8       5 – the objecting party's expectation of privacy.

9   <u>Arista,</u> supra, 604 F.2d at 119, <u>quoting, Sony Music,</u> supra, 326 F. Supp. at 564 – 65
10  (emphasis added).  Thus, the <u>Arista</u> court also required a prima facie showing of each
11  element of the cause of action.

12      A number of district courts have required the same in the intellectual property
13  context, including several from the Northern District of California, where this case is
14  pending.  <u>See, e.g., Highfields, supra,</u> 385 F. Supp. 2d 969 (N.D. Cal. 2011) (granting
15  a motion to quash, stating plaintiff seeking to discover identity of anonymous internet
16  speaker must show there is real evidentiary basis for claim, including trademark
17  infringement); <u>SaleHoo, supra,</u> 722 F. Supp. 2d 1210, 1213-14 (W.D. Wash. 2010)
18  (granting a motion to quash, and stating "plaintiff must, in general allege a facially
19  valid cause of action and produce prima facie evidence to support all of the elements
20  of the cause of action within his or her control").

21      One particularly instructive case is <u>Art of Living Found. v. Does 1-10,</u> 2011
22  WL 5444622 (N.D. Cal. Nov. 9, 2011).  In <u>Art of Living,</u> an anonymous internet
23  poster sharply criticized the Art of Living Foundation ("AOLF"), which styled itself
24  an "international 'educational and humanitarian' organization dedicated to teaching
25  the spiritual lessons of 'His Holiness Ravi Shankar.'"  <u>Id.</u> at *1.  The Doe defendants
26  published postings that called AOLF a manipulative and abusive cult, and also
27  allegedly published AOLF's "Breate Water Sound Manual."  Doe defendants claimed
28  they published the manual to "debunk the notion that Ravi Shankar is an enlightened

1   being", and that they removed the manual shortly after receiving a DMCA takedown
2   notice. Id. Plaintiff sued for copyright infringement and other claims.

3       The Art of Living court adopted the foregoing Highfields standard of proof,
4   based on the nature of the speech at issue, and quashed the subpoena.  The court
5   stated, "In choosing the proper standard to apply, the district court should focus on
6   the "nature" of the speech conducted by the defendant, rather than the cause of action
7   alleged by the plaintiff. . . . For example, a more rigorous standard may be applicable
8   where the defendant's speech is political, religious or literary, while commercial
9   speech should be subject to a lesser standard." Id. at *5. (citations omitted) (emphasis
10  added).

11      The court found that defendants' speech in Art of Living raised substantial
12  First Amendment concerns because it was commentary on a public issue.  It thus was
13  subject to the most rigorous protections, and the Highfields standard was appropriate:

15      Highfields establishes a two-part test for determining whether to allow
16      discovery seeking the identity of an anonymous defendant: (1) The
17      plaintiff must produce competent evidence supporting a finding of each
18      fact that is essential to a given cause of action; and (2) if the plaintiff
19      makes a sufficient evidentiary showing, the court must compare the
20      magnitude of the harms that would be caused to the competing interests
21      by a ruling in favor of the plaintiff and by a ruling in favor of the
22      defendant. Id. 975–76.

23  Art of Living, supra, 2011 WL 5444622 at * 7.

24      The Highfields court explained these two prongs as follows:

25      It is not enough for a plaintiff simply to plead and pray. Allegation and
26      speculation are insufficient. The standards that inform Rule 8 and Rule
27      12(b)(6) offer too little protection to the defendant's competing interests.
28      Thus, the plaintiff must adduce *competent evidence*-and the evidence

- 14 -
DEFENDANT DOE 1's MOTION TO QUASH SUBPOENA

1    plaintiff adduces must address *all* of the inferences of fact that plaintiff

2    would need to prove in order to prevail under at least one of the causes

3    of action plaintiff asserts. In other words, the evidence that plaintiff

4    adduces must, if unrebutted, tend to support a finding of *each* fact that is

5    essential to a given cause of action. The court may not enforce the

6    subpoena if, under plaintiff's showing, any *essential* fact or finding lacks

7    the requisite evidentiary support.

8    . . .

9    The court proceeds to the second component of the test if, but only if, the

10   plaintiff makes an evidentiary showing sufficient to satisfy the court in

11   the first component of the test. If reached, the second component of the

12   test requires the court to assess and compare the magnitude of the harms

13   that would be caused to the competing interests by a ruling in favor of

14   plaintiff and by a ruling in favor of defendant.

15   Highfields, supra, 385 F. Supp. 2d at 974-76.

16   Based on this standard, the Art of Living court found that the chilling impact of

17   disclosing defendants' identities would create a substantial cost to the public. As

18   stated in Highfields, "When word gets out that the price tag of effective sardonic

19   speech [includes disclosure of the speaker's identity], that speech likely will

20   disappear." Art of Living, supra, 2011 WL 5444622 at * 7 (quoting, Highfields, 385

21   F. Supp. 2d at 981). The Art of Living case is squarely applicable to the present case,

22   and this court should follow its persuasive and well-supported reasoning.

23   In the instant case, Dhillon certainly has not made such an evidentiary

24   showing.    The fair use doctrine serves as an absolute defense to copyright

25   infringement in this case.    Therefore, this Court should quash the subpoena and

26   should not order disclosure of the identity of Doe 1 or any of the Doe defendants.

27

28

VII.   DHILLON  FAILED  TO  MAKE  A  SUFFICIENT  SHOWING  OF
INFRINGEMENT IN LIGHT OF THE "FAIR USE" DOCTRINE

To establish infringement of copyright, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). See also, 17 U.S.C. § 501(a). In UMG Recordings, Inc. v. Augusto, 628 F.3d 1175, 1178 (9th Cir.2011), the court phrased the second element as "violation by the alleged infringer of at least one of the exclusive rights granted to copyright owners by the Copyright Act."

Dhillon cannot meet her burden of proof on these elements. Specifically, she cannot present sufficient evidence of actual infringement.  She alleges that Doe 1 used her political campaign photo in an article entitled "Meet Harmeet" on the mungergames.net political blog.   Under the "Fair Use" doctrine, this is not infringement of a copyrighted work. As stated in the Art of Living case, supra:

> [E]vidence of copyright infringement does not *automatically* remove the
> speech at issue from the scope of the First Amendment. While "the First
> Amendment does not shield copyright infringement," (citation omitted)
> "copyright law contains built-in First Amendment accommodations."
> Eldred v. Ashcroft, 537 U.S. 186, 219–20 (2003).  Perhaps the most
> important is the doctrine of fair use . . . . 17 U.S.C. § 107; see also, Elvis
> Presley Enters. v. Passport Video, 349 F.3d 622, 626 (9th Cir.2003)
> ("First Amendment concerns in copyright cases are subsumed within the
> fair use inquiry.").

Art of Living, supra, 2011 WL 5444622 at *6.

The "fair use" of a copyrighted work "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research" is not an infringement of copyright.  In determining whether the use

made of a work in any particular case is a fair use the factors to be considered shall include--

>   (1) the purpose and character of the use, including whether such use is of a
>   commercial nature or is for nonprofit educational purposes;

>   (2) the nature of the copyrighted work;

>   (3) the amount and substantiality of the portion used in relation to the
>   copyrighted work as a whole; and

>   (4) the effect of the use upon the potential market for or value of the
>   copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors. 17 U.S.C. § 107.

This exception "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." Kelly v. Arriba Soft Corp., 336 F. 3d 811, 817 (9th Cir. 2003), quoting, Dr. Seuss Enters., L.P v. Penguin Books USA, Inc., 109 F. 3d 1394, 1399 (9th Cir. 1997). The Arriba Soft court also stated, "We must balance these factors in light of the objectives of copyright law, rather than view them as definitive or determinative tests." Arriba Soft, supra, 109 F.3d at 1399.

   A. PURPOSE AND CHARACTER OF THE USE.

The question regarding this factor is "whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose of different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994). The more transformative the new work, the less important the other factors, including commercialism, become." Id. "Typically, a work created for commercial use is less likely to bear fair use protection; however, the commercial/non-commercial distinction is less significant the more transformative the work is."

1   Northland Family Planning Clinic, Inc. v. Center for Bio-Ethical Reform, 868
2   F.Supp.2d 962, 970 (C.D. Cal. 2012).

3        Cases have consistently held that reproducing a photographic image for
4   purposes of criticism or commentary is transformative, and thus cannot constitute
5   copyright infringement.  In the Ninth Circuit Arriba Soft case, defendant was an
6   internet search engine that displayed search results in the form of thumbnail
7   photographic images.  Plaintiff was a photographer whose photos of the American
8   West appeared in defendant's search engine results.

9        The court focused on the fact that the search engine's images served an entirely
10  different function that the original photographic images, and found no infringement.
11  While the photographer's "images are used to portray scenes . . . in an aesthetic
12  manner, . . . Arriba's search engine functions as a tool to help index and improve
13  access to images . . . ."  Arriba Soft, supra, 336 F.3d at 818.

14       In Hustler Magazine, Inc. v. Moral Majority, Inc.,606 F.Supp. 1526, 1536
15  (C.D. Cal. 1985), aff'd, 796 F.2d 1148 (9th Cir. 1986), Hustler magazine brought an
16  infringement action against a fundamentalist minister for reproducing the magazine's
17  parody ads that prominently featured the minister.  The court found that the minister
18  had reproduced the ad as part of a "broader, continuing debate over pornography and
19  other social issues" between the magazine and the minister.  The court found no
20  infringement and granted summary judgment in favor of the minister.

21       The court stated, "[W]hen an act of copying occurs in the course of a political,
22  social or moral debate, the public interest in free expression is one factor favoring a
23  finding of fair use."  Id. See also, Keep Thomson Governor Committee v. Citizens for
24  Gallen Committee, 457 F.Supp. 957, 959–60 (D.N.H. 1978) (political committee's
25  use of a portion of rival candidate's musical composition amounted to fair use in light
26  of public interest in full debate over election and absence of injury to plaintiff).

27       The recent Art of Living case also discussed the fair use doctrine in the context
28  of reproducing an entire pamphlet for purposes of criticizing its author as a sham and

1   a fraud.  Although the <u>Art of Living</u> court stated it did not need to decide whether the
2   copying was fair use, "the circumstances here create a substantial question as to
3   whether the doctrine applies."  <u>Art of Living</u>, <u>supra</u>, 2011 WL 5444622 at *5.  <u>See</u>
4   <u>also</u>, <u>New Era Publications Intern., ApS v. Carol Pub. Group</u>, 904 F.2d 152 (2d
5   Cir.1990) (the use of copyrighted quotations in a biography of Church of Scientology
6   founder L. Ron. Hubbard was protected where the intended purpose of the work was
7   to show that "Hubbard was a charlatan and the Church a dangerous cult").

8          Several other recent district court opinions have found that using a photo for
9   purposes of criticizing the subject of the photo is fair use.  See <u>Sedgwick Claims</u>
10  <u>Mgmt. Servs., Inc. v. Delsman</u>, 2009 WL 2157573, at *5 (N.D. Cal. 2009) (finding
11  that defendant's use of photographs of two of plaintiff's executives as a vehicle for
12  criticizing plaintiff's alleged business practices was "fundamentally different" than
13  the original promotional reason), <u>aff'd</u>, 422 F. App'x 651 (9th Cir. 2011); <u>Ascend</u>
14  <u>Healthcare Corp. v. Wells</u>, Slip Copy, 2013 WL 1010589 (E.D.N.C. 2013) (finding
15  use of two entire photographs fair use, on a blog criticizing the mental hospital shown
16  in the photographs); <u>Baraban v. Time Warner Inc.</u>, 54 USPQ2d 1759 (S.D.N.Y. 2000)
17  (granting summary judgment for accused infringer, which had taken an entire
18  photograph of a nuclear plant and used it in a chapter of a book criticizing the nuclear
19  industry's and the government's portrayal of nuclear power as safe).

20         In the present case, the use of Dhillon's photograph was clearly transformative.
21  Ms. Dhillon's stated original purpose of the photo was for publicity for a political
22  campaign, whereas mungergames.net used the photo for purposes of criticizing Ms.
23  Dhillon's political activities.  These two purposes could not be more different.

24         In addition, mungergames.net did not use the photo for commercial purposes,
25  which increases the inference of fair use.  Instead, mungergames.net posted the photo
26  on a free internet blog for purposes of engaging in political debate over an issue of
27  public concern.  Mungergames.net's use is, therefore, is at the very core of the First
28  Amendment.  It is subject to the most rigorous protection.

B. NATURE OF THE COPYRIGHTED WORK

The Ninth Circuit has described this factor well in the Arriba Soft case, stating: Works that are creative in nature are closer to the core of intended copyright protection than are more fact-based works." Photographs that are meant to be viewed by the public for informative and aesthetic purposes . . . are generally creative in nature. The fact that a work is published or unpublished also is a critical element of its nature. Published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred.

Arriba Soft, supra, 336 F.3d at 820, quoting, Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 564 (1985) (noting that the scope of fair use is narrower with respect to unpublished works because the author's right to control the first public appearance of his work weighs against the use of his work before its release).

In this case, Ms. Dhillon has, by her own allegations, extensively published and released her publicity headshot photo to the general public over the course of the past several years. As she freely admits in paragraph 14 of her Complaint, "Ms. Dhillon has used the 2008 Photograph, including the Headshot Photograph, in connection with her campaign for Member of the State Assembly, beginning in or around June 2008, as well as in connection with her subsequent campaigns, political activities, and various professional marketing efforts." (Cigel Decl., Exh. 7, Complaint at ¶ 14).

Therefore, the single isolated use of Dhillon's widely published headshot publicity is more likely to be fair use than not, especially because she is a political public figure. In addition, although a photographer's use of lighting or angle or setting sometimes may be deemed "creative", Ms. Dhillon's purpose in commissioning the photo (which seems to have been taken outside with her standing in sunlight next to a building) was for campaign publicity. (Cigel Decl., Exh. 7, Complaint at ¶ 11). The subject photo was obviously for the purpose of identification

1  and face recognition rather than creative aesthetics.  Thus, this factor weighs in
2  mungergames.net's favor as well.

3     C. AMOUNT AND SUBSTANTIALITY OF PORTION USED

4          As stated in Arriba Soft, "the extent of permissible copying varies with the
5  purpose and character of the use. (citation omitted) If the secondary user only copies
6  as much as is necessary for his or her intended use, then this factor will not weigh
7  against him or her."  Arriba Soft, supra, 336 F.3d at 820 – 821.  The Arriba Soft court
8  continued, "It was necessary for Arriba to copy the entire image to allow users to
9  recognize the image and decide whether to pursue more information. . . . If Arriba
10 only copied part of the image, it would be more difficult to identify it, thereby
11 reducing the usefulness of the visual search engine." Id. at 821.

12         In the present case, the purpose of mungergames.net's use of the photograph
13 was to allow readers of mungergames.net to identify Ms. Dhillon, the subject of the
14 political blog entry.  It is impossible to use only a portion of that headshot
15 photograph.  It should be beyond dispute that mungergames.net copied only as much
16 of the photo as was necessary.

17     D. EFFECT OF THE USE UPON THE POTENTIAL MARKET FOR OR
18        VALUE OF THE COPYRIGHTED WORK

19         In discussing this factor, the Arriba Soft court stated that courts should consider
20 whether the alleged copying harmed the copyright owner's market, or would have a
21 substantial adverse impact on the potential market for the original.  Id. at 821.  In this
22 case, there simply is no market for Dhillon's widely-used publicity headshot
23 photograph.  She cannot identify any market and has never alleged that she sells her
24 publicity headshot for profit.  On the contrary, as already stated, she used the photo at
25 issue in political campaigns and in marketing efforts.

26         Doe 1 cannot conceive of any market that is harmed by copying a widely
27 published publicity headshot into a political blog for purposes of political debate.  By
28 its nature, a publicity photo is distributed free and in mass for purposes of generating

- 21 -
DEFENDANT DOE 1's MOTION TO QUASH SUBPOENA

1   media attention and notoriety.  In addition, that photograph has been removed from
2   the article on mungergames.net.  Thus, this factor weighs in mungergames.net's favor
3   as well.

4        In summary, each of the four "Fair Use" factors weigh heavily in finding that
5   there was no copyright infringement.  The photo was used for First Amendment
6   political commentary, a purpose very different from the original purpose of campaign
7   publicity, and therefore "transformative."  The photo had been widely distributed and
8   published prior to its appearance in mungergames.net, which copied only as much of
9   the photo as was necessary, and there was no impact on any potential market for a
10  photo that was used for publicity rather than sold.

11       Thus, because mungergames.net's alleged copying was "Fair Use", there is no
12  copyright infringement.  Dhillon cannot present any evidence to counter a finding of
13  fair use, and thus she could not withstand a motion for summary judgment as required
14  for political speech.

15  VIII. DOE 1 WOULD SUFFER GREAT HARM IF HIS IDENTITY WERE
16       DISCLOSED

17       As stated in the cases discussed above, even if a plaintiff submits sufficient
18  evidence of infringement, courts should still balance the potential harm to the
19  defendant against the plaintiff's need for disclosure of his identity.   See, e.g.,
20  SaleHoo, supra, 722 F. Supp. 2d at 1216-17; Highfields, supra, 385 F.Supp.2d at 975
21  – 76 (court should "assess and compare the magnitude of the harms that would be
22  caused to the competing interests by a ruling in favor of plaintiff and by a ruling in
23  favor of defendant.")

24       As noted by the Cahill court, a plaintiff could bring a non-meritorious action
25  against an anonymous defendant, knowing they will lose, but still be successful in
26  their main goal:  unmasking their critic's identity.  "After obtaining the identity of an
27  anonymous critic through the compulsory discovery process, a . . . plaintiff who
28  either loses on the merits or fails to pursue a lawsuit is still free to engage in extra-

1   judicial self-help remedies; <u>more bluntly, the plaintiff can simply seek revenge or</u>
2   <u>retribution</u>." <u>Cahill</u>, supra, 884 A.2d at 457 (emphasis added). That is one of the
3   primary reasons the <u>Cahill</u> court adopted a "summary judgment" standard of proof for
4   political speech, rather than the lower good faith standard. <u>Id.</u>

5        Similarly, in this case, Dhillon's $250.00 copyright infringement claim does
6   not appear sincere. It is merely a vehicle to serve multiple subpoenas to unmask the
7   identity of the Doe defendants, and thereby chill free speech under the First
8   Amendment. In addition, as Dhillon certainly knows, she is not even entitled to the
9   attorneys' fees she seeks in her Complaint, nor to any statutory damages.
10   Mungergames.net's alleged infringement occurred on February 12, 2013. However,
11   Dhillon did not seek to register her copyright until February 21, 2013, when she
12   submitted her complete application. (Cigel Decl., Exh. "E", Complaint at ¶¶ 15, 17).
13   Where a copyright owner fails to register its work within three months of publication
14   and the purported infringement occurs prior to registration, the copyright owner is not
15   entitled to statutory damages or attorney's fees. 17 U.S.C. § 412.

16        Thus, this case is not about a true interest in protecting a copyright, or seeking
17   compensation. Instead, this case smacks of improper intent to seek the identity of,
18   and then seek revenge against, someone who is critical of Dhillon's and Munger's
19   politics. "The spirit of the First Amendment applies to the copyright laws at least to
20   the extent that the courts should not tolerate any attempted interference with the
21   public's right to be informed regarding matters of general interest when anyone seeks
22   to use the copyright statute which was designed to protect interests of quite a different
23   nature." <u>Rosemont Enterprises, Inc. v. Random House, Inc.</u>, 366 F.2d 303, 311 (2d
24   Cir. 1966) (Lombard, J. and Hays, J., concurring).

25        In the <u>Rosemont</u> case, the Court of Appeals reversed the grant of an injunction,
26   on copyright grounds, to a Howard Hughes-owned entity that had sought to prevent
27   publication of a biography that was critical of Hughes. <u>Id.</u> The concurring Justices
28   found it significant that the record "pointed to the existence of a scheme developed by

- 23 -
DEFENDANT DOE 1's MOTION TO QUASH SUBPOENA

1   Hughes and his attorneys and employees to prevent the publication of any biography
2   of Hughes and, in particular, the [critical] biography. Id. at 311 - 12.

3          Similarly, in this case, the reasonable inference from Dhillon's complaint is
4   that this matter is not about copyright infringement at all.  Dhillon was not selling her
5   headshot, but was instead publishing it freely to anyone who would give her
6   campaign publicity.  Even so, Dhillon is so determined to find out who is behind the
7   mungergames.net blog that she is now seeking to obtain two additional subpoenas for
8   that same purpose in the Northern District of California.

9          Thus, the potential harm to Doe 1 is great.  By contrast, the potential harm to
10  Dhillon if this subpoena is quashed is nonexistent. The cost to Dhillon of pursuing
11  this matter to judgment is exponentially greater than the $250 in damages she seeks.
12  Balancing these competing interests, this Court should quash this subpoena.

13      IX. CONCLUSION

14         For all the foregoing reasons, Doe 1 respectfully requests this Court to quash
15  the subpoena dated July 22, 2013.

16

17  Dated: September 20, 2013          **THE CIGEL LAW GROUP, P.C.**

18

19                                    By: _____
20                                        Rick A. Cigel
                                          Attorneys for Defendant
21                                        DOE 1

22

23

24

25

26

27

28

- 24 -
DEFENDANT DOE 1's MOTION TO QUASH SUBPOENA

| | |
|---|---|
| 1 | <div align="center">PROOF OF SERVICE</div> |
| 2 | UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA |
| 3 | CASE NAME: **HARMEET K. DHILLON v. DOE 1** |
| 4 | |
| 5 | The undersigned declares: I am a resident of the United States and am employed in the City and County of Los Angeles, State of California; I am over the age of eighteen years and not a party to the within action; my business address is 10866 Wilshire Boulevard, Suite 400, Los Angeles, California 90024. |
| 6 | |
| 7 | On September 20, 2013, I served the following documents: |
| 8 | |
| 9 | 1. **NOTICE OF MOTION AND MOTION BY DEFENDANT DOE 1 TO QUASH SUBPOENA ISSUED IN CENTRAL DISTRICT OF CALIFORNIA TO NEW DREAM NETWORK, LLC** |
| 10 | |
| 11 | 2. **DECLARATION OF RICK A. CIGEL IN SUPPORT OF MOTION BY DEFENDANT DOE 1 TO QUASH SUBPOENA ISSUED IN CENTRAL DISTRICT OF CALIFORNIA TO NEW DREAM NETWORK, LLC** |
| 12 | |
| 13 | 3. **CIVIL CASE COVER SHEET** |
| 14 | 4. **CERTIFICATE OF INTERESTED PARTIES** |
| 15 | By serving in the manner described below to the interested parties herein and addressed to: |

| | |
|---|---|
| Harold P. Smith<br>Krista L. Shoquist<br>Dhillon & Smith, LLP<br>177 Post Street, Suite 700<br>San Francisco, CA 94108 | Joel Voelzke<br>Intellectual Property Law Office of Joel Voelzke<br>24772 W. Saddle Peak Road<br>Malibu, CA 90265-3042 |
| *Attorneys for Dhillon* | *Attorney for New Dream Network* |

21 — [ x ] **MAIL:** I caused such envelope(s) to be deposited in the mail at my business address, with postage thereon fully prepaid, addressed to the addressee(s) designated. I am readily familiar with the business practice of collecting and processing correspondence to be deposited with the United States Postal Service on that same day in the ordinary course of business.

23 — [ x ] **(FEDERAL):** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

25 — Executed on September 20, 2013 at Los Angeles, California.

Wanda Taylor

<div align="center">1<br>Proof of Service</div>

# EXHIBIT I

# PewResearch
# Center for the People & the Press

JANUARY 4, 2011

# Internet Gains on Television as Public's Main News Source

*More Young People Cite Internet than TV*

OVERVIEW

The internet is slowly closing in on television as Americans' main source of national and international news. Currently, 41% say they get most of their news about national and international news from the internet, which is little changed over the past two years but up 17 points since 2007. Television remains the most widely used source for national and international news – 66% of Americans say it is their main source of news – but that is down from 74% three years ago and 82% as recently as 2002.



**Where Do You Get Most of your News About National and International Issues?**

PEW RESEARCH CENTER Dec 1-5 2010. Figures add to more than 100% because respondents could volunteer up to two main sources. If asked more than once in a calendar year, trend shows final datapoint from each year.

The national survey by the Pew Research Center for the People & the Press, conducted Dec. 1-5, 2010 among 1,500 adults reached on cell phones and landlines, finds that more people continue to cite the internet than newspapers as their main source of news, reflecting both the

EXHIBIT I Page 1

growth of the internet, and the gradual decline in newspaper readership (from 34% in 2007 to 31% now). The proportion citing radio as their main source of national and international news has remained relatively stable in recent years; currently, 16% say it is their main source.

An analysis of how different generations are getting their news suggests that these trends are likely to continue. In 2010, for the first time, the internet has surpassed television as the main source of national and international news for people younger than 30. Since 2007, the number of 18 to 29 year olds citing the internet as their main source has nearly doubled, from 34% to 65%. Over this period, the number of young people citing television as their main news source has dropped from 68% to 52%.

Among those 30 to 49, the internet is on track to equal, or perhaps surpass, television as the main source of national and international news within the next few years. Currently, 48% say the internet is their main source – up 16 points from 2007 – and 63% cite television – down eight points.

EXHIBIT I Page 2

## Main News Source, By Age



The internet also has grown as a news source for people ages 50 to 64; currently 34% say the internet is their main source of national and international news, nearly equal to the number who cite newspapers (38%), though still far below television (71%). There has been relatively little change in the how people age 65 and older get their news. The internet has risen to 14% from 5% in 2007, but is still far behind newspapers (47%) and television (79%) as a main source.

EXHIBIT I Page 3

The decline in the share of Americans who cite television as their main source of national and international news crosses all age groups. Over the past three years, the number saying TV is their main source has fallen 16 points among 18-29 year-olds, eight points among those 30 to 49, and six points among those age 50 and older.

### TV News Still Dominates Among Less Educated

College graduates are about as likely to get most of their national and international news from the internet (51%) as television (54%). Those with some college are just as likely as college grads to cite the internet as their main source (51%), while 63% cite television. By contrast, just 29% of those with no more than a high school education cite the internet while more than twice as many (75%) cite television.

## Internet Now Rivals TV as Main News Source for College Grads

| | Tele-vision | Inter-net | News-paper | Radio | Maga-zines |
|---|---|---|---|---|---|
| | % | % | % | % | % |
| Total | 66 | 41 | 31 | 16 | 3 |
| Men | 61 | 43 | 29 | 17 | 3 |
| Women | 70 | 39 | 33 | 15 | 3 |
| Men 18-49 | 55 | 56 | 21 | 19 | 3 |
| Women 18-49 | 62 | 53 | 23 | 16 | 3 |
| Men 50+ | 69 | 28 | 39 | 14 | 3 |
| Women 50+ | 78 | 24 | 45 | 14 | 3 |
| White | 64 | 41 | 32 | 18 | 3 |
| Black | 86 | 35 | 30 | 9 | 3 |
| Hispanic | 66 | 45 | 28 | 12 | 3 |
| College grad+ | 54 | 51 | 35 | 20 | 5 |
| Some college | 63 | 51 | 30 | 15 | 2 |
| HS or less | 75 | 29 | 29 | 14 | 2 |
| $75k or more | 57 | 54 | 29 | 22 | 4 |
| $30k-$74,999 | 67 | 42 | 29 | 17 | 3 |
| Less than $30k | 72 | 34 | 33 | 12 | 2 |
| Northeast | 63 | 40 | 38 | 15 | 5 |
| Midwest | 73 | 38 | 30 | 17 | 2 |
| South | 68 | 41 | 29 | 13 | 3 |
| West | 55 | 47 | 30 | 20 | 2 |
| Republican | 67 | 38 | 29 | 18 | 3 |
| Democrat | 69 | 43 | 32 | 12 | 5 |
| Independent | 63 | 43 | 33 | 18 | 2 |

PEW RESEARCH CENTER Dec 1-5  2010. Figures read across and add to more than 100% because respondents could volunteer up to two main sources. Whites and blacks include only those who are not Hispanic. Hispanics are of any race.

Similarly, those with household incomes of $75,000 or more are about as likely to get most of their news on the internet (54%) as from television (57%). People with household incomes under $30,000 are far more likely to cite television (72%) than the internet (34%).

There also are different patterns of news consumption across regions of the country. Notably, people living in the West are the most likely to cite the internet

EXHIBIT I Page 4

# Whether Critical Of King George, or Charles Munger, Jr, Anonymous Speech Should Be Protected

Posted by Jon Fleischman at 11:33 pm on Sep 29, 2013

People who frequent this website know that it is our general rule (with occasional exception) to only support attributed blogging and commenting. I can think of a handful of times over the years when we have featured, or linked to, anonymous content.

That having been said, anonymous speech certainly has its place in politics, and here in America its foundations are rooted in our beginnings. The federalist papers, as they were drafted, first appeared in pamphlets around the colonies under the pseudonym Publius — and Benjamin Franklin himself wrote on more than one occasion under the pen name of Mrs. Silence Dogood.

In the Press, and speedily will be published, THE FEDERALIST, A Collection of Essays written in favor of the New Constitution. By a Citizen of New-York. Corrected by the Author, with Additions and Alterations. This work will be printed on a fine Paper and good Type, in one handsome Volume duodecimo, and delivered to subscribers at the moderate price of one dollar. A few copies will be printed on superfine royal writing paper, price ten shillings. No money required till delivery. To render this work more complete, will be added, without any additional expence, PHILO-PUBLIUS, AND THE Articles of the Convention, As agreed upon at Philadelphia, September 17th, 1787.

Those who publish their thoughts anonymously have a high bar to reach in order to be credible, as many will discount someone's words when they do not know the true identify of their author. But still there are some who are in a position to shed light on an issue, or bring matters to light, who might put themselves at risk by exposing themselves publicly. Certainly this might be the case if you were stirring up enlightenment and dissent amongst colonials living under the tyranny of the British government.

I bring this up because for some period of time there has been an anonymous political website, The Munger Games, which has been producing a lot of content critical of Charles Munger, Jr. Munger, of course, is a very high profile and controversial figure in California politics. He has spent north of 40 million dollars on ballot measures, as well as party, candidate and independent expenditure campaigns in California in recent years. While his contributions to try and end the corrupting influence of public employee unions in California politics are laudable, as are some of his contributions to assist with Republican party building, Munger has also spent a lot of money to lead an ongoing, major effort to shift the California GOP leftwards towards "Democrat lite" — which, as you might expect, I think is a very bad idea.

That said, this column is not really intended to be a critique of Munger, thought I have done that before. It's really about defending the right of those who would seek to blog anonymously about Munger (or anyone else) to have the right to do so. I don't blog anonymously myself. I do not author the Munger Games nor to I create any of the content for that site. I don't really care who does it — and in fact go out of my way not to inquire or probe into that question out of respect for their right to be unattributed.

That having been said, I will provide one of my (very) occasional links to anonymous content and direct your attention to this latest post on the Munger Games website, entitled: Criticize Charles Munger and He'll Subpeona Your Gmail Account.

*Charles Munger, Jr.*

Apparently at some point the Munger Games ran a photo of California Republican Party Vice Chairman Harmeet Dhillon on their site. Harmeet has filed what in my opinion is a questionable and certainly unfortunate lawsuit against the Munger Games saying that they did not have authority to use her photograph. Really? It's a photo that I've seen used in many places. We have used it here (though it was provided to us by Harmeet for one of the columns by her that we have featured). Anyways, people grab photos all of the time. I actually think it is a good photo of Dhillon — sometimes people use unflattering photos, which is always unfortunate.

The Munger Games writers assert that Harmeet, in her lawsuit, is acting as an agent for Munger. I couldn't

**Jon Coupal:**
[WHY HIGHER BUSINESS PROPERTY TAXES WOULD HURT HOMEOWNERS](#)

**Laer Pearce:**
[Buried Treasure in the Mojave – Water](#)

**Jon Fleischman:**
[Whether Critical Of King George, or Charles Munger, Jr, Anonymous Speech Should Be Protected](#)

**Katy Grimes:**
[Lo and behold! Those in need in CA are receiving help in exchange for votes (and other things)](#)

**Richard Rider:**
[San Diego Mid-Town Trolley Per Mile Cost Today More Than Five Times 2002 Estimate – S.O.P.](#)

**Katy Grimes:**
[Sacto arena bill signed, but it's not over yet](#)

**Congressman John Campbell:**
[President Obama's Phone Call](#)

**Roger Covalt:**
[Taxpayer Burden: Public vs. Private Salaries](#)

### Blogger Menu
[Register](#)
[Log in](#)
[Entries RSS](#)
[Comments RSS](#)
[WordPress.org](#)

speak to that, although I do have direct knowledge of one other instance where Harmeet did, in fact, represent Munger in a legal matter. The Munger Games asserts that the purpose of the suit (which now includes a request to Google to provide email correspondence to and from the Munger Games' Gmail account) is really a fishing expedition to try and expose the authors of the Munger Games.

If Harmeet's lawsuit succeeds in accomplishing this goal, that would be most unfortunate. As I said above, anonymous free speech — especially aimed at controversial public figures such as Munger — has its place. As I also said above, one can and many do discount the content of such speech, because they are suspect of things penned by "secret" authors. But that should be sorted out by the consumers of information.

Since I have found Harmeet to be a reasonable person, I will end this column by urging her to drop her lawsuit against the unknown authors of the Munger Games. Not because she shouldn't defend her rights to her photo (I'm no expert on that), but because we all lose if anonymous political speech is stifled because of the lawsuit. It would also let air out of the allegation by the folks at the Munger Games that she is really acting as a proxy for Munger.

Tags: [Anonymous political speech](#), [California Republican Party](#), [Charles Munger Jr.](#), [Harmeet Dhillon](#), [Munger Games](#), [Publius](#), [Silence Dogood](#)

This entry was posted on Sunday, September 29th, 2013 at 11:33 pm and is filed under [Blog Posts](#). You can follow any responses to this entry through the [RSS 2.0](#) feed.

[Previous Post](#)                                                                                          [Next Post](#)

**18 comments** ⇄                                                                                    **Add a comment**

 Add a comment...
☐ Post to Facebook



**Aaron F Park** · ⭐ Top Commenter · Rocklin, California
Jon - the cowards taking potshots at people could not hold the loincloth of Mr. Franklin. It is smarmy and disengenuous to even attempt to juxtapose the two! Stand up for integrity and accountability and decry these attacks - including those on the CRA, an organization you are the past president of!
Reply · 👍 4 · Like · Yesterday at 8:57am

 Add a Reply...

**Christopher Mays** · Intellectual Property Attorney at Wilson Sonsini Goodrich & Rosati
Before I comment, let me say I have no affiliation with the Munger Games, and have no idea who writes that blog. I also won't comment on Harmeet's lawsuit, the issues of which are far broader than the narrow discussion of anonymous political commentary.

\*\*\*

I've never chosen to post criticism anonymously, but I can understand the sentiment and reasons why someone would do so in this instance. Mr. Munger has a reputation for having a temper and for holding grudges. I've seen it firsthand -- when my good friend Rohit Joy ran for CRP Bay Area Vice, Mr. Munger and his associates threatened and cajoled just about everyone they could to not support him. Why? Because Rohit had a public, but reasonable, policy disagreement on how the CRP's proxy system operates and advocated for a change away from the current system, which is overrun by political operatives.

The authors of the Munger Games wish to continue to post without having their livelihood threatened by Mr. Munger and his associates, in the same way that James Madison, Alexander Hamilton, and others wished to post political commentary in their day without fear of personal attack from their political opponents. Of course the issues back then were far more important than today, but the sentiment is still the same.
Reply · 👍 2 · Like · 7 hours ago

 Add a Reply...

**Sue Caro** · Oakland, California
Anonymity is cowardly. The Munger Games is not anonymous because King George is going to arrest the authors. The Munger Games is anonymous because they are cowards and cannot take their arguments directly to the party public square and win. I can't stand The Munger Games and it took me making several requests for them to remove me from their distribution list, which is BTW,



Whether Critical Of King George, or Charles Munger, Jr, Anonymous Speech Should Be Protected | FlashReport

illegitimate. Email distribution is required to be Permission Based. There is no general support for The Munger Games. It is simply 'sleazy' gossip, full of innuendo and deceptive conjecture which has one aim and that is to destroy another Republican. It is not responsible nor is it an act of conservative integrity.

Reply · 2 · Like · 16 hours ago



**Steve Frank**



The bigger problem Greg is those using their name to spam the entire California Republican Party delegate list to smear conservatives and activists. The lack of decency and civility by these people make Washington look honest--worse they use rumors and half truths to smear people. Any wonder folks are leaving the Republican Party? Great activist prefer to watch reruns of Seinfeld than be a part of a on going smear campaign.

Reply · 2 · Like · Yesterday at 9:00am



**Gregory Gandrud** · ☆ Top Commenter · President at Gandrud Financial Services Corporation



Jon, perhaps you could comment on whether or not you support anonymous commenters spamming the entire California Republican Party delegate list with their libelous drivel?

Reply · 1 · Like · Yesterday at 8:34am

**Justin Smith** · ☆ Top Commenter



Stones from a glass house, Greg. You can't send precinct walkers out on your behalf and call it protected political speech, then turn around and cry about "spam" political speech in your inbox. Much like it is pretty ridiculous that the anonymous authors of the Munger Games content rail against the billionaire incremental democrat's exclusionary and devisive tactics within the CRP, and then turn around and actively exclude and divide fellow activists. No one's hands are clean, Greg. And speaking of stones from a glass house, I see that Aaron Park posted something about integrity. Its comedy gold this morning.

Reply · 1 · Like · Yesterday at 9:13am

**Justin Smith** · Communications Specialist at Quest Diagnostics



Gregory, you should really look at who you're tagging in your posts as you tagged the wrong Justin.

Reply · Like · Yesterday at 10:55am

**Gregory Gandrud** · ☆ Top Commenter · President at Gandrud Financial Services Corporation



I don't send out masked precinct walkers disseminating libelous materials from anonymous sources.

Reply · Like · Yesterday at 11:14am

View 3 more ▾



**Tom Kaptain** · ☆ Top Commenter · Works at Self-Employed



For whatever my opinion is worth as a Democrat, I think most people in politics have seen anonymous attacks and I know I have been on the receiving end of more than a few. Thurlow Weed once said for candidates, that "if someone can smear you, then you haven't done a good enough job of getting a message out about who you really are and what you really stand for" and I think that applies here. I have no idea what the attacks are about, but Jon is right that our country made a decision long ago that we would follow a system of allowing as much freedom as possible with limits on what was said only being allowed in situations where the general public welfare was endangered. For people in the public square like myself or Mr. Munger, the standards are even higher as I think they should be. JMO!

Reply · Like · 20 hours ago



**Celeste Greig** · President at Self-Employed

EXHIBIT J Page 1



I find agreeing 90% on the above with Jon, not because he is a long, long time friend but because frivolous law suits have always been associated with the Dems, with the ACLU, with the liberals, with those without integrity. However it is not a surprise that within the Republican Party we have newcomers who are carbon copy of the Dems, OR want to make the CRP carbon copy of the other party. I recently was invited and attended a great evening get together (viewing of a documentary "They coming to America") at a home in Encino (San Fernando Valley) with all attendees grassroots, passionate, issue oriented, public policy, constitutionalists and highly educated Tea Party members, of all those in attendance there were only two registered Republicans, myself and my friend Karen. The message; they do NOT want anything to do with the GOP, they lost credibility and respect for it. So when we have people who are trying to buy the Party, harm free speech from activists/conservatives, the in result can only lead to apathy, more registering Independents or Decline to State. I do not know

FLASHREPORT™ - All rights reserved          Thanks to
                                          Sayfie Review                          Privacy Statement

EXHIBIT J Page 1

PROOF OF SERVICE

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

CASE NAME:  **HARMEET K. DHILLON v. DOE 1**
CASE NO.    **C 13-1465 SI**

The undersigned declares: I am a resident of the United States and am employed in the City and County of Los Angeles, State of California; I am over the age of eighteen years and not a party to the within action; my business address is 10866 Wilshire Boulevard, Suite 400, Los Angeles, California 90024.

On October 1, 2013, I served the following documents:

1.   **DECLARATION OF RICK A. CIGEL**

2.   **MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANT DOE 1  AND THIRD-PARTY MICHAEL J. SCHROEDER IN OPPOSITION TO PLAINTIFF'S ADMINISTRATIVE MOTIONS FOR LEAVE TO TAKE LIMITED DISCOVERY PRIOR TO A RULE 26(f) CONFERENCE**

3.   **CERTIFICATTION OF INTERESTED ENTITIES OR PERSONS**

By serving in the manner described below to the interested parties herein and addressed to:

| | |
|---|---|
| Harold P. Smith | Joel Voelzke |
| Krista L. Shoquist | Intellectual Property Law Office of Joel Voelzke |
| Dhillon & Smith, LLP | 24772 W. Saddle Peak Road |
| 177 Post Street, Suite 700 | Malibu, CA 90265-3042 |
| San Francisco, CA 94108 | |
| | *Attorney for New Dream Network* |
| *Attorneys for Dhillon* | |

**[x]**   **ELECTRONIC MAILING:** I emailed copies of all documents to the above party(s) at their respective email addresses as shown above.

**[X]**   **MAIL:** I caused such envelope(s) to be deposited in the mail at my business address, with postage thereon fully prepaid, addressed to the addressee(s) designated. I am readily familiar with the business practice of collecting and processing correspondence to be deposited with the United States Postal Service on that same day in the ordinary course of business.

**[X]**   **(FEDERAL):** I declare that I am employed by the office of a member of the bar of this court at whose direction the service was made.

Executed on October 1, 2013 at Los Angeles, California.

_____
Michael B. Kadish