Rick A. Cigel (SBN 105424)
THE CIGEL LAW GROUP, P.C.
10866 Wilshire Blvd., Suite 400
Los Angeles, California 90024
Tel:  (424) 901-8513
Fax:  (424) 901-8514


Attorneys for Defendant
DOE 1

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| HARMEET K. DHILLON, an individual,<br><br>               Plaintiff,<br>    vs.<br><br>DOE 1, an unknown individual, and DOES 2 through 10,<br><br>               Defendants. | Case No. 13-cv-01465 SI<br><br>DEFENDANT DOE 1's NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FRCP 12(C) OR FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITES<br><br>[CONCURRENTLY FILED WITH THE DECLARATION OF RICK A. CIGEL]<br><br>Date:  February 28, 2014<br>Time: 9:00 a.m.<br>Courtroom 10, 19th Floor<br>Hon. Susan Illston |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

NOTICE OF MOTION AND RELIEF SOUGHT ............................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 2

I.     INTRODUCTION AND STATEMENT OF ISSUES ................................................... 2

II.    STATEMENT OF FACTS ........................................................................................... 7

III.   UNDER THE STANDARDS FOR EITHER FRCP 12(C) OR FRCP 56 MOTIONS, DOE 1 IS ENTITLED TO A JUDGMENT ENDING THIS CASE ...................................... 9

    A.     Doe 1 Is Entitled To Judgment On The Pleadings Under FRCP 12(C) ............................ 9

    B.     Doe 1 Is Entitled To Summary Judgment Under FRCP 56 ............................. 11

IV.  DOE 1'S ANONYMOUS POLITICAL SPEECH IS PROTECTED BY THE FIRST AMENDMENT. ................................................................................................... 12

V.    AS A MATTER OF LAW, THE USE ON MUNGERGAMES.NET OF PLAINTIFF'S PHOTOGRAPH WAS "FAIR USE" AND THUS NOT COPYRIGHT INFRINGEMENT. ... 14

    A. Purpose And Character Of The Use ............................................................. 15

    B. Nature Of The Copyrighted Work ............................................................... 19

    C. Amount And Substantiality Of Portion Used ................................................ 20

    D. Effect Of The Use Upon The Potential Market For Or Value Of The Copyrighted Work . 21

VI.   DOE 1 IS ENTITLED TO ALL COSTS AND ATTORNEY'S FEES IN DEFENDING THIS PATENTLY FRIVOLOUS ACTION ............................................................. 23

VII.  CONCLUSION ....................................................................................................... 25

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

AF Holdings LLC v. Navasca, 2013 WL 3815677  (N.D. Cal. 2013)................................................23

4

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) .....................................................................11

5

Art of Living Foundation v. Does 1 – 10,  2011 WL 5444622 (N.D. Cal. 2011).................. 13, 14, 16

6

Ascend Healthcare Corp. v. Wells, Slip Copy, 2013 WL 1010589 (E.D.N.C. 2013) .......................16

7

Baraban v. Time Warner Inc., 54 USPQ2d 1759 (S.D.N.Y. 2000) ...................................................17

8

Bond v. Blum, 317 F.3d 385 (4th Cir. 2003) ....................................................................................23

9

Calkins v. Playboy Enterprises Intern., Inc., 561 F.Supp.2d 1136 (E.D. Cal. 2008).........................17

10

Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994)...............................................10, 15, 18

11

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)...................................................................................11

12

Doe v. 2TheMart.com Inc., 140 F. Supp. 2d 1088 (W.D. Wash. 2001) ............................................12

13

Dr. Seuss Enters., L.P v. Penguin Books USA, Inc., 109 F. 3d 1394 (9th Cir. 1997) .......................15

14

Eldred v. Ashcroft, 537 U.S. 186 (2003) ..........................................................................................14

15

Elvis Presley Enters. v. Passport Video, 349 F.3d 622 (9th Cir.2003) .............................................14

16

Fogerty v. Fantasy, Inc. 510 U.S. 517 (1994) ...........................................................................23, 24

17

Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist

18

    Congregational Church, 887 F.2d 228 (9th Cir. 1989) ...............................................................9

19

Haberman v. Hustler Magazine, Inc., 626 F. Supp. 201 (D. Mass. 1986) .......................................20

20

Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542 (9th Cir. 1989).....................9

21

Halicki Films, LLC v. Sanderson Sales & Mktg., 547 F.3d 1213 (9th Cir. 2008) ............................23

22

Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539 (1985)...............................11, 19, 20

23

Highfields Capital Management, L.P v. Doe, 385 F. Supp. 2d 969 (N.D. Cal. 2005)........................13

24

Hustler Magazine, Inc. v. Moral Majority, Inc., 606 F.Supp. 1526 (C.D. Cal. 1985) .......................16

25

In re Anonymous Online Speakers, 661 F.3d 1168 (9th Cir. 2011)............................................13, 25

26

Keep Thomson Governor Committee v. Citizens for Gallen Committee,

    457 F.Supp. 957 (D.N.H. 1978) ...............................................................................................16

27

28

Kelly v. Arriba Soft Corp., 336 F. 3d 811, 817 (9th Cir. 2003)..................................................passim

Lee v. City of Los Angeles, 250 F.3d 668 (9th Cir. 2001)..................................................................10

Leibovitz v. Paramount Pictures Corp., 137 F.3d 109 (2d Cir.1998) ................................................17

Mattel, Inc. v. Walking Mountain Productions, 353 F.3d 792 (9th Cir. 2003)..................................17

Mattel, Inc. v. Entertainment, Inc., 705 F.3d 1108 (9th Cir. 2013).....................................................25

McIntyre v. Ohio Elections Comm'n, 514 U.S. 334 (1995) .........................................................12, 13

Meyer v. Grant, 486 U.S. 414 (1988)..................................................................................................13

New Era Publications Intern., ApS v. Carol Pub. Group, 904 F.2d 152 (2d Cir.1990) .....................16

New.Net, Inc. v. Lavasoft, 356 F.Supp.2d 1090 (C.D. Cal. 2004) .....................................................10

Northland Family Planning Clinic, Inc. v. Center for Bio-Ethical Reform,
      868 F.Supp.2d 962 (C.D. Cal. 2012)......................................................................................15

Nunez v. Caribbean Intern. News Corp., 235 F.3d 18 (1st Cir.2000)......................................17, 18, 20

Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146 (9th Cir. 2007)................................................17

Perry v. Schwarzenegger,  591 F.3d 1147 (9th Cir. 2010)..................................................................13

Religious Tech. Ctr. v. Lerma, 908 F.Supp. 1362 (E.D.Va 1995) ......................................................24

Reno v. ACLU, 521 U.S. 844 (1997)...................................................................................................13

Sedgwick Claims Management Services, Inc. v. Delsman,
      2009 WL 2157573 (N.D. Cal. 2009)......................................................................................17

Sedgwick Claims Mgmt. Servs., Inc. v. Delsman, 2009 WL 2157573 (N.D. Cal. 2009)..................16

Sofa Entm't, Inc. v. Dodger Prods., 709 F.3d 1273 (9th Cir. 2013)......................................23, 24, 25

Talley v. California, 362 U.S. 60 (1960)..............................................................................................12

Video-Cinema Films, Inc. v. Cable News Network, Inc., 2003 WL 1701904 (S.D.N.Y. 2003).......24

Zito v. Steeplechase Films, Inc. 267 F. Supp. 2d 1022 (N.D. Cal. 2003) ..........................................14

**Statutes**

17 U.S.C. § 107 ................................................................................................................................1, 14

17 U.S.C. § 505 .........................................................................................................................1, 23, 24

**Rules**

Fed. R. Civ. P. 12 ................................................................................................. 1, 9, 25

Fed. R. Civ. P. 56 ............................................................................................... 1, 11, 25

## NOTICE OF MOTION AND RELIEF SOUGHT

PLEASE TAKE NOTICE that on February 28, 2014, at 9:00 a.m., or at such other time as the Court may direct, before the Honorable Susan Illston, Courtroom 10, 19th Floor, United States District Court, 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Doe 1 will, and hereby does, move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), or in the alternative, for summary judgment pursuant to Fed. R. Civ. P. 56. Defendant Doe 1 also moves for an award of attorney's fees and costs pursuant to 17 U.S.C. § 505.

This motion is made on the grounds that Plaintiff Harmeet K. Dhillon's complaint, which alleges a single cause of action for copyright infringement, fails to plead a claim and is barred as a matter of law by the Fair Use doctrine. 17 U.S.C. § 107. The complaint is objectively unreasonable, frivolous, and brought for an improper motive, and therefore warrants an award of attorney's fees and costs.

This motion is based on the Notice of Motion and Motion, the Memorandum of Points and Authorities below, the Declaration of Rick A. Cigel submitted herewith, and such other and further papers, evidence and argument as may be submitted to the Court in connection with the hearing on this motion.

Dated: January 14, 2014                              **THE CIGEL LAW GROUP, P.C.**

By:  /s/ _____
        Rick A. Cigel
        Attorneys for Defendant
        DOE 1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.     INTRODUCTION AND STATEMENT OF ISSUES**

Plaintiff Harmeet Dhillon ("Dhillon") knows better than to file a federal lawsuit for the improper purpose of unmasking an anonymous internet political blogger.  Dhillon is a senior litigation attorney who is the namesake of her San Francisco law firm, Dhillon & Smith, LLP.  According to her law firm's website, Dhillon is a staunch advocate of federal anti-SLAPP legislation and of the work done by the ACLU in support of First Amendment rights.  She also is a public figure who is heavily involved in politics, as she is the current Vice Chairperson of the California Republican Party and a long time unsuccessful candidate for public office.   In light of her advanced professional training and activities, she knows that her actions against Doe 1 are a deliberate intrusion of his[1] constitutional rights.

Despite all this, Dhillon filed this lawsuit for a single and remarkably transparent reason:  to gain access to federal discovery tools needed to force Doe 1 to reveal his identity.  Doe 1 is involved in some manner with "The Munger Games", a political blog that is highly critical of Charles Munger, Jr.  Munger is one of the richest activists in California politics and the chairman of the Santa Clara County Republican Party.  Since January 1, 2012, Munger donated more than $42,000,000.00 for campaigns and elections in California politics[2].  Many people believe that Munger has used his enormous family fortune to do great damage to California and to its politics.

Munger is very important to Dhillon.  He has been a client of Dhillon's firm, is the largest single contributor to Dhillon's political campaign[3], and is a political ally of hers.

---

[1] This motion offers no information about the gender of Doe 1 or the number or gender of bloggers or other individuals involved in The Munger Games.  The use of singular or male pronouns in this brief has no significance.

[2] Munger is the son of Charles Munger, the billionaire Vice-Chairman of Warren Buffet's company, Berkshire Hathaway Corporation.

[3] In 2012, Munger donated $7,500 to Dhillon's failed election for a state senate seat.  Attached to the concurrently-filed Declaration of Rick A. Cigel ("Cigel Dec.") as Exhibit "A" is a true and correct copy of a report from the website www.votesmart.org.   It shows Munger as the top contributor to Dhillon's 2012 campaign finances at $7,500.00.

The Munger Games site was created in January 2013 to educate readers about Munger's activities[4] and to voice political commentary regarding issues critically important to California voters.  It is located on the internet at www.mungergames.net.  The blog is a pure exercise of the First Amendment right to speak anonymously about these substantial political matters and the harms Munger and others are inflicting on California. As an anonymous critic, Doe 1 is free to speak without fear of political or economic retribution by Munger.  Anonymous political speech has been cherished in our country as far back as the Founding Fathers.

On his own, Munger can do nothing to learn Doe 1's identity.   That is why Dhillon entered the picture.  Munger and Dhillon saw what they thought was the perfect opportunity to strike when The Munger Games ran an article on February 12, 2013 about Dhillon called "Meet Harmeet", and accompanied the article with an out-of-date publicity headshot photograph of her that was found on the internet.  Cigel Dec., Exhibit "D".   The photograph apparently was taken in March 2008 as one of several photographs shot of her.  (Complaint at ¶¶ 10 - 11)

Dhillon and Munger quickly strategized that she would file a copyright lawsuit regarding the use of that photo.  Their plan was to have Dhillon serve interrogatories and subpoenas in order to learn the identities of The Munger Games' operators and authors, and turn that information over to Munger.

However, as Dhillon confesses in the complaint, she had not yet registered a copyright on the photograph.  She delayed filing the lawsuit while she rushed out to register the copyright on February 21, 2013.  With the fresh registration in hand, she then had her own law firm file this suit on April 2, 2013.  Her motivation to register the photo before suing is self-evident.

**Despite all of Dhillon's rhetoric in her pleadings, she knows that she has de minims alleged damages.  Dhillon is spending all the time and money to register the copyright and then pursue this federal lawsuit <u>for the miniscule damage claim of only $250.00</u>.  As Dhillon claims in Paragraph 22 of her complaint:**

---

[4] A true and correct copy of the blog's inaugural article written about Munger is attached to the Cigel Dec. as Exhibits "B" and "C".

**20.     Pursuant to 17 U.S.C. §504, Ms. Dhillon is entitled to recover the actual damages suffered by her as a result of Defendants' infringement, in the amount of $250, which represents the reasonable license fee to use the Headshot photograph.**

No one spends the time and money to orchestrate an aggressive federal lawsuit regarding a purported copyright violation for a mere $250 in damages.  The allegedly infringed work is nothing more than an out-of-date publicity photograph that has absolutely no commercial value.

Once Dhillon filed this suit, she launched into the real purpose for this case.  She moved quickly, aggressively, and repeatedly to unmask Doe 1:

1)  Dhillon served a subpoena on New Dream Network, LLC, the Southern California company that hosts the website for Mungergames.net.  The subpoena was issued on April 11, 2013 and commanded the production of all information identifying the Doe defendants.  A true and correct copy of the subpoena is attached to the Cigel Decl. as Exhibit "E";

2)  Dhillon then filed an unsuccessful administrative motion to compel compliance with the New Dream Network subpoena.  This Court denied the motion (Dkt. 19) because it had no jurisdiction under F.R.C.P. 45 to enforce a subpoena against a Southern California company;

3)  On July 22, 2013, Dhillon had a subpoena issued out of the Central District of California against New Dream Network.  A true and correct copy of the subpoena is attached to the Cigel Decl. as Exhibit "F";

4)  On August 26, 2013, Dhillon filed an Administrative Motion For Leave To Take Limited Discovery On Google, Inc. Prior To A Rule 26(f) Conference.  She stated the urgent need to have this Court issue subpoenas against Google, Inc. and Michael J. Schroeder, an Orange County attorney who is the former chairman of the California Republican Party.  The subpoenas sought not only the identity of the individuals at Mungergames.net, but also all account information for two email addresses that Dhillon believes are associated with Mungergames.net.  The proposed subpoenas commanded production of "the name, address

and phone number of the owner(s) of these email addresses, and the IP address(es) from which the user(s) created the accounts and signed in and signed out, with dates and times."; and

       5)  Dhillon not only wanted the identity of the persons associated with the IP addresses, she tried to force Mr. Schroeder to produce "any communication between Schroeder and any such individual concerning the "Meet Harmeet" post, from February 12, 2013 to present."  Under the guise of needing to learn the identity of Doe defendants to effect service, Dhillon tried to conduct sweeping discovery regarding <u>nine months</u> of substantive communications with Attorney Schroeder, with absolutely no regard for possible attorney-client privileges.

As Dhillon pushed ahead with the discovery, the sole justification she ever provided regarding her multiple attempts to learn Doe 1's identity is that she needed that information in order to serve Doe 1 with the summons and complaint.  That stated justification was taken away from her on October 25, 2013 when Doe 1's counsel stated that he would accept service of the summons and complaint on behalf of Doe 1.   The offer was made in conjunction with the motion to quash that Doe 1 filed in the Central District of California, as Case No. CV 13-7003-JFW (MANx).  In her opposition brief, Dhillon argued that she "specifically limited" the information sought in that subpoena "to data that is necessary to, and will, enable Plaintiff to serve process on Defendants."  Doe 1 quickly addressed this supposed justification in Doe 1's Reply Brief in support of the motion:

> [T]here is no compelling need for the disclosure of Doe 1's identity at this time.  Plaintiff claims she cannot go forward with this lawsuit unless she determines Doe 1's identity.  However, <u>counsel for Doe 1 hereby represents that he will accept service on behalf of Doe 1</u>.  Thus, there is no longer any requirement for disclosure in order to serve Plaintiff's Complaint.

<u>Id</u>. at p. 3:15-19 (emphasis added).  A true and correct copy of the brief is attached to the Cigel Decl. as Exhibit "G".

That announcement removed any need for the subpoenas, as Dhillon's only stated purpose for the discovery was to facilitate service on Doe 1.  Remarkably, Dhillon's counsel made absolutely no effort to contact Doe 1's counsel and accept the service offer or to complete the

service until recently ordered to do so by this Court.  Cigel Dec., para. 13.  Had Dhillon truly been seeking the discovery for the sake of effecting service and moving the case forward, her attorneys would have <u>instantly</u> contacted Doe 1's counsel and accepted the service offer.

Dhillon plainly is using this lawsuit as an artifice to conduct that discovery, with the specific plan to deliver any such information to Munger for his use.  Munger has already demonstrated that he uses his enormous wealth to crush political commentators and adversaries, as he is pursing nearly $250,000 in attorney's fees against a political critic who has an annual salary of $6,000.

Dhillon's tactics are not proper and the lawsuit should be dismissed.  Doe 1 has done nothing more than exercise his First Amendment right to free speech.  Political speech receives the highest level of First Amendment protection, and courts consistently hold that internet speech is entitled to the same protection as any other kind of speech.  Courts also recognize that a person has First Amendment rights to remain anonymous in critical speech.

Doe 1 seeks alternative forms of relief: either judgment on the pleadings under FRCP 12(c), or summary judgment under FRCP 56.  The set of facts necessary for these rulings is extremely limited and is undisputed.  All this Court needs to do is read the February 12, 2013 article about Dhillon that is attached to the Cigel Decl. as Exhibit "D".  The article is so clearly a political criticism of Dhillon that this Court can easily rule as a matter of law that any use of Dhillon's headshot is transformative and thus protected under the fair use doctrine.

Under the clear facts of this case, it is patently obvious that Dhillon sued Doe 1 for the sole, improper motive of chilling political free speech by forcing the identity of an anonymous critical author.  Under all the circumstances, this Court should therefore award Doe 1 his costs and attorney's fees under the Copyright Act's fee-shifting provision. Doe 1 has been forced to expend considerable resources to protect his rights.  In addition to the cost of this motion, Doe 1's counsel was forced to thoroughly research and brief both a motion to quash subpoenas in Los Angeles and an opposition to Dhillon's misguided Administrative Motions in this Court. (Dkt. Nos. 20 and 24) The briefs have contained complex analyses of Constitutional issues including First Amendment

protection of free speech, the fundamental right to remain anonymous, and the interplay of the Copyright Act and the Fair Use doctrine.

## II.    STATEMENT OF FACTS

Dhillon is a public and political figure, as well as an attorney, in the San Francisco area. (Complaint at ¶¶ 8 - 9) Doe 1 is involved in some capacity with the political internet blog called "The Munger Games," at www.mungergames.net. The Munger Games primarily criticizes a prominent figure in the California Republican Party, multi-millionaire Charles Munger, Jr.

On February 12, 2013, The Munger Games posted an article entitled "Meet Harmeet", as Dhillon was then campaigning for Vice-Chairman of the California Republican Party. The article criticized Dhillon's past political activities and questioned her political ideology. The article also contained a small "headshot" photograph of Dhillon, which was later removed from the blog post. (Complaint at ¶ 15).

Dhillon's counsel attached a copy of the article to her own Declaration in support of a previous motion to this Court, and represented that it is a true and correct copy of the article as posted in February 2013. (Shoquist Declaration at ¶ 2, Exh. A, Dkt. 40 and 40-1). The appearance and content of the article and the small publicity headshot therefore is undisputed.

Dhillon filed her lawsuit in this Court on April 2, 2013, with a single cause of action for Copyright Infringement. (Dkt. 1) The Complaint alleged that mungergames.net/Doe defendants used the photo without her authorization and thus violated her copyright in the photo. Dhillon sought only $250 in damages. (Complaint at ¶ 22)

Dhillon did not list any named defendants in the complaint, and sued Doe 1 and Does 2 – 10 as the defendants. On the same day she filed her Complaint, Dhillon filed an additional document she called an "Ex Parte Application for Leave to Take Limited Discovery." (Dkt. 2) She sought a subpoena against New Dream Network, the web host for www.mungergames.net, in order to discovery the identity of Doe 1. Even at that early stage, Dhillon was plainly aware that the Fair Use doctrine was highly relevant to this matter, and Dhillon addressed that complicated issue in

exactly two paragraphs, presumably in attempt to make it appear as a simple and easily defeated argument.  (Dkt. 2, pp. 7 – 8)

The initial judge on this case granted the "Ex Parte" application a week later, merely signing Dhillon's proposed order without any further discussion, amendment or ruling.  (Dkt.8)  Dhillon issued the subpoena dated April 11, 2013 from the Northern District of California. (Cigel Dec., Exh. "E").

Dhillon then sought to enforce that subpoena by filing what she styled as an "Administrative Motion" (Dkt. 16), although administrative motions are reserved for "miscellaneous administrative matter, not otherwise governed by a federal statute, Federal or local rule or standing order of the assigned judge" under Local Rule 7-11.  Before the hearing on Dhillon's first (of three) Administrative Motions regarding discovery, this case was reassigned to the Honorable Susan Ilston.

This Court rejected the motion, noting that Dhillon had served New Dream Network at an address in Los Angeles, yet sought to compel compliance in San Francisco.  (Dkt. 19)  Because this is a distance of greater than 100 miles, this Court denied enforcement under Fed. R. Civ. P. 45(a)(2).  This Court further ordered Dhillon to seek a subpoena from the Central District of California that directs production of documents in Los Angeles.  (Dkt. 19 at p. 2)

Dhillon issued the subpoena out of the Central District on July 22, 2013, again commanding New Dream Network to produce documents sufficient to disclose the identity of the Doe defendants/owners of mungergames.net.  (Cigel Dec., Exh. "F").  When Doe 1 learned of that subpoena, Doe 1 filed a motion in the Central District of California to quash the subpoena.  (Cigel Dec., Exh. 13)  The subpoena was ultimately withdrawn by Dhillon in response to this Court's November 4, 2013 order.  (Cigel Dec., ¶ 13)

In the meantime, expending even more funds on her $250 copyright claim, Dhillon filed another "Administrative Motion" in this Court, which was later amended, seeking leave to issue subpoenas on Google, Inc. and Orange County attorney Michael J. Schroeder.  (Dkt. 20 and 24) These subpoenas were for the same stated purpose of discovering Doe 1's identity, even though

Dhillon sought not only to compel disclosure of identifying information, but also six months of personal emails from Mr. Schroeder.  These "Administrative Motions" were correctly calendared as "Ex Parte" applications, reflecting the fact that Dhillon had not served notice on anyone, and attorney Schroeder only learned he was the subject of a subpoena when Doe 1's counsel happened upon it while researching the motion to quash in the Central District.

After extensive briefing by Dhillon and Doe 1, this Court denied the "Administrative Motions" based on the papers alone.  (Dkt. 42)  Although the motions had been set for hearing on November 7, 2013, this Court vacated the hearing.  In light of the standing offer that Doe 1's counsel made to accept service of process for Doe 1, this Court instructed Doe 1's counsel to accept service of the Complaint.  Doe 1's counsel quickly did so. (Cigel Decl., ¶ 13)

## III.   UNDER THE STANDARDS FOR EITHER FRCP 12(C) OR FRCP 56 MOTIONS, DOE 1 IS ENTITLED TO A JUDGMENT ENDING THIS CASE

### A.   Doe 1 Is Entitled To Judgment On The Pleadings Under FRCP 12(C)

"After the pleadings are closed - but early enough not to delay trial - a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  A Rule 12(c) motion tests the legal sufficiency of the claims stated in the complaint. "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1989).

In ruling on a 12(c) motion, the Court assumes the truthfulness of the material facts alleged in the complaint and all inferences reasonably drawn from these facts are to be construed in favor of the responding party. Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church, 887 F.2d 228, 230 (9th Cir. 1989).  Documents attached to the complaint and incorporated by reference are treated as part of the complaint, not as extrinsic evidence, and are properly considered in ruling on a Rule 12(c) motion.

Moreover, "[a] district court may consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the

pleading." <u>New.Net, Inc. v. Lavasoft, 356 F.Supp.2d 1090, 1115</u> (C.D. Cal. 2004) (internal

quotations omitted); <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 688 (9th Cir. 2001). In fact, a court

may consider a document not explicitly incorporated in the complaint "if it is 'necessarily relied'

upon by the complaint, [and] as long as the authenticity of the document is not challenged."

<u>New.Net</u>, <u>supra</u>, 356 F.Supp.2d at 1116; <u>Lee</u>, 250 F.3d at 688.

It is appropriate to grant a Rule 12(c) motion in a copyright infringement case where the

defendant establishes that the claim is barred as a matter of law by the doctrine of fair use.  This

Court carefully reviewed and granted such a motion on July 25, 2008 in <u>Savage v. Council On

American-Islamic Relations, Inc.</u>, 2008 WL 2951281 (N.D. Cal. 2008).  In that action, plaintiff

Michael Savage made harsh comments against defendant and the Muslim religion.  Defendant made

a four-minute audio clip from Savage's two-hour long program and posted the clip on their website.

Savage sued the Council alleging copyright infringement and RICO claims.

The Court explained that it was empowered to make a determination as a matter of law

whether the fair use doctrine applies:

> The doctrine of Fair Use is evaluated as a "mixed question of law and fact."
> <u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 560 (1985).
> However, "[i]f there are no genuine issues of material fact, or if, even after resolving
> all issues in favor of the opposing party, a reasonable trier of fact can reach only one
> conclusion, a court may conclude as a matter of law whether the challenged use
> qualifies as fair use of the copyrighted work."  <u>Hustler Magazine</u>, 796 F.2d at 1151;
> <u>see, e.g.</u>, <u>Fisher v. Dees</u>, 794 F.2d 432, 435-36 (9th Cir. 1986) (finding fair use where
> the operative facts were undisputed or assumed; the court is to make fair use
> judgments, which "are legal in nature")' <u>Leadsinger, Inc., v. BMG Music Pub.</u>, 512
> F.3d 522, 530 (9th Cir. 2008).

Id. at *4.

All of the fair use factors must be "explored and weighed together, not in isolation".

<u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 5798 (1994).  The scope of fair use is broader

when the information relayed involves issues of concern to the public.  <u>Harper & Row Publishers,

Inc. v. Nation Enters.</u>, 471 U.S. 539, 555-56 (1985).

In <u>Savage</u>, this Court noted the four factors in the application of the fair use doctrine and

concluded that the majority of the four factors, including the most important factors, weighed in

favor of the defendants.  The Court found that fair use applied and granted the motion for judgment on the pleadings as to the copyright infringement claims as a matter of law.

In this case, the Court should review the "Meet Harmeet" article, which is relied upon in the Complaint, and is also attached to the Declaration by Dhillon's counsel in support of Dhillon's Administrative Motions.  (Dkt. 40-1)  As discussed in detail in Section V below, each of the four factors is met here, and the Court should grant judgment on the pleadings.

### B.      Doe 1 Is Entitled To Summary Judgment Under FRCP 56

Alternatively, the Court should grant summary judgment in Doe 1's favor.  A court may grant summary judgment when the submissions in the record "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A "genuine issue" of material fact means that there is sufficient evidence in favor of the non-moving party to allow a jury to return a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The burden is on the non-moving party to designate specific facts showing a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). However, a mere "scintilla" of evidence will not suffice to meet that burden.  Anderson, 477 U.S. at 252. Nor is it enough for the non-moving party to show that there is some "metaphysical doubt as to the material facts," provided that any inferences from the underlying facts are viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In this case, there are no disputed material facts.  The only facts needed by this Court to determine the issues raised in this Motion are that mungergames.net posted an article called "Meet Harmeet" on its political web blog in February 2013, and that article also contained a small campaign publicity headshot taken in 2008.  A simple review of the article is all that is needed to make a finding of Fair Use as a matter of law under the federal Copyright Act.

## IV.    DOE 1'S ANONYMOUS POLITICAL SPEECH IS PROTECTED BY THE FIRST AMENDMENT.

The Munger Games' website exclusively contains anonymous political speech.  The fact that it is anonymous is self-evident.  There is no identification whatsoever about the identity of anyone connected with the site.   Also, it cannot be disputed that the content of the website is political speech.  A simple review of any of the articles contained on the site shows that they address candidates, issues and individuals involved in California political matters.

It is well established that the First Amendment protects the right to anonymous speech. McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 342 (1995) ("An author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment.").   The U.S. Supreme Court stressed that "Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all." Talley v. California, 362 U.S. 60, 64 (1960).  "Anonymous speech is a great tradition that is woven into the fabric of this nation's history."  Doe v. 2TheMart.com Inc., 140 F. Supp. 2d 1088, 1092 (W.D. Wash. 2001) (referring to the Federalist Papers).

 "Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent. Anonymity is a shield from the tyranny of the majority. It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society."  McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 357 (1995) (citations omitted).

The mere disclosure of an anonymous political speaker constitutes irreparable harm. As stated in Art of Living Foundation v. Does 1 – 10,  2011 WL 5444622 at *9 (N.D. Cal. 2011):

> First, to the extent that [the speaker's] anonymity facilitates free speech, the disclosure of his identity is itself an irreparable harm. See, Perry v. Schwarzenegger,

591 F.3d 1147, 1158 (9th Cir. 2010)("One injury to Proponents' First Amendment rights is the disclosure itself. Regardless of whether they prevail at trial, this injury will not be remediable on appeal."). As the Supreme Court has explained, "an advocate may believe her ideas will be more persuasive if her readers are unaware of her identity. Anonymity thereby provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent." McIntyre, supra, 514 U.S. at 342. The Highfields court put it more succinctly: "Anonymity liberates." Highfields Capital Management, L.P v. Doe, 385 F. Supp. 2d 969 (N.D. Cal. 2005). Insofar as [the speaker] may garner a larger audience by employing a pseudonym, unveiling his true identity diminishes the free exchange of ideas guaranteed by the Constitution.

This First Amendment protection extends to anonymous speech on the internet. "As with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely without 'fear of economic or official retaliation ... [or] concern about social ostracism.' " Anonymous Online Speakers, supra, 661 F.3d. at 1173 (citing McIntyre, supra, 514 U.S. at 341–42).

With regard to political speech, the Supreme Court has recognized that First Amendment protection is especially critical.  "When speech touches on matters of public political life, such as debate over the qualifications of candidates, discussion of governmental or political affairs, discussion of political campaigns, and advocacy of controversial points of view, such speech has been described as the "core" or "essence" of the First Amendment."  Doe v. 2TheMart.com Inc., supra, 140 F. Supp. at 1092-93 (emphasis added), citing,  McIntyre, supra, 514 U.S. at 346–47.

The Ninth Circuit agrees that it is crucial to protect political speech.  "Given the importance of political speech in the history of this country, it is not surprising that courts afford political speech the highest level of protection."  In re Anonymous Online Speakers, 661 F.3d 1168, 1173 (9th Cir. 2011), citing,  Meyer v. Grant, 486 U.S. 414, 422, 425 (1988).  The Court stressed that the First Amendment protection of "core political speech" is "at its zenith".

This fundamental right enjoys the same protections whether the context for speech is a political leaflet or an Internet blog.  Reno v. ACLU, 521 U.S. 844, 870 (1997) (there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to" the Internet).

In this case, there is no question that the content of The Munger Games is political speech. The blog discusses qualifications of political candidates, political activity and campaigns, and addresses controversial issues of public interest.  As such, it is the very essence of the First Amendment, and subject to its most rigorous protections.  In turn, the identity of the author of any posts on mungergames.net is protected by the First Amendment.

## V.  AS A MATTER OF LAW, THE USE ON MUNGERGAMES.NET OF PLAINTIFF'S PHOTOGRAPH WAS "FAIR USE" AND THUS NOT COPYRIGHT INFRINGEMENT.

Due to the importance of protecting the First Amendment right to free speech, the copyright law has built into it certain accommodations, such as the Fair Use doctrine.  If an alleged claim of copyright violation is "Fair Use", it is not infringement as a matter of law.  As stated in Art of Living:

> [E]vidence of copyright infringement does not *automatically* remove the speech at issue from the scope of the First Amendment. While "the First Amendment does not shield copyright infringement," (citation omitted) "copyright law contains built-in First Amendment accommodations." Eldred v. Ashcroft, 537 U.S. 186, 219–20 (2003).  Perhaps the most important is the doctrine of fair use . . . . 17 U.S.C. § 107; see also, Elvis Presley Enters. v. Passport Video, 349 F.3d 622, 626 (9th Cir.2003) ("First Amendment concerns in copyright cases are subsumed within the fair use inquiry.").

Art of Living, supra, 2011 WL 5444622 at *6.

The "fair use" of a copyrighted work "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research" is not an infringement of copyright.  17 U.S.C. § 107.

The statute goes on to state that in determining whether the use made of a work in any particular case is a fair use, the factors to be considered shall include--

**(1)** the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

**(2)** the nature of the copyrighted work;

1    (**3**) the amount and substantiality of the portion used in relation to the copyrighted work as a

2    whole; and

3    (**4**) the effect of the use upon the potential market for or value of the copyrighted work.

4    The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made

5    upon consideration of all the above factors.  Id.

6    The Fair Use exception "permits courts to avoid rigid application of the copyright statute

7    when, on occasion, it would stifle the very creativity which that law is designed to foster."  Kelly v.

8    Arriba Soft Corp., 336 F. 3d 811, 817 (9th Cir. 2003), quoting, Dr. Seuss Enters., L.P v. Penguin

9    Books USA, Inc., 109 F. 3d 1394, 1399 (9th Cir. 1997).  The Arriba Soft court also stated, "We

10   must balance these factors in light of the objectives of copyright law, rather than view them as

11   definitive or determinative tests."  Arriba Soft, supra, 109 F.3d at 1399.

12   Each of these four elements will now be discussed:

13   **A.      Purpose And Character Of The Use**

14   The question regarding this factor is "whether the new work merely supersede[s] the objects

15   of the original creation, or instead adds something new, with a further purpose of different

16   character, altering the first with new expression, meaning, or message; it asks, in other words,

17   whether and to what extent the new work is transformative."  Campbell v. Acuff-Rose Music, Inc.,

18   510 U.S. 569, 579 (1994).  The more transformative the new work, the less important the other

19   factors, including commercialism, become."  Id.  "Typically, a work created for commercial use is

20   less likely to bear fair use protection; however, the commercial/non-commercial distinction is less

21   significant the more transformative the work is."  Northland Family Planning Clinic, Inc. v. Center

22   for Bio-Ethical Reform, 868 F.Supp.2d 962, 970 (C.D. Cal. 2012).

23   Cases have consistently held that reproducing a photographic image for purposes of

24   criticism or commentary is transformative, and thus cannot constitute copyright infringement.  In

25   the Ninth Circuit Arriba Soft case, defendant was an internet search engine that displayed search

26   results in the form of thumbnail photographic images.  Plaintiff was a photographer whose photos

27   of the American West appeared in defendant's search engine results.

28

DOE 1'S FRCP 12(C) AND SUMMARY JUDGMENT MOTION

The court focused on the fact that the search engine's images served an entirely different function that the original photographic images, and found no infringement. While the photographer's "images are used to portray scenes . . . in an aesthetic manner, . . . Arriba's search engine functions as a tool to help index and improve access to images . . . ." Arriba Soft, supra, 336 F.3d at 818.

In Hustler Magazine, Inc. v. Moral Majority, Inc.,606 F.Supp. 1526, 1536 (C.D. Cal. 1985), aff'd, 796 F.2d 1148 (9th Cir. 1986), Hustler magazine brought an infringement action against a fundamentalist minister for reproducing the magazine's parody ads that prominently featured the minister.  The court found that the minister had reproduced the ad as part of a "broader, continuing debate over pornography and other social issues" between the magazine and the minister.  The court found no infringement and granted summary judgment in favor of the minister.

The court stated, "[W]hen an act of copying occurs in the course of a political, social or moral debate, the public interest in free expression is one factor favoring a finding of fair use."  Id.  See also, Keep Thomson Governor Committee v. Citizens for Gallen Committee, 457 F.Supp. 957, 959–60 (D.N.H. 1978) (political committee's use of a portion of rival candidate's musical composition amounted to fair use in light of public interest in full debate over election and absence of injury to plaintiff).

The recent Art of Living case also discussed the fair use doctrine in the context of reproducing an entire pamphlet for purposes of criticizing its author as a sham and a fraud.  Although the Art of Living court stated it did not need to decide whether the copying was fair use, "the circumstances here create a substantial question as to whether the doctrine applies."  Art of Living, supra, 2011 WL 5444622 at *5.  See also, New Era Publications Intern., ApS v. Carol Pub. Group, 904 F.2d 152 (2d Cir.1990) (the use of copyrighted quotations in a biography of Church of Scientology founder L. Ron. Hubbard was protected where the intended purpose of the work was to show that "Hubbard was a charlatan and the Church a dangerous cult").

Several other recent district court opinions have found that using a photo for purposes of criticizing the subject of the photo is fair use.  See Sedgwick Claims Mgmt. Servs., Inc. v. Delsman,

2009 WL 2157573, at *5 (N.D. Cal. 2009) (finding that defendant's use of photographs of two of

plaintiff's executives as a vehicle for criticizing plaintiff's alleged business practices was

"fundamentally different" than the original promotional reason), aff'd, 422 F. App'x 651 (9th Cir.

2011); Ascend Healthcare Corp. v. Wells, Slip Copy, 2013 WL 1010589 (E.D.N.C. 2013) (finding

use of two entire photographs fair use, on a blog criticizing the mental hospital shown in the

photographs); Baraban v. Time Warner Inc., 54 USPQ2d 1759 (S.D.N.Y. 2000) (granting summary

judgment for accused infringer, which had taken an entire photograph of a nuclear plant and used it

in a chapter of a book criticizing the nuclear industry's and the government's portrayal of nuclear

power as safe).

      Despite this wealth of authority, Dhillon argued in her Administrative Motion that the use of

her headshot is not "transformative" because Doe 1 did not alter the photo, and therefore did not

add any new expression, meaning or message.  That argument was soundly put to rest in Sedgwick:

> The question of fair use does not turn simply on whether the photographs themselves were unaltered. Rather, as the relevant jurisprudence makes clear, the salient inquiry is whether the use of the photos, *in the specific context used,* was transformative. See Perfect 10, Inc., 508 F.3d at 1164 ("a search engine puts images *'in a different context'* so that they are 'transformed into a new creation.' ") (emphasis added). In that regard, the Ninth Circuit has consistently held that "making an exact copy of a work may be transformative so long as the copy serves a different function than the original work[.]" Id.  (image originally used for entertainment or aesthetic purposes was transformed where defendant used the same image to facilitate use of an internet browser to locate information on the web); Kelly v. Arriba Soft Corp., 336 F.3d 811, 816 (9th Cir.2003) ( "exact replication" of protected images was fair use where used in a different context from the original); Mattel, 353 F.3d at 802 (photographs of Barbie dolls "in various absurd and often sexualized positions" parodied "Barbie's influence on gender roles and the position of women in society" and hence was transformative); see also Nunez v. Caribbean Intern. News Corp., 235 F.3d 18, 22 (1st Cir.2000) (holding that use of unaltered pictures in conjunction with editorial commentary gave them "new meaning" sufficient to transform the works into a "newsworthy" use); Leibovitz v. Paramount Pictures Corp., 137 F.3d 109, 115 n. 3 (2d Cir.1998) (application of the fair use doctrine is particularly apropos where the use of the work disparages the original).

Sedgwick Claims Management Services, Inc. v. Delsman,  2009 WL 2157573 (N.D. Cal. 2009)

(emphasis added), aff'd, 422 Fed.Appx. 651 (9th Cir. 2011).

      Cases consistently hold that criticizing, debating or commenting on the subject of an

unaltered photograph is transformative.  It is difficult to argue with that premise.  In <u>Calkins v.</u>

<u>Playboy Enterprises Intern., Inc.</u>, 561 F.Supp.2d 1136, 1141 (E.D. Cal. 2008), the court addressed

whether republication of a centerfold model's photograph was transformative when used in an

article about the model.  The court stated:

> In this regard, the Court finds PEI's use of the Photograph to be transformative because although PEI made a replica of the Photograph, <u>the reproduced image was much smaller and served an entirely different function than the original image</u>. Mother Lode originally created the Photograph for the limited purpose of being used as a gift by Shannon's family and friends [ ] while PEI used the Photograph, in conjunction with other photographs of Shannon and a handwritten biography, for the purpose of personalizing Shannon by providing insight into her life, including how she grew up and what her interests are. [ ] Thus, <u>because PEI used the Photograph in a new context to serve a different function</u> (inform and entertain Playboy readers) than the original Photograph (gifts for family and friends), <u>PEI's use did not supersede the function of the original Photograph, and therefore PEI's use is transformative</u>. <u>See Kelly,</u> 336 F.3d at 818-19; <u>see also</u>, <u>Nunez v. Caribbean Int'l News Corp.</u>, 235 F.3d 18, 22-23 (1st Cir.2000) (republication of photographs taken for a modeling portfolio in a newspaper was transformative because the photos served to inform, as well as entertain). (emphasis added)

In the <u>Nunez</u> case, plaintiff photographer had taken photos of "Joyce Giraud (Miss Puerto

Rico Universe 1997) for use in Giraud's modeling portfolio. Núñez then distributed the photographs

to various members of the Puerto Rico modeling community in accordance with normal practice."

<u>Id.</u>, 235 F.3d at 21.  A local television station reproduced the photographs for purposes of debate

and commentary on whether the photos "were appropriate for a Miss Puerto Rico Universe, based

on the fact that Giraud was naked or nearly naked in at least one of the photos."  <u>Id.</u>   A magazine

then republished the photos in articles about the controversy.

Nunez sued for copyright infringement, and the court found Fair Use and dismissed the

complaint with prejudice.  The court stated, "[W]hat is important here is that <u>plaintiffs' photographs</u>

<u>were originally intended to appear in modeling portfolios, not in the newspaper</u>; the former use, not

the latter, motivated the creation of the work. Thus, by using the photographs in conjunction with

editorial commentary, El Vocero did not merely "supersede[ ] the objects of the original

creation[s]," but instead used the works for "a further purpose," giving them a new "meaning, or

message."  <u>Id.</u> at 23, *citing*, <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 579 (1994).

In summary, Dhillon's publicity headshot was plainly put in a different context and was used for a different purpose than originally intended.  Dhillon's stated original purpose of the photo was for publicity for a political campaign, whereas The Munger Games used the photo for purposes of criticizing Ms. Dhillon's political activities.  These two purposes could not be more different, and weigh heavily in favor of a finding of Fair Use.

## B.   Nature Of The Copyrighted Work

The Ninth Circuit has described this second factor well in the <u>Arriba Soft</u> case, stating:

> Works that are creative in nature are closer to the core of intended copyright protection than are more fact-based works."  Photographs that are meant to be viewed by the public for informative and aesthetic purposes . . . are generally creative in nature. The fact that a work is published or unpublished also is a critical element of its nature. Published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred.

<u>Arriba Soft</u>, <u>supra</u>, 336 F.3d at 820, <u>quoting</u>, <u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 564 (1985) (noting that the scope of fair use is narrower with respect to unpublished works because the author's right to control the first public appearance of his work weighs against the use of his work before its release).

In this case, Dhillon has, by her own allegations, extensively published and released her publicity headshot photo to the general public over the course of the past several years.  (Complaint at ¶ 14, Doc. 1). In addition, a simple internet search reveals hundreds of images of Dhillon readily available on the web, including the very publicity photo at issue in this case.  (Cigel Dec. at ¶ 14).

Therefore, the single isolated use of Dhillon's widely published headshot publicity is more likely to be fair use than not, especially because she is a political public figure.  (Complaint at ¶ 9). In addition, although a photographer's use of lighting or angle or setting sometimes may be deemed "creative", Dhillon's purpose in commissioning the photo (which seems to have been taken outside with her standing in sunlight next to a building) was for campaign publicity.  (Complaint at ¶ 11, Doc. 1).  The subject photo was obviously for the purpose of identification and face recognition rather than creative aesthetics.

In prior briefing before this Court, Dhillon argued that her headshot photo is "creative"

because the photographer made certain creative choices such as urging her to smile and posing her so that she was not squinting into the sun.  However, as in the <u>Nunez</u> case, where pictures were taken for a modeling portfolio, this does not warrant a finding of "creative".  The <u>Nunez</u> court stated:

> The district court suggested, and we agree, that Núñez's pictures could be categorized as either factual or creative: certainly, photography is an art form that requires a significant amount of skill; <u>however, the photographs were not artistic representations designed primarily to express Núñez's ideas, emotions, or feelings, but instead a publicity attempt to highlight Giraud's abilities as a potential model.</u> *Cf.* <u>Haberman v. Hustler Magazine, Inc.,</u> 626 F. Supp. 201, 211 (D. Mass. 1986) (reproduction of surrealistic art in magazine, where creativity counted against fair use finding).

<u>Nunez</u>, <u>supra</u>, 235 F.3d at 23 (emphasis added).

Likewise, in the present case, Dhillon's publicity headshot was not meant to express her photographer's ideas, emotions or feelings, but instead as publicity for Dhillon as a political candidate. (Complaint at ¶ 11).  There is nothing in Dhillon's Complaint or any declaration that states that the photographer took Dhillon's photo for purposes of creating an original artistic work.  Thus, this factor also weighs in favor of finding Fair Use.

Also relevant to this factor is Dhillon's own statement in a previous brief to this Court that Doe 1 "cut-and-pasted the Headshot Photograph 'from a previous [Dhillon] political campaign' website".  (Dkt. 39 at p. 3).  Thus, Dhillon admitted that she previously published that very headshot, which is a fact that also weighs in favor of a finding of Fair Use.  <u>Harper & Row</u>, <u>supra</u>, 471 U.S. at 555.

### C.    Amount And Substantiality Of Portion Used

As stated in <u>Arriba Soft</u>, "the extent of permissible copying varies with the purpose and character of the use. (citation omitted) If the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her."  <u>Arriba Soft</u>, <u>supra</u>, 336 F.3d at 820 – 821.  The <u>Arriba Soft</u> court continued, "It was necessary for Arriba to copy the entire image to allow users to recognize the image and decide whether to pursue more information. . . . If Arriba only copied part of the image, it would be more difficult to identify it, thereby reducing the

usefulness of the visual search engine." Id. at 821.

In the present case, the headshot publicity photograph of Dhillon was already tightly-cropped.  It would have been impossible to use only a portion of that photograph without deleting a portion of her face.  It is plainly obvious that The Munger Games copied only as much of the photo as was necessary.

**D.**   **Effect Of The Use Upon The Potential Market For Or Value Of The Copyrighted Work**

In discussing this factor, the Arriba Soft court stated that courts should consider whether the alleged copying harmed the copyright owner's market, or would have a substantial adverse impact on the potential market for the original.  Id. at 821.  In order to survive a summary judgment motion, Dhillon bears the burden of providing evidence of actual economic harm.  Dash v. Mayweather, 2013 WL 5365967 (4th Cir. September 26, 2013).

In this case, Dhillon has not produced _any_ evidence of an actual market for her out-of-date campaign publicity headshot, much less the kind of competent evidence that is required.   She certainly cannot prove that her ability to license this six year old photo has actually been harmed by The Munger Games.   She conspicuously made no allegations whatsoever in her complaint that she ever attempted to license the photograph or that she had actually licensed it for money.

In the Mayweather case, a professional boxer used a musical track to be played when he entered the boxing ring at a World Wrestling Entertainment ("WWE") event.  The composer of the musical track sued for copyright infringement.  The composer presented an expert witness affidavit setting forth the various revenue streams for the WWE and sample licensing fees for other composers for WWE events.  He then stated his expert opinion regarding the supposed actual damages and loss of profits.  Id. at *2 – 3.  The court held that the expert's opinion was merely speculative, in that there was no proof that anyone had ever paid the composer for any license fee, or that the composer had ever generated any income from his composition.  Thus, the composer failed to present evidence of any fair market value.  Id.

Likewise, in the present case, Dhillon has not made a single allegation that she has ever sold

or licensed her campaign publicity headshot, or that anyone has even offered to pay her to purchase or license that photograph.  Instead, Dhillon set an arbitrary and conclusory value of $250 for a "reasonable license fee", based on nothing more than fanciful speculation.  (Complaint at ¶ 22).  In addition, Dhillon's headshot photo is badly out-of-date, as it was taken in 2008.  (Complaint at ¶¶ 11- 12).

Furthermore, there is no allegation or evidence that mungergames.net generated any income from the posting of the headshot.  There cannot be any such evidence, because the blog is entirely non-commercial.  Anyone can go to the mungergames.net website and view its content for free.  There is no login information required, no subscription required, and no fee requested.  (Cigel Dec. at ¶ 4).  The site does not sell anything whatsoever and there is no option anywhere on the site to provide money.

There simply is no market for Dhillon's widely-used and now out-of-date publicity headshot photograph.  She cannot identify any market and has never alleged that she sells her publicity headshot for profit.  On the contrary, as already stated, she widely used the photo in political campaigns and in marketing efforts.  (Complaint at ¶ 14).

In summary, each of the four "Fair Use" factors weighs heavily in finding that there was no copyright infringement:

1)  The photo was used for First Amendment political commentary, a purpose very different from the original purpose of campaign publicity, and therefore "transformative."

2)  The nature of the photo was for purposes of identifying Dhillon in her political campaigns in 2008, rather than as an artistic original expression of the photographer.

3)  The photo had been widely distributed and published prior to its appearance on mungergames.net, which copied only as much of the photo as was necessary.

4)  There was no impact on the non-existent market for a photo that was used solely for publicity and never had commercial value.

Thus, because The Munger Games' posting of Dhillon's publicity headshot was "Fair Use", there is no copyright infringement as a matter of law.  It is not even a close call pursuant to well-

1  established authority directly on point.

2  **VI.     DOE 1 IS ENTITLED TO ALL COSTS AND ATTORNEY'S FEES IN DEFENDING**

3  **THIS PATENTLY FRIVOLOUS ACTION**

4      Dhillon knew this action had no basis in copyright law when she filed it, yet she caused Doe

5  1 to incur significant expense in defending his Constitutional rights to free speech.  This is precisely

6  the type of case in which attorney's fees should be awarded to Doe 1.  Section 505 of the Copyright

7  Act states that the court may allow recovery of full costs and a reasonable attorney's fee to the

8  prevailing party as part of the costs.  17 U.S.C. § 505.

9      Judge Chen of this court has recently set forth the factors a court should consider in

10  awarding attorney's fees and costs under the Copyright Act's fee-shifting provisions, relying on

11  precedent from both the U.S. Supreme Court and the Ninth Circuit.  In AF Holdings LLC v.

12  Navasca, 2013 WL 3815677  (N.D. Cal. 2013), the court stated:

13      In Fogerty v. Fantasy, Inc. 510 U.S. 517 (1994), the Supreme Court noted that . . .
14  "There is no precise rule or formula for making these determinations," but instead
   equitable discretion should be exercised "in light of the considerations we have
15  identified."  Id. at 534.  The Court also noted that nonexclusive factors that could be
   considered in making a fee/cost determination included "'**frivolousness, motivation,**
16  **objective unreasonableness (both in the factual and in the legal components of**
   **the case) and the need in particular circumstances to advance considerations of**
17  **compensation and deterrence**.' " Id. at 534 n. 19.  According to the Ninth Circuit,
   the **degree of success** obtained is another factor that may be considered. See Halicki
18  Films, LLC v. Sanderson Sales & Mktg., 547 F.3d 1213, 1230 (9th Cir. 2008).
   However, "'[t]he most important factor in determining whether to award fees under
19  the Copyright Act[ ] is whether an award will further the purposes of the Act' "—the
   primary objective of the Act being "to 'encourage the production of original literary,
20  artistic, and musical expression for the good of the public.' " Sofa Entm't, Inc. v.
   Dodger Prods., 709 F.3d 1273, 1280 (9th Cir. 2013). (emphasis added)
21

22      Courts applying Section 505 have generally found that the more frivolous a purported

23  copyright action is, the more appropriate it is to award attorney's fees and costs.  See, e.g., Bond v.

24  Blum, 317 F.3d 385, 397-98 (4th Cir. 2003) (affirming copyright defendants' fee award because fair

25  use question was "not a close one" and copyright holder's position was frivolous and unreasonable);

26  Video-Cinema Films, Inc. v. Cable News Network, Inc., 2003 WL 1701904, *3 (S.D.N.Y. 2003)

27  (awarding defendants' fees because copyright holder's position on fair use was "objectively

28

unreasonable"); <u>Religious Tech. Ctr. v. Lerma</u>, 908 F.Supp. 1362, 1368 (E.D.Va 1995) (awarding defendants' fees because "no reasonable copyright holder could have in good faith brought a copyright infringement action.").

Cases from the Ninth Circuit have bolstered the notion that attorney's fees and costs should be awarded as a deterrent to bringing frivolous or even borderline frivolous copyright actions, especially when the motivation behind the action is suspect due to the plaintiff's knowledge of copyright law.  In the <u>SOFA Entertainment</u> case, <u>supra</u>, defendant had used a seven-second clip from *The Ed Sullivan Show* in a theatrical musical, *Jersey Boys*.  The musical was about a band that had been introduced on the television show.  The court found that plaintiff had already been embroiled in a similar copyright action once before, involving the use of Elvis Presley television clips in a biographical movie about Elvis.  The <u>SOFA</u> court stated:

> In light of the education SOFA received as the plaintiff in *Elvis Presley Enterprises,* SOFA should have known from the outset that its chances of success in this case were slim to none. Moreover, we agree with the district court that "lawsuits of this nature ... have a chilling effect on creativity insofar as they discourage the fair use of existing works in the creation of new ones." The fair use doctrine is an integral part of copyright law precisely because it gives authors "breathing space within the confines of copyright" to build upon their predecessors' works. *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164. When a fee award encourages a defendant to litigate a meritorious fair use claim against an unreasonable claim of infringement, the policies of the Copyright Act are served. *Fogerty,* 510 U.S. at 527, 114 S.Ct. 1023. Therefore, we conclude that the district court's award of attorney fees to Dodger was justified.

> <u>SOFA Entertainment</u>, 709 F.3d at 1281.

Similarly, in the present case, Dhillon cannot claim that she is ignorant of copyright law or the application of the Fair Use doctrine.  On the contrary, her law firm, Dhillon & Smith LLP, holds itself out as experts in copyright law on its website.  (Cigel Dec. ¶ 15)  In addition, as already stated, Dhillon raised the Fair Use doctrine in her original Ex Parte application for leave to issue a subpoena on New Dream Network to discovery Doe 1's identity, which was filed the very same day as her frivolous copyright Complaint.  (Dkt. 2)  Dhillon was fully aware of the Fair Use doctrine, yet chose to ignore its obvious application to this case and instead moved brazenly ahead with her

scheme to uncover the identity of the people who criticized her benefactor, Munger, and her.  See also, Mattel, Inc. v. Entertainment, Inc., 705 F.3d 1108, 1111 (9th Cir. 2013) (affirming an award of attorney's fees in a copyright claim "that was stunning in scope and unreasonable in the relief it requested")

In the present case, the public has a paramount interest in robust political debate. Anonymous Online Speakers, supra, 661 F.3d at 1173.  Dhillon's frivolous copyright claim seeks to chill free speech rather than promote it.  Further, Dhillon seeks to squelch original literary commentary and criticism, in violation of the primary purpose of the Copyright Act.  Sofa Entm't, supra, 709 F.3d at 1280.

Because Dhillon's firm publically touts its expertise in copyright law, she cannot claim she brought her $250 claim in good faith for purposes of recouping infringed rights of a six year old campaign publicity headshot.  Instead, Dhillon brought this action to learn the identity of the author of the mungergames.net political blog for the benefit of her benefactor, Charles Munger.  This Court should therefore award Doe 1 his attorney's fees and costs in the amount of $128,665.00 through December 2013, plus all additional time spent in 2014, in defending this action, .  (Cigel Decl. at ¶ 16-19)

## VII.   CONCLUSION

For all the foregoing reasons, Doe 1 respectfully requests this Court to grant judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) or alternatively for summary judgment pursuant to Fed. R. Civ. P. 56.  In addition, Doe 1 requests attorney's fees of at least $128,665.00.

Date: January 14, 2014                    **THE CIGEL LAW GROUP, P.C.**



                              By:   /s/
                                 Rick A. Cigel, Esq.
                                 Attorneys for Defendant
                                 DOE 1

PROOF OF SERVICE

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

CASE NAME:  **HARMEET K. DHILLON v. DOE 1**

The undersigned declares: I am a resident of the United States and am employed in the City and County of Los Angeles, State of California; I am over the age of eighteen years and not a party to the within action; my business address is 10866 Wilshire Boulevard, Suite 400, Los Angeles, California 90024.

On January 14, 2014, I served the following document:

**DEFENDANT DOE 1's NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FRCP 12(C) OR FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITES**

By serving in the manner described below to the interested parties herein and addressed to:

Harold P. Smith, Esq.
Krista L. Shoquist, Esq.
Dhillon & Smith, LLP
177 Post Street, Suite 700
San Francisco, CA 94108

[x] **MAIL:** I caused such envelope(s) to be deposited in the mail at my business address, with postage thereon fully prepaid, addressed to the addressee(s) designated. I am readily familiar with the business practice of collecting and processing correspondence to be deposited with the United States Postal Service on that same day in the ordinary course of business.

[x] **FEDERAL:** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on January 14, 2014 at Los Angeles, California.

/s/ _____
Shelly Lokietz