Rick A. Cigel, Esq. (SBN 105424)
THE CIGEL LAW GROUP, P.C.
10866 Wilshire Blvd., Suite 400
Los Angeles, California 90024
Tel:  (424) 901-8513
Fax: (424) 901-8514

Attorneys for Defendant
DOE 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARMEET K. DHILLON, an individual, | Case No. 13-cv-01465 SI |
| Plaintiff, | |
| vs. | DECLARATION OF RICK A. CIGEL IN SUPPORT OF DEFENDANT DOE 1'S REPLY BRIEF TO THE MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FRCP 12(C) OR FOR SUMMARY JUDGMENT |
| DOE 1, an unknown individual, and DOES 2 through 10, | |
| Defendants. | Date:  February 28, 2014<br>Time: 9:00 a.m.<br>Courtroom 10, 19th Floor<br>Hon. Susan Illston |

1

**DECLARATION OF RICK A. CIGEL**

2       I, Rick A. Cigel, declare and state as follows:

3       1.      I am an attorney at law duly licensed to practice before all the courts in the State of

4    California.  I have personal knowledge of the matters set forth below, and if called upon to do so,

5    I could and would testify competently thereto.

6       2.      I am the principal at The Cigel Law Group, P.C., counsel for Defendant Doe 1.

7    Doe 1 is an unnamed defendant and files this motion under his or her fictitious name in order to

8    preserve anonymity.   No reference to Doe 1 in this declaration is meant to convey any

9    information about the gender of Doe 1 or the number of individuals involved.

10      3.      Attached hereto as Exhibit "A" is a true and correct copy of Swatch Group

11   Management Services Ltd. v. Bloomberg L.P., 2014 WL 274407, *1 (2d Cir., Jan. 27, 2014, 12-

12   2412-CV). The ruling is significant for a number of reasons, including the fact that the District

13   Court's *sua sponte* granting of summary judgment was affirmed unanimously, where the Court

14   made its ruling under the fair use doctrine even before plaintiff Swatch had the opportunity to

15   take any discovery.   Because of Doe 1's page limitation for his reply brief, Doe 1 was not able to

16   fully discuss and analyze the breadth and significance of Swatch.   Doe 1 urges this Court to

17   review the case carefully.

18      4.      In November 2013, the San Francisco Chronicle published a lengthy article

19   regarding plaintiff Harmeet Dhillon's lawsuit against Doe 1.   The San Francisco Chronicle

20   reporter interviewed and quoted Dhillon for the story.   The Orange County Register republished

21   the article in its entirety.  Attached hereto as Exhibit "B" is a true and correct copy of the article,

22   which I obtained by going to the Orange County Register's website last week and printing the

23   article exactly as it was shown on screen.

24      5.      On January 29, 2014, Thomson Reuters published an article regarding this lawsuit

25   and the recent motion for leave to file an amicus brief that was filed by the Electronic Freedom

26   Foundation. A true and correct copy of that article is attached hereto as Exhibit "C".

27

28

1     I declare under penalty of perjury under the laws of the State of California that the

2 foregoing is true and correct and that this declaration was executed on February 4, 2014 at Los

3 Angeles, California.

4

5                             _____/s/_____

6                                   Rick A. Cigel

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF RICK A. CIGEL, Case No. 13-cv-01465 SI

Exhibit "A"

2014 WL 274407
Only the Westlaw citation is currently available.
United States Court of Appeals,
Second Circuit.

The SWATCH GROUP MANAGEMENT
SERVICES LTD., Plaintiff–Counter–
Defendant–Appellant–Cross–Appellee,

v.

BLOOMBERG L.P., DefendantCounter–
Claimant–Appellee–Cross–Appellant.

Docket Nos. 12–2412–cv, 12–2645–cv.  |
Argued: Oct. 21, 2013.  |  Decided: Jan. 27, 2014.

**Synopsis**
**Background:** Watch manufacturer that hosted international conference call with group of securities analysts brought action against news service, alleging that news service infringed copyright in audio recording of earnings call by recording it without authorization, and making transcript of call available to its paid subscribers. The United States District Court for the Southern District of New York, Hellerstein, J., 861 F.Supp.2d 336, granted summary judgment to defendant. Parties appealed.

**Holdings:** The Court of Appeals, Katzmann, Chief Judge, held that:

[1] lack of additional commentary or analysis did not preclude finding that "purpose and character" of use of original work favored fair use;

[2] nature of copyrighted work favored finding of fair use;

[3] manifestly factual character of manufacturer's earnings call favored finding of fair use;

[4] statutory fair use factor regarding "amount and substantiality of the portion used in relation to the copyrighted work as a whole" did not favor manufacturer;

[5] statutory fair use factor that considered "effect of the use upon the potential market for or value of the copyrighted work" favored finding of fair use;

[6] use of earnings call was in accordance with fair use defense;

[7] service was not entitled to cross-appeal issue of whether manufacturer's recording was validly copyrightable; and

[8] prior notice of cross-appeal reasonably could not be read to contemplate review of district court's subsequent order dismissing copyright invalidity counterclaims of news service as moot.

Affirmed. News service's cross-appeal dismissed.

West Headnotes (25)

**[1]**   **Federal Civil Procedure**
        🔑 Motion

        **Federal Civil Procedure**
        🔑 Time for Consideration of Motion

        Before granting summary judgment sua sponte, discovery must either have been completed, or it must be clear that further discovery would be of no benefit, such that the record reflects the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment. Fed.Rules Civ.Proc.Rule 56(a–e), 28 U.S.C.A.

**[2]**   **Copyrights and Intellectual Property**
        🔑 Fair Use and Other Permitted Uses in General

        Because copyright law recognizes the need for "breathing space," a defendant who otherwise would have violated one or more of the exclusive rights granted to a copyright holder may avoid liability if he can establish that he made "fair use" of the copyrighted material. 17 U.S.C.A. § 107.

**[3]**   **Copyrights and Intellectual Property**
        🔑 Fair Use and Other Permitted Uses in General

        Though mandatory, the four factors for evaluating fair use of a copyrighted work are

non-exclusive; although defendants bear the burden of proving that their use was fair, they need not establish that each of the factors weighs in their favor, but, instead, all factors are to be explored, and the results weighed together, in light of the purposes of copyright, because the ultimate test of fair use is whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it. 17 U.S.C.A. § 107.

**[4]** **Copyrights and Intellectual Property**
🔑 Trial

The determination of fair use is a mixed question of fact and law. 17 U.S.C.A. § 107.

**[5]** **Copyrights and Intellectual Property**
🔑 Fair Use and Other Permitted Uses in General

Under the fair use analysis, the statutory factor regarding purpose and character of the use encompasses within it a number of distinct considerations, including whether the use is of a commercial nature or is for nonprofit educational purposes, whether the use is transformative or merely supersedes the objects of the original creation, whether the defendant acted in good faith, and whether the defendant engaged in "news reporting" or another activity illustratively listed in statute as indicative of fair use. 17 U.S.C.A. § 107(1).

**[6]** **Copyrights and Intellectual Property**
🔑 Fair Use and Other Permitted Uses in General

While the good or bad faith of a defendant generally should be considered, it generally contributes little to fair use analysis. 17 U.S.C.A. § 107.

**[7]** **Copyrights and Intellectual Property**
🔑 Sound Recordings

Lack of additional commentary or analysis to transform manufacturer's earnings call that had been conducted with group of securities analysts by telephone, recorded by news service without authorization, and made available by transcript to news service's subscribers, did not preclude finding that "purpose and character" of use of original work favored fair use in light of independent informational value inherent in that faithful recording; what manufacturer's executives said and how they said it may have been valuable to investors and analysts since speaker's demeanor, tone, and cadence could elucidate his or her true beliefs. 17 U.S.C.A. § 107(1).

**[8]** **Copyrights and Intellectual Property**
🔑 Fair Use and Other Permitted Uses in General

The statutory fair use factor concerning "the nature of the copyrighted work" accounts for the fact that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied. 17 U.S.C.A. § 107(2).

**[9]** **Copyrights and Intellectual Property**
🔑 Sound Recordings

Nature of copyrighted work favored finding of fair use of manufacturer's earnings call that had been conducted with group of securities analysts by telephone, recorded by news service without authorization, and made available by transcript to news service's subscribers, although earnings call technically was unpublished; manufacturer invited over three hundred investment analysts from around globe to earnings call, out of which over one hundred actually attended, and thus manufacturer had not been deprived of ability to control first public appearance of its expression, including when, where, and in what form it appeared. 17 U.S.C.A. §§ 101, 107(2).

**[10]** **Statutes**

☞ **Defined Terms; Definitional Provisions**

In general, statutory definitions control the meaning of statutory words.

**[11]    Copyrights and Intellectual Property**
☞ Fair Use and Other Permitted Uses in General

Although inquiry into a work's publication status is relevant to fair use, it in no way limits a court's consideration of that issue to the statutory definition of "publication"; to the contrary, if a court finds a work to be "unpublished," however that term is understood, its analysis of the four statutory factors, including "the nature of the copyrighted work," cannot end there. 17 U.S.C.A. §§ 101, 107(2).

**[12]    Copyrights and Intellectual Property**
☞ Fair Use and Other Permitted Uses in General

Publication as a judicial gloss on "the nature of the copyrighted work" aims to take account of the author's right to control the first public appearance of his expression, which in turn forms part of a court's open-ended and context-sensitive inquiry into whether allowing the use in question would serve the goals of copyright. 17 U.S.C.A. §§ 101, 107(2).

**[13]    Copyrights and Intellectual Property**
☞ Fair Use and Other Permitted Uses in General

The scope of fair use is greater with respect to factual than non-factual works. 17 U.S.C.A. § 107.

**[14]    Copyrights and Intellectual Property**
☞ Sound Recordings

Manifestly factual character of manufacturer's earnings call that had been conducted with group of securities analysts by telephone, recorded by news service without authorization, and made available by transcript to news service's

subscribers favored finding of fair use; even if call contained sufficient original expression in form of executives' tone, cadence, accents, and particular choice of words to be copyrightable, purpose of call was not in any sense to showcase those forms of expression, but rather to convey financial information about company to investors and analysts. 17 U.S.C.A. § 107(2).

**[15]    Copyrights and Intellectual Property**
☞ Sound Recordings

Due to public interest in information embodied in recording, statutory fair use factor regarding "amount and substantiality of the portion used in relation to the copyrighted work as a whole" did not favor manufacturer with regard to its earnings call that had been conducted with group of securities analysts by telephone, recorded by news service without authorization, and made available by transcript to news service's subscribers. 17 U.S.C.A. § 107(3).

**[16]    Copyrights and Intellectual Property**
☞ Fair Use and Other Permitted Uses in General

The statutory fair use factor regarding "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" asks whether the quantity and value of the materials used are reasonable in relation to the purpose of the copying; in general, the more of a copyrighted work that is taken, the less likely the use is to be fair. 17 U.S.C.A. § 107(3).

**[17]    Copyrights and Intellectual Property**
☞ Sound Recordings

Statutory fair use factor that considered "effect of the use upon the potential market for or value of the copyrighted work" favored finding of fair use of manufacturer's earnings call that had been conducted with group of securities analysts by telephone, recorded by news service without authorization, and made available by transcript to news service's subscribers, since "value" of copyrighted expression for

manufacturer lay not in its capacity to generate licensing royalties, but rather in its capacity to convey important information about company to interested investment analysts; whatever cognizable interest manufacturer had in maintaining ability to know and control precisely who heard call was far outweighed by public interest in dissemination of important financial information. 17 U.S.C.A. § 107(4).

**[18]     Copyrights and Intellectual Property**
    ☞  Fair Use and Other Permitted Uses in General

The statutory fair use factor that considers "the effect of the use upon the potential market for or value of the copyrighted work" requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original. 17 U.S.C.A. § 107(4).

**[19]     Copyrights and Intellectual Property**
    ☞  Nature of Statutory Copyright

While the immediate effect of copyright law is to secure a fair return for an author's creative labor, the ultimate aim is, by this incentive, to stimulate creativity for the general public good. 17 U.S.C.A. § 107.

**[20]     Copyrights and Intellectual Property**
    ☞  Sound Recordings

News service's use of watch manufacturer's earnings call that had been conducted with group of securities analysts by telephone, recorded by news service without authorization, and made available by transcript to news service's subscribers was in accordance with "fair use" defense, thereby precluding infringement claim under Copyright Act; purpose and character of news service's use advanced the public interest of furthering full, prompt, and accurate dissemination of business and financial news,

very little of the earnings call qualified as original expression, and news service's use of call was not at odds with watch manufacturer's desire to create an advantageous perception of its financials and business performance. 17 U.S.C.A. § 107.

**[21]     Federal Courts**
    ☞  Particular Persons

Defendant news service had not been aggrieved by district court's dismissal of manufacturer's complaint on ground of fair use, and therefore was not entitled to cross-appeal issue of whether manufacturer's recording was validly copyrightable, although it was entitled to urge that court affirm district court's decision on any basis submitted to that court and supported by the record. 17 U.S.C.A. § 107.

**[22]     Federal Courts**
    ☞  Right of Review

In order to have standing to appeal, a party must be aggrieved by the judicial action from which it appeals.

**[23]     Federal Courts**
    ☞  Requisites and Sufficiency;  Defects

The requirement for a notice of appeal to designate the judgment, order, or part thereof being appealed is jurisdictional in nature. F.R.A.P.Rule 3(c)(1)(B), 28 U.S.C.A.

**[24]     Federal Courts**
    ☞  Requisites and Sufficiency;  Defects

Prior notice of cross-appeal reasonably could not be read to contemplate review of district court's subsequent order dismissing copyright invalidity counterclaims of news service as moot, where subsequent order had been filed two months after court had granting summary judgment in favor of news service on basis of fair use as to manufacturer's copyright infringement claims; service would have had to file additional or supplemental notice of

appeal designating subsequent order as subject of cross-appeal for Court to have jurisdiction over invalidity counterclaims. 17 U.S.C.A. § 107; F.R.A.P.Rule 3(c)(1)(B), 28 U.S.C.A.; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

[25]    **Federal Courts**
   👉 Requisites and Sufficiency; Defects

Notices of appeal are construed liberally, taking the parties' intentions into account. F.R.A.P.Rule 3(c)(1)(B), 28 U.S.C.A.

Appeal and cross-appeal from a judgment of the United States District Court for the Southern District of New York (Hellerstein, *J.*), granting summary judgment to the defendant as to the plaintiff's claim of copyright infringement on the ground that the defendant had engaged in fair use. The plaintiff claims that the defendant, a financial news and data reporting service, infringed the plaintiff's copyright in a sound recording of a foreign public company's earnings call with invited investment analysts by obtaining a copy of the recording without authorization and making it available to the defendant's paying subscribers. We hold, upon consideration of the relevant factors, *see* 17 U.S.C. § 107, that the defendant's use qualifies as fair use. We further grant the plaintiff's motion to dismiss the defendant's cross-appeal because the defendant lacks appellate standing and we lack appellate jurisdiction.

For the reasons stated below, the defendant's cross-appeal is **DISMISSED**, and the judgment of the district court is **AFFIRMED.**

**Attorneys and Law Firms**

Joshua Paul (Jess M. Collen, Kristen Mogavero, on the brief), Collen IP, Ossining, NY, for Plaintiff–Counter–Defendant–Appellant–Cross–Appellee.

John M. DiMatteo (Thomas H. Golden, Amina Jafri, on the brief), Willkie Farr & Gallagher LLP, New York, NY, for Defendant–Counter–Claimant–Appellee–Cross–Appellant.

Before KATZMANN, Chief Judge, KEARSE, and WESLEY, Circuit Judges.

**Opinion**

KATZMANN, Chief Judge:

**\*1**   This case concerns the scope of copyright protection afforded to a sound recording of a conference call convened by The Swatch Group Ltd. ("Swatch Group") a foreign public company, to discuss the company's recently released earnings report with invited investment analysts. In particular, we must determine whether Defendant–Appellee Bloomberg L.P. ("Bloomberg") a financial news and data reporting service that obtained a copy of that sound recording without authorization and disseminated it to paying subscribers, may avoid liability for copyright infringement based on the affirmative defense of "fair use." 17 U.S.C. § 107. We also must determine whether we have jurisdiction to hear Bloomberg's cross-appeal on the issue of whether the sound recording of the conference call is copyrightable in the first instance.

Plaintiff–Appellant The Swatch Group Management Services Ltd. ("Swatch"), a subsidiary of Swatch Group, appeals from a judgment of the United States District Court for the Southern District of New York (Hellerstein, *J.*), which *sua sponte* granted summary judgment to Bloomberg on Swatch's claim of copyright infringement on the ground of fair use. On appeal, Swatch argues that the district court's ruling was premature because Swatch had not yet had the opportunity to take discovery on three issues: (1) whether Bloomberg obtained and disseminated the sound recording for the purpose of "news reporting" or for some other business purpose; (2) Bloomberg's state of mind when it obtained and disseminated the recording; and (3) whether Bloomberg subscribers actually listen to sound recordings of earnings calls, or instead glean information about such calls by reading written transcripts or articles. Swatch also contends that the district court erroneously concluded that Swatch had published the sound recording before Bloomberg disseminated it. More broadly, Swatch argues that the district court erred in how it evaluated and balanced the various considerations relevant to fair use. For the reasons set forth below, we agree with the district court and hold that, upon consideration of the relevant factors and resolving all factual disputes in favor of Swatch, Bloomberg has engaged in fair use.

In addition, Bloomberg cross-appeals from the same judgment of the district court, urging us to hold that Swatch's sound recording is not protected by the copyright laws in the

first place. Swatch has moved to dismiss the cross-appeal on the grounds that Bloomberg lacks appellate standing and we lack appellate jurisdiction. That motion is granted. Because the judgment designated in Bloomberg's notice of appeal was entered in Bloomberg's favor, Bloomberg is not "aggrieved by the judicial action from which it appeals," *Great Am. Audio Corp. v. Metacom, Inc.,* 938 F.2d 16, 19 (2d Cir.1991), and therefore lacks standing. Similarly, although the district court later dismissed as moot Bloomberg's counterclaim for a declaration that Swatch's copyright is invalid, Bloomberg never filed an additional notice of appeal identifying that subsequent order as the subject of an appeal, and thus we have no jurisdiction to review it.

 **\*2** Accordingly, we affirm the judgment of the district court, and we dismiss the cross-appeal.

## BACKGROUND

### *I. Factual Background*
The following facts are drawn from the record before the district court and are undisputed unless otherwise noted.

On February 8, 2011, Swatch Group released its 2010 earnings report, a seven-page compilation of financial figures and textual narrative about the company's financial performance during the prior year. Because Swatch Group is incorporated in Switzerland and its shares are publicly traded on the Swiss stock exchange, Swatch Group is governed by Swiss securities law and the listing rules of the Swiss exchange. In accordance with those rules, Swatch Group filed its earnings report with the exchange before trading opened for the day, and simultaneously posted the report in four languages (English, German, French, and Italian) on the Investor Relations section of its website.

After it released this information to the public, Swatch Group held a conference call with an invited group of financial analysts, as is its custom. Swiss law permits public companies to hold this kind of earnings call with a limited group of analysts, provided that the company does not disclose non-public, significantly price-sensitive facts during the call. Here, Swatch Group did not reveal any significantly price-sensitive facts during the call that had not already been revealed in its previously released report. In advance of the call, Swatch Group sent invitations to all 333 financial analysts who were registered with Swatch Group's Investor Relations Department. Swatch Group held the call at 2 p.m.

local Swiss time, several hours after it had released the earnings report, in order to allow European, American, and Asian analysts to participate. In the end, approximately 132 analysts joined the call. For Swatch Group's part, its Chief Executive Officer, Chief Financial Officer, and three other senior executives participated in the call from the company's offices in Switzerland.

At Swatch Group's request, an audio conferencing vendor recorded the entire earnings call as it was in progress. At the beginning of the call, an operator affiliated with the vendor welcomed the analysts to the call and told them, "This call must not be recorded for publication or broadcast." J.A. 22. Swatch Group's executives then provided commentary about the company's financial performance and answered questions posed by fifteen of the analysts. The entire call lasted 132 minutes; Swatch Group executives spoke for approximately 106 of those minutes.

Neither Bloomberg nor any other press organization was invited to the earnings call. Nevertheless, within several minutes after the call ended, Bloomberg obtained a sound recording and written transcript of the call and made them both available online, without alteration or editorial commentary, to subscribers to its online financial research service known as Bloomberg Professional. According to Bloomberg's promotional materials, Bloomberg Professional provides "[a] massive data stream" with "rich content" that is "unparalleled in scope and depth" and is "delivered to your desktop in real time," as well as "access to all the news, analytics, communications, charts, liquidity, functionalities and execution services that you need to put knowledge into action." *Id.* 640.

 **\*3** On February 10, 2011, after Swatch Group learned that the recording and transcript had been made available on Bloomberg terminals, Swatch Group sent Bloomberg a cease-and-desist letter demanding that they be removed. Bloomberg refused. On February 14, 2011, Swatch then filed its initial complaint against Bloomberg in this action claiming infringement of its copyright in the sound recording of the earnings call. In an agreement signed by representatives of Swatch Group and Swatch on February 14 and 15, 2011, Swatch Group assigned its interest in the copyright to its subsidiary Swatch.

Two weeks later, on March 2, 2011, Swatch filed an application with the U.S. Copyright Office to register a copyright in a sound recording of the earnings call. The

Copyright Office and Swatch then exchanged a series of emails over the scope of the claimed copyright. After Swatch narrowed the copyright to cover only the statements made by Swatch Group executives, and not the statements made by the operator or the questions posed by the analysts, the Copyright Office issued a registration on April 27, 2011.

### II. Procedural History

As stated, Swatch filed its initial complaint in this action on February 14, 2011. Swatch then twice amended its complaint; the operative pleading thus is the Second Amended Complaint, filed on May 10, 2011. The Second Amended Complaint alleges that, by recording the earnings call and making the recording available to the public, Bloomberg infringed Swatch's exclusive rights "to reproduce the copyrighted work" and "to distribute copies or phonorecords of the work to the public." 17 U.S.C. § 106(1), (3). Swatch does not challenge Bloomberg's preparation or distribution of the written transcript of the earnings call. [1]

On May 20, 2011, Bloomberg moved under Rule 12(b)(6) to dismiss the Second Amended Complaint for failure to state a claim, arguing *inter alia* that the earnings call was not copyrightable in the first place and that Bloomberg's copying and dissemination of the call was fair use. The district court denied that motion in an order entered on August 30, 2011. *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P. ("Swatch I"),* 808 F.Supp.2d 634 (S.D.N.Y.2011). The district court found that the recording was copyrightable, *id.* at 638–39, and declined to address the "fact-intensive" questions implicated by Bloomberg's fair use defense on a motion to dismiss, *id.* at 641.

At an in-court conference held two weeks later on September 16, 2011, however, the district court informed the parties of its belief that it could resolve the case through a motion for judgment on the pleadings, and directed Swatch to file such a motion. Swatch moved as directed on October 21, 2011, and Bloomberg opposed. The district court held oral argument on December 12, 2011, at which it denied Swatch's motion and explained that, in the court's view, "defendant's use qualifies as fair use." J.A. 581. Later that day, the district court issued a summary order stating that it had "preliminarily granted judgment to Defendant on the basis that if Defendant's alleged actions constitute infringement, they are protected as fair use." *Id.* 584. The order directed Swatch to submit "a brief regarding the existence of any triable issues of material fact with respect to Defendant's fair use affirmative defense." *Id.*

Swatch did so, pointing out that it had taken no discovery in the action.

**\*4** In an opinion and order entered on May 17, 2012, the district court *sua sponte* granted summary judgment to Bloomberg, finding that Bloomberg's copying and dissemination of the recording qualify as fair use. *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P. ("Swatch II"),* 861 F.Supp.2d 336 (S.D.N.Y.2012). On May 18, 2012, the clerk of the district court entered judgment "in favor of defendant." J.A. 7.

On June 14, 2012, Swatch filed a timely notice of appeal from that judgment. On June 28, 2012, Bloomberg filed a notice of cross-appeal from the same judgment, and on July 24, 2012, Swatch moved to dismiss the cross-appeal. On August 27, 2012, after the parties had filed a stipulation of dismissal without prejudice to reinstatement under Local Rule 42.1, the district court issued an order dismissing as moot all of Bloomberg's counterclaims, including the counterclaim for a declaration that Swatch's copyright is invalid. On November 13, 2012, upon receipt of a letter from Swatch, the Clerk reinstated the appeal. Finally, on January 14, 2013, the motions panel of this Court referred Swatch's motion to dismiss the cross-appeal to the merits panel.

### DISCUSSION

**[1]** We review a district court's grant of summary judgment *de novo,* resolving all ambiguities and drawing all reasonable inferences against the moving party. *See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.,* 697 F.3d 59, 63–64 (2d Cir.2012). Summary judgment is appropriate only where the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Under Federal Rule of Civil Procedure 56(f), district courts have discretion to grant summary judgment *sua sponte* "[a]fter giving notice and a reasonable time to respond" and "after identifying for the parties material facts that may not be genuinely in dispute." Fed.R.Civ.P. 56(f), (f)(3); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that [it] had to come forward with all of [its] evidence."). Before granting summary judgment *sua sponte,* however, a district court "must assure itself that following the procedures set out in Rule 56 [ (a)-(e) ] would

not alter the outcome." *Ramsey v. Coughlin,* 94 F.3d 71, 74 (2d Cir .1996). In other words, "[d]iscovery must either have been completed, or it must be clear that further discovery would be of no benefit," such that "the record ... reflect[s] the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment." *Id.* [2]

### I. Fair Use

[2] The Copyright Act of 1976 grants copyright holders a bundle of exclusive rights, including the rights to "reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of" the copyrighted work. *Arista Records LLC v. Doe 3,* 604 F.3d 110, 117 (2d Cir.2010) (citing 17 U.S.C. § 106). Because copyright law recognizes the need for "breathing space," *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), however, a defendant who otherwise would have violated one or more of these exclusive rights may avoid liability if he can establish that he made "fair use" of the copyrighted material. Though of common-law origin, the doctrine of fair use is now codified at 17 U.S.C. § 107, which provides that "the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."

**\*5** [3] To evaluate whether a particular use qualifies as "fair use," we must engage in "an open-ended and context-sensitive inquiry." *Blanch v. Koons,* 467 F.3d 244, 251 (2d Cir.2006). The Copyright Act directs that, in determining whether a particular use is fair, "the factors to be considered shall include":

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (5) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. Though mandatory, these four factors are non-exclusive. Moreover, "[a]lthough defendants bear the burden of proving that their use was fair, they need not

establish that each of the factors set forth in § 107 weighs in their favor." *NXIVM Corp. v. Ross Inst.,* 364 F.3d 471, 476–77 (2d Cir.2004) (internal citation omitted). Rather, "[a]ll [factors] are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell,* 510 U.S. at 578. "The ultimate test of fair use is whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it." *Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 608 (2d Cir.2006) (quoting *Castle Rock Entm't Inc. v. Carol Publi'g Grp.,* 150 F.3d 132, 141 (2d Cir.1998)) (ellipsis omitted).

[4] The determination of fair use is a mixed question of fact and law. *Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). While we have reversed district courts that too hastily resolved factual questions relevant to fair use on summary judgment, *see, e.g., Ringgold v. Black Entm'nt Television, Inc.,* 126 F.3d 70, 81 (2d Cir.1997), "this [C]ourt has on a number of occasions resolved fair use determinations at the summary judgment stage where there are no genuine issues of material fact." *Blanch,* 467 F.3d at 250 (quoting *Castle Rock Entm't,* 150 F.3d at 137) (ellipsis omitted).

### A. Purpose and Character of Use

[5] We turn first to "the purpose and character of the use." 17 U.S.C. § 107(1). This statutory factor encompasses within it a number of distinct considerations, including "whether [the] use is of a commercial nature or is for nonprofit educational purposes," *id.;* whether the use is "transformative" or "merely supersedes the objects of the original creation," *Campbell,* 510 U.S. at 579 (quotation marks and brackets omitted); whether the defendant acted in good faith, *see NXIVM,* 364 F.3d at 478; and whether the defendant engaged in "news reporting" or another activity illustratively listed in § 107 as indicative of fair use, *see Harper & Row,* 471 U.S. at 561. Below, the district court found that this factor as a whole favored fair use because "[B]loomberg's work as a prominent gatherer and publisher of business and financial information serves an important public interest, for the public is served by the full, timely and accurate dissemination of business and financial news." *Swatch II,* 861 F.Supp.2d at 340.

**\*6** Swatch argues that this conclusion was error for several reasons. First, Swatch contends that the district court improperly accepted Bloomberg's unsubstantiated claim that it had engaged in "news reporting." Swatch notes that Bloomberg itself has characterized its Bloomberg

Professional service as delivering both financial "news" and "data," and argues that the district court erred in denying Swatch the chance to develop facts in discovery to show that the sound recording at issue here is the latter and not the former. Similarly, Swatch argues that the district court improperly denied Swatch the chance to develop facts relevant to Bloomberg's state of mind. Swatch acknowledges that the district court "credited [Swatch]'s allegations that [Bloomberg] was not authorized to access the Earnings Call and that [Bloomberg]'s publication of the Infringing Work violated [Swatch Group's] directive," *Swatch II,* 861 F.Supp.2d at 343, but argues that Swatch should have been able to take discovery into whether Bloomberg *knew* at the time that obtaining and publishing the recording violated Swatch Group's directive. Swatch also argues that it should have been permitted to take discovery into whether Bloomberg Professional subscribers actually choose to access information about earnings calls by listening to recordings, or instead by reading written transcripts or articles. More broadly, Swatch argues that the district court gave insufficient weight to the fact that Bloomberg's use was commercial and did not transform the underlying recording.

We find these arguments unpersuasive and hold that the first statutory factor favors fair use here. To begin with, whether one describes Bloomberg's activities as "news reporting," "data delivery," or any other turn of phrase, there can be no doubt that Bloomberg's purpose in obtaining and disseminating the recording at issue was to make important financial information about Swatch Group available to American investors and analysts. That kind of information is of critical importance to American securities markets. Indeed, as Bloomberg points out, the Securities and Exchange Commission ("SEC") has mandated that when American companies disclose this kind of material nonpublic information, they must make it available to the public immediately. *See* Regulation FD, 17 C .F.R. § 243.100. At a minimum, a use of copyrighted material that serves this public purpose is very closely analogous to "news reporting," which is indicative of fair use. *See Harper & Row,* 471 U.S. at 561 ("News reporting is one of the examples enumerated in § 107 to 'give some idea of the sort of activities the courts might regard as fair use under the circumstances.' " (quoting S.Rep. No. 94–473, at 61 (1975)). We agree with the district court, moreover, that this important public purpose underlying Bloomberg's use overcomes the countervailing weight we would otherwise give to Bloomberg's clandestine methods and the commercial, nontransformative nature of its use. [3]

*7 Seizing on Bloomberg's citation to Regulation FD, Swatch protests that in crafting that regulation, the SEC expressly exempted "foreign private issuer [s]" like Swatch Group that are "incorporated or organized under the laws of [a] foreign country." 17 C.F.R. §§ 243.101(b), 230.405. In fact, as initially proposed, Regulation FD would have applied to such issuers, *see* Selective Disclosure and Insider Trading, 64 Fed.Reg. 72,590, 72,597 (Dec. 28, 1999), but the SEC ultimately "determined to exempt foreign private issuers ... as it has in the past exempted them from certain U.S. reporting requirements such as Forms 10–Q and 8–K," Selective Disclosure and Insider Trading, 65 Fed.Reg. 51,716, 51,724 (Aug. 24, 2000). Swatch thus argues that giving weight to a public interest in the dissemination of important financial information in this case would in effect erase foreign issuers' exemption from Regulation FD and set up organizations like Bloomberg as private enforcers of U.S. public disclosure rules.

This argument, however, misapprehends the limited relevance of Regulation FD to this case. The regulation merely provides additional support for a proposition that would be clear in any event: American investors and analysts have an interest in obtaining important financial information about companies whose securities are traded in American markets. The fact that the SEC has chosen not to require foreign issuers to follow certain disclosure rules imposed on domestic issuers in no way implies that information about foreign issuers is irrelevant to American markets. Indeed, Swatch Group recognized as much by scheduling its earnings call at a time when American analysts would be able to attend. Accordingly, contrary to Swatch's suggestion, nothing in our decision today subjects Swatch Group or any other foreign issuer to the requirements of Regulation FD. Nor do we hold that a foreign issuer's failure to follow Regulation FD prevents it from enforcing its copyrights in the United States. We merely hold that where a financial research service obtains and disseminates important financial information about a foreign company in order to make that information available to American investors and analysts, that purpose supports a finding of fair use.

Swatch stands on firmer ground when it stresses the commercial nature of Bloomberg's use. Section 107 expressly directs courts to consider whether the use "is of a commercial nature or is for nonprofit educational purposes," 17 U.S.C. § 107(1), and we have held that "[t]he greater the private economic rewards reaped by the secondary user (to the

exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair." *Am. Geophysical Union v. Texaco Inc.,* 60 F.3d 913, 922 (2d Cir.1994). It is undisputed here that Bloomberg is a commercial enterprise and that Bloomberg Professional is a subscription service available to paying users. At the same time, we have recognized that "[a]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit," *Consumers Union of U.S., Inc. v. Gen. Signal Corp.,* 724 F.2d 1044, 1049 (2d Cir.1983), and have discounted this consideration where "the link between [the defendant]'s commercial gain and its copying is ... attenuated" such that it would be misleading to characterize the use as "commercial exploitation." *Am. Geophysical Union,* 60 F.3d at 922. Here, Swatch does not contest that Bloomberg Professional is a multifaceted research service, of which disseminating sound recordings of earnings calls is but one small part. Moreover, it would strain credulity to suggest that providing access to Swatch Group's earnings call more than trivially affected the value of that service. So while we will not ignore the commercial nature of Bloomberg's use, we assign it somewhat reduced weight.

**\*8**   [6]   Bloomberg's lack of good faith likewise merits relatively little weight in this case. "[W]hile the good or bad faith of a defendant generally should be considered, it generally contributes little to fair use analysis." *NXIVM,* 364 F.3d at 479 n. 2 (citing *Campbell,* 510 U.S. at 585 n. 18). Bloomberg does not dispute that it obtained the recording of the earnings call in violation of Swatch Group's express directive that the call "must not be recorded for publication or broadcast," J.A. 22, and, resolving all factual disputes in Swatch's favor, we must assume Bloomberg was fully aware that its use was contrary to Swatch Group's instructions. But Bloomberg's overriding purpose here was not to "scoop[ ]" Swatch or "supplant the copyright holder's commercially valuable right of first publication," *Harper & Row,* 471 U.S. at 562, but rather simply to deliver newsworthy financial information to American investors and analysts. That kind of activity, whose protection lies at the core of the First Amendment, would be crippled if the news media and similar organizations were limited to authorized sources of information. *See generally New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

[7]   Fair use must also take account of the transformativeness of the use—that is, the degree to which "the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character,

altering the first with new expression, meaning, or message." *Campbell,* 510 U.S. at 579 (internal citations, quotation marks and alterations omitted). While a transformative use generally is more likely to qualify as fair use, "transformative use is not absolutely necessary for a finding of fair use," *id.,* and indeed, some core examples of fair use can involve no transformation whatsoever. *See* 17 U.S.C. § 107 (listing "multiple copies for classroom use" among illustrative examples of fair use).

In the context of news reporting and analogous activities, moreover, the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work rather than transform it. In such cases, courts often find transformation by emphasizing the altered purpose or context of the work, as evidenced by surrounding commentary or criticism. *See, e.g., Bill Graham Archives,* 448 F.3d at 609–610; *Nunez v. Caribbean Int'l News Corp.,* 235 F.3d 18, 22–23 (1st Cir.2000). Here, Bloomberg provided no additional commentary or analysis of Swatch Group's earnings call. But by disseminating not just a written transcript or article but an actual sound recording, Bloomberg was able to convey with precision not only *what* Swatch Group's executives said, but also *how* they said it. This latter type of information may be just as valuable to investors and analysts as the former, since a speaker's demeanor, tone, and cadence can often elucidate his or her true beliefs far beyond what a stale transcript or summary can show. As courts have long recognized in the context of witness testimony, " 'a cold transcript contains only the dead body of the evidence, without its spirit,' " and "cannot reveal ... '[t]he speaker's hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration.' " *Zhou Yun Zhang v. INS,* 386 F.3d 66, 73–74 (2d Cir.2004) (quoting *Regina v. Bertrand,* L.R. [1867] 1 L.R.P.C. 520, 535), *overruled on other grounds by Shi Liang Lin v. U.S. Dep't of Justice,* 494 F.3d 296, 305 (2d Cir.2007).

**\*9**   To be sure, "[t]he promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report.' " *Harper & Row,* 471 U.S. at 557. But here, in light of the independent informational value inherent in a faithful recording of the earnings call, the fact that Bloomberg did not transform Swatch's work through additional commentary or analysis does not preclude a finding that the "purpose and character" of Bloomberg's use favors fair use.

Our decisions in *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.,* 166 F.3d 65 (2d Cir.1999), *Wainwright Securities, Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91 (2d Cir.1977), and *Financial Information, Inc. v. Moody's Investors Service, Inc.* ("*FII* "), 751 F.2d 501 (2d Cir.1984), on which Swatch relies, are not to the contrary. In those cases, we rejected fair use arguments pressed by defendants who purported to be serving the public by providing access to important financial information. In *Nihon* and *Wainwright,* we stressed that the defendants had not supplemented or otherwise transformed the plaintiffs' works, but had instead simply translated Japanese business articles into English, *Nihon,* 166 F.3d at 69, or recounted the critical conclusions and predictions from research reports about major industrial and financial corporations, *Wainwright,* 558 F.2d at 93 & n. 1. In *FII,* we rejected a fair use defense by a ratings agency that had copied information about municipal bond redemptions compiled by a competing financial publisher. *FII,* 751 F.2d at 502–03. Criticizing the district court's conclusion that the defendant's use served a "public function," we stated that to so hold "would, it seems to us, state a rule that whenever there is a market for information, the paid delivery of goods to that market rises to a public function." *Id.* at 509. We rejected such a rule, finding that it would "distort" proper fair use analysis. *Id.*

In all three of these cases, however, the defendants appropriated works in which the copyright owner had transformed raw financial information by compiling it from multiple sources or by mixing it with their own commentary and analysis. Here, by contrast, the statements captured in the sound recording, including the particular modes of expression used by Swatch Group's executives, were themselves pieces of financial information. In other words, while our previous cases concerned the appropriation of secondary sources that had compiled or commented on financial news, this case concerns the use of a primary source that itself *was* financial news. We find this distinction significant. As the Supreme Court has observed, "[t]he news element-the information respecting current events contained in the literary production-is not the creation of the writer, but is a report of matters that ordinarily are *publici juris;* it is the history of the day." *Harper & Row,* 471 U.S. at 556 (quoting *Int'l News Serv. v. Assoc. Press,* 248 U.S. 215, 234, 39 S.Ct. 68, 63 L.Ed. 211 (1918)).

**\*10** The discovery Swatch seeks would not alter our analysis. With respect to the request for discovery into whether Bloomberg delivered "news" or "data" to its

subscribers, such a distinction raises a semantic rather than factual dispute. It is undisputed that Bloomberg gave subscribers access to the full, unaltered sound recording of Swatch Group's earnings call as part of its paid financial research service. That is sufficient for present purposes. There is likewise no need for further discovery into Bloomberg's good or bad faith, for we, like the district court, have resolved that subfactor in Swatch's favor. We also see no need to resolve how many of Bloomberg's subscribers chose to listen to the sound recording in question rather than read a written transcript or article. As we have explained, because the sound recording conveys information that a transcript or article cannot, the recording has independent value, regardless of how many Bloomberg subscribers chose to avail themselves of that independent value in this instance.

This first factor accordingly favors fair use.

### B. Nature of the Copyrighted Work

**[8]** The second statutory fair use factor concerns "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor accounts for the fact that "some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell,* 510 U.S. at 586. As relevant here, this factor requires us to consider the extent of Swatch's copyright in the recording—the "thickness" or "thinness" of Swatch's exclusive rights—as well as whether or not the recording had been published at the time of Bloomberg's use. *See id.* (citing cases). The district court determined that this factor favored fair use because Swatch's copyright was "at best ... 'thin' " and because "the first publication of Swatch Group's expression occurred prior to [Bloomberg]'s publication of the Infringing Work." *Swatch II,* 861 F.Supp.2d at 341.

Swatch argues that the district court erred in concluding that the recording had been published. Swatch points out that the Copyright Act contemplates two methods of publishing an audio recording: "the distribution of ... phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending," or "offering to distribute ... phonorecords to a group of persons for purposes of further distribution, public performance, or public display." 17 U.S.C. § 101 (defining "publication"). "Phonorecords," in turn, are defined as "material objects in which sounds ... are fixed ... and from which the sounds can be perceived, reproduced, or otherwise communicated." *Id.* Applying these definitions, Swatch contends that the sound recording of the

earnings call has never been published. Simply put, Swatch has never, before or after Bloomberg's use, "distribut[ed]" a CD or other "material object" embodying the spoken commentary on the earnings call "to the public," nor has it ever "offer[ed] to distribute" a phonorecord of the call to any "group of persons for purposes of further distribution, public performance, or public display."

**\*11  [9]**   Swatch is unquestionably correct that the earnings call is unpublished under the definition of "publication" set forth in § 101. But that technical definition does not control our analysis of this aspect of the second fair use factor. While we will consider the statutory definition, we also will not blind ourselves to the fact that Swatch Group invited over three hundred investment analysts from around the globe to the earnings call, out of which over a hundred actually attended. Thus, even though the sound recording remains statutorily unpublished, it is clear that Swatch was not deprived of the ability to "control the first public appearance of [its] expression," including "when, where, and in what form" it appeared. *Harper & Row,* 471 U.S. at 564.

**[10]**   Swatch insists that because the definitions in § 101 by their terms apply for all purposes under the Copyright Act "[e]xcept as otherwise provided in this title," 17 U.S.C. § 101, the statutory definition of "publication" must control. Not so. While in general, "[s]tatutory definitions control the meaning of statutory words," *Burgess v. United States,* 553 U.S. 124, 129, 128 S.Ct. 1572, 170 L.Ed.2d 478 (2008) (quoting *Lawson v. Suwanee Fruit & S.S. Co.,* 336 U.S. 198, 201, 69 S.Ct. 503, 93 L.Ed. 611 (1949)), in this case, no variant of the word "publish" appears in the text of the second fair use factor in § 107. Whether or not a work was published thus enters into our analysis of this factor as a judicial gloss on "the nature of the copyrighted work." That gloss, of course, is firmly grounded in fair use's common law origins and the legislative history of the 1976 Copyright Act. *See Harper & Row,* 471 U.S. at 552–54.

**[11]**   To the extent the text of § 107 mentions publication, it is only in a closing proviso cautioning that "[t]he fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors." Congress added this proviso to § 107 in 1992, *see* Pub.L. No. 102–492, 106 Stat. 3145 (1992), to clarify, in response to certain decisions of this Court, that there is no "per se rule barring any fair use of unpublished works." H.R.Rep. No. 102–836, at 4, 9 (1992) (discussing *New Era Publications International, ApS v. Henry Holt & Co., Inc.,* 873 F.2d 576

(2d Cir.1989), and *Salinger v. Random House, Inc.,* 811 F.2d 90 (2d Cir.1987)). While this proviso indicates by clear implication that inquiry into a work's publication status is relevant to fair use, it in no way limits our consideration of that issue to the statutory definition of "publication" in § 101. To the contrary, the proviso directs that if we find a work to be "unpublished," however that term is understood, our analysis of the four statutory factors, including "the nature of the copyrighted work," cannot end there.

**[12]**   Limiting our consideration of a work's publication status to the statutory definition, moreover, would obscure the different purposes served by the statutory definition and the judicial gloss on "the nature of the copyrighted work" in the context of fair use. The statutory concept of "publication" serves numerous purposes, such as triggering the requirement to deposit a copy with the Library of Congress, *see* 17 U.S.C. § 407, measuring the copyright term for certain categories of works, *see id.* § 302(c)-(e), setting the circumstances under which works by foreign authors are protected, *see id.* § 104(b), and determining the legal effect of registration, *see id.* §§ 410(c), 412. *See also* 1 Nimmer on Copyright § 4.01 (explaining the significance of publication). Publication as a judicial gloss on "the nature of the copyrighted work," by contrast, aims to take account of "the author's right to control the first public appearance of his expression," *Harper & Row,* 471 U.S. at 564, which in turn forms part of our "open-ended and context-sensitive inquiry" into whether allowing the use in question would serve the goals of copyright, *Blanch,* 467 F.3d at 251.

**\*12**   This is not the first time that we have found that the second statutory factor favors fair use even though the work in question was technically unpublished under the statutory definition, *see Diamond v. Am–Law Pub. Corp.,* 745 F.2d 142, 144, 148 (2d Cir.1984), and courts in fact commonly look past the statutory definition when considering this issue, *see, e.g., Rotbart v. J.R. O'Dwyer Co., Inc.,* No. 94 Civ.2091(JSM), 1995 WL 46625, at \*4 (S.D.N.Y. Feb.7, 1995) (finding that an unfixed, undisseminated talk, delivered publicly, had been "de facto published" for purposes of fair use); *see also* 4 Nimmer on Copyright § 13.05[A][2] [b][ii] ("If the author does not seek confidentiality, fair use is not necessarily precluded even as to an unpublished work."). [4]   We accordingly agree with the district court that although the sound recording is statutorily unpublished, because Swatch Group publicly disseminated the spoken performance embodied in the recording before Bloomberg's use, the publication status of the work favors fair use.

 **[13]**    Swatch does not challenge the district court's determination that Swatch's copyright in the earnings call is "at best ... 'thin,' " *Swatch II,* 861 F.Supp.2d at 341, nor could it. It is well established that "the scope of fair use is greater with respect to factual than non-factual works." *New Era Publ'ns,* 904 F.2d at 157. Moreover,

> [e]ven within the field of fact works, there are gradations as to the relative proportion of fact and fancy. One may move from sparsely embellished maps and directories to elegantly written biography. The extent to which one must permit expressive language to be copied, in order to assure dissemination of the underlying facts, will thus vary from case to case.

*Harper & Row,* 471 U.S. at 563 (quoting Robert A. Gorman, *Fact or Fancy? The Implications for Copyright,* 29 J. Copyright Soc'y 560, 561 (1982)).

 **[14]**    There can be no doubt as to the manifestly factual character of the earnings call in this case. The entire copyrighted portion of the call consists of Swatch Group executives explaining the company's financial performance and outlook to a group of investment analysts. And while we assume without deciding in this appeal that the call contained sufficient original expression—in the form of the executives' tone, cadence, accents, and particular choice of words-to be copyrightable, the purpose of the call was not in any sense to showcase those forms of expression. Rather, the call's sole purpose was to convey financial information about the company to investors and analysts.[5]

The through-and-through factual nature of the earnings call places it at the very edge of copyright's protective purposes. In light of that fact, as well as Swatch Group's prior dissemination of its executives' copyrighted expression, we find that the second statutory factor strongly favors fair use.

### C. Amount and Substantiality of the Portion Used

 ***13**  **[15]**    **[16]**    We turn now to "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This factor asks whether "the quantity and value of the materials used are reasonable in relation to the purpose of the copying." *Campbell,* 510 U.S. at 586 (internal citations and quotation

marks omitted). In general, "the more of a copyrighted work that is taken, the less likely the use is to be fair." *Infinity Broad. Corp. v. Kirkwood,* 150 F.3d 104, 109 (2d Cir.1998). It is undisputed here that Bloomberg used the entire work. The district court acknowledged that "this generally weighs against fair use," but found that the public interest in the information contained in the recording "is better served by the dissemination of that information in its entirety, including the incidents of oral speech that do not translate onto the page but color the purely factual content." *Swatch II,* 861 F.Supp.2d at 342.

Swatch argues that the district court improperly resolved this factor in Bloomberg's favor because, as it also argued with respect to the first fair use factor, there are genuine disputes of material fact regarding whether Bloomberg subscribers glean information about earnings calls by listening to audio recordings or instead by reading a written transcript or article.

We are unpersuaded. As an initial matter, we do not understand the district court to have affirmatively weighed the third statutory fair use factor in Bloomberg's favor. Such a holding would have been novel, as "[n]either our court nor any of our sister circuits has ever ruled that the copying of an entire work *favors* fair use." *Bill Graham Archives,* 448 F.3d at 613. Rather, we believe that the district court found this factor neutral, refusing to weigh it in Swatch's favor despite Bloomberg's use of the entire recording because of the public interest in the information embodied in the recording. That holding is entirely consistent with our case law. As we have recognized, a number of courts "have concluded that such copying does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use." *Id.* (citing cases); *see also Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 449–55, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (finding copying of an entire work to be fair use).

For the reasons already explained in our discussion of the first fair use factor, we agree with the district court that Bloomberg's use of the entire recording was reasonable in light of its purpose of disseminating important financial information to American investors and analysts. The recording has independent informational value over and above the value of a written transcript or article, regardless of how many Bloomberg subscribers took advantage of that value in this instance. Like the district court, we accordingly weigh this factor in neither party's favor.

**D. Effect upon the Market for or Value of the Original**

**\*14** **[17]** **[18]** The final fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S .C. § 107(4). This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell,* 510 U.S. at 590 (quotation marks and alterations omitted). We have described this factor as "requir[ing] a balancing of 'the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied.' " *Bill Graham Archives,* 448 F.3d at 613 (quoting *MCA, Inc. v. Wilson,* 677 F.2d 180, 183 (2d Cir.1981)).

The district court weighed this factor in favor of fair use, noting that "the relevant market effect is that which stems from [Bloomberg]'s use of the original expression of Swatch Group's senior officers, not that which stems from [Bloomberg]'s work as a whole." *Swatch II,* 861 F.Supp.2d at 342. The district court found "[n]othing in the record [that] suggests any possible market effect stemming from [Bloomberg]'s use of such a limited portion of the recording." *Id.* The district court further found that any conceivable effect was outweighed by the public benefit of providing the information contained in the call to American investors and analysts. *Id.*

Swatch argues that this analysis was erroneous because the district court again assumed that affording American investors and analysts access to the recording, as opposed to a written transcript or article, served the public interest. As we have already explained, we see nothing mistaken in that finding.

Swatch also contends that it was improperly denied the opportunity to take discovery into the existence of a market for audio recordings of earnings calls conducted by foreign companies that, like Swatch Group, are exempt from Regulation FD. Swatch admitted in its answer to Bloomberg's counterclaims that it "did not seek to profit from the publication of the February 8, 2011 Earnings Call in audio or written format." J.A. 294. Any discovery thus would concern a potential market, as yet untapped by Swatch, for recordings of exempt earnings calls.

While the loss of a potential yet untapped market can be cognizable under the fourth fair use factor, the potential market here is defined so narrowly that it begins to partake of circular reasoning. As Professor Nimmer has observed, "it is a given in every fair use case that plaintiff suffers a loss of a *potential* market if that potential is defined as the theoretical market for licensing the very use at bar." 4 Nimmer on Copyright § 13.05[A][4]. To guard against this "vice of circular reasoning," our case law limits our consideration to a use's "impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets." *Am. Geophysical Union,* 60 F.3d at 930–31. The hypothesized market for audio recordings of earnings calls convened by foreign companies that are exempt from Regulation FD cannot meet this standard.

**\*15** **[19]** Moreover, to the extent that a financial news or research organization might be willing to pay to obtain such recordings, we must bear in mind that while "[t]he immediate effect of our copyright law is to secure a fair return for an 'author's' creative labor," the "ultimate aim is, by this incentive, to stimulate creativity for the general public good." *Fogerty v. Fantasy, Inc .,* 510 U.S. 517, 526–27, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) (quoting *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975)). Here, the possibility of receiving licensing royalties played no role in stimulating the creation of the earnings call. Indeed, Swatch affirmatively argues that it does not know whether there is a potential market for this kind of recording, and cannot know without obtaining discovery from Bloomberg. The context of the earnings call, moreover, makes perfectly plain that its purpose was to enable Swatch Group executives to disseminate financial information about the company in a way that they believed would be advantageous. It is that calculation of advantageousness, and not the possibility of receiving royalties, that induces Swatch Group and other similarly situated companies to hold earnings calls.

Put differently, the "value" of the copyrighted expression for Swatch Group in this case lay not in its capacity to generate licensing royalties, but rather in its capacity to convey important information about the company to interested investment analysts. By making the recording available to analysts who did not or could not participate in the call initially, Bloomberg simply widened the audience of the call, which is consistent with Swatch Group's initial purpose. *Cf. Sony,* 464 U.S. at 421 (noting that the fair use known as "timeshifting"—recording a television program in order to

view it in its entirety at a later time—"enlarges the television viewing audience" and therefore would not impair the value of the copyright to the plaintiffs). At most, Bloomberg's use had the effect of depriving Swatch Group of the ability to know and control precisely who heard the call. But whatever cognizable interest Swatch Group has in maintaining that ability, it is far outweighed by the public interest in the dissemination of important financial information. As we recently observed in a related context, "a [f]irm's ability to make news—by issuing a [report] that is likely to affect the market price of a security—does not give rise to a right for it to control who breaks that news and how." *Barclays Capital Inc. v. Theflyonthewall.com, Inc.,* 650 F.3d 876, 907 (2d Cir.2011).

We accordingly agree with the district court that, balancing the public benefits of the use against the potential private royalties lost, the fourth statutory factor weighs in favor of fair use.

### E. Balance of Factors

[20] Balancing the four statutory factors together, we conclude that "the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing [B]loomberg's use than by preventing it." *Bill Graham Archives,* 448 F.3d at 608 (quoting *Castle Rock,* 150 F.3d at 141). Although Bloomberg obtained the recording without authorization and put it to commercial use without transforming it, Bloomberg's use served the important public purpose, also reflected in Regulation FD, of ensuring the wide dissemination of important financial information. Moreover, although the recording remains technically unpublished under § 101, Swatch Group controlled the first dissemination of its executives' expression to the public. In addition, Swatch's copyright is exceedingly thin, as the recording is thoroughly factual in nature. Indeed, the whole purpose of the conference call was to convey financial information about Swatch Group to analysts and investors around the world. And while Bloomberg used the recording in its entirety, doing so was reasonably necessary in light of Bloomberg's purpose. Finally, we are confident that this type of use will neither significantly impair the value of earnings calls to foreign companies that convene and record them, nor appreciably alter the incentives for the creation of original expression. In sum, Bloomberg's use is fair use.

### II. Bloomberg's Cross–Appeal

*\*16 [21]* Having resolved Swatch's main appeal on the ground of fair use without reaching the issue of copyrightability, we must address Swatch's motion to dismiss Bloomberg's cross-appeal. That motion is granted, for two reasons.

[22] First, it is axiomatic that "[i]n order to have standing to appeal, a party must be aggrieved by the judicial action from which it appeals." *Great Am. Audio Corp.,* 938 F.2d at 19. Here, the May 18, 2012 judgment identified in Bloomberg's notice of appeal as the subject of the cross-appeal provides simply: "[f]or the reasons stated in the Court's Opinion and Order dated May 17, 2012, judgment is hereby entered in favor of [Bloomberg]." Special App. 13. The May 17, 2012 Opinion and Order, in turn, had explained that "since [Bloomberg]'s use qualifies as fair use, [Bloomberg] has not infringed, and [Swatch]'s Second Amended Complaint should be dismissed." *Swatch II,* 861 F.Supp.2d at 343.

Bloomberg argues that it is aggrieved by the May 18, 2012 judgment because it seeks a decision not only as to whether its use was fair use, but also as to whether Swatch's recording was validly copyrightable in the first place. To the extent Bloomberg contends that Swatch's complaint should be dismissed on the ground of copyright invalidity in addition to or instead of the ground of fair use, Bloomberg "is not urging that we alter the judgment in any way, but rather that we alter the reasons underlying it." *Allstate Ins. Co. v. A.A. McNamara & Sons, Inc.,* 1 F.3d 133, 137 (2d Cir.1993). While Bloomberg "is entitled to urge that we affirm the district court's decision on any basis submitted to that court and supported by the record" *id.* (quoting *Great Am. Audio Corp.,* 938 F.2d at 19), it is not aggrieved by the district court's dismissal of Swatch's complaint on the ground of fair use, and therefore "is not entitled to cross-appeal," *id.*

[23] [24] [25] Second, to the extent that Bloomberg challenges the district court's dismissal of its counterclaim seeking a declaration that Swatch's copyright is invalid, that ruling of the district court is not properly before us. *Federal Rule of Appellate Procedure 3(c)(1)(B)* provides that a notice of appeal "must ... designate the judgment, order, or part thereof being appealed." This requirement is "jurisdictional in nature." *Gonzales v. Thaler,* ---- U.S. ----, ----, 132 S.Ct. 641, 652, 181 L.Ed.2d 619 (2012) (quoting *Smith v. Barry,* 502 U.S. 244, 248, 112 S.Ct. 678, 116 L.Ed.2d 678 (1992)). Bloomberg's notice of cross-appeal, filed on June 28, 2012, designates only the district court's May 18, 2012 judgment, which did not resolve Bloomberg's counterclaim.

As the May 17, 2012 Opinion and Order incorporated into the judgment makes plain, the district court simply dismissed Swatch's complaint on the ground of fair use, "assum[ing], without deciding, ... that [Swatch]'s copyright is valid." *Swatch II,* 861 F.Supp.2d at 338. It was not until August 27, 2012, that the district court issued an order dismissing Bloomberg's counterclaims as moot. Bloomberg never filed any additional or supplemental notice of appeal designating that subsequent order as the subject of a cross-appeal. While "we construe notices of appeal liberally, taking the parties' intentions into account," *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 256 (2d Cir.1995), we cannot reasonably read Bloomberg's notice of cross-appeal to contemplate review of an order that did not issue until nearly two months afterwards. While Bloomberg may be aggrieved by the dismissal of its declaratory counterclaim, which arguably would have enlarged Bloomberg's rights, we have no jurisdiction to review it in the absence of a proper cross-appeal. *See Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.,* 38 F.3d 1279, 1286 (2d Cir.1994).

**\*17** Bloomberg's cross-appeal accordingly is dismissed for lack of standing and lack of jurisdiction.

### CONCLUSION

For the foregoing reasons, Bloomberg's cross-appeal is **DISMISSED,** and the district court's judgment is **AFFIRMED.**

[1] Swatch has disclaimed any such challenge in light of 17 U.S.C. § 114(b), under which a copyright owner's right to prepare derivative works based on a sound recording "is limited to the right to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality."

[2] Although *Ramsey* was decided before Rule 56 was amended in 2010 to provide express procedures

governing the grant of summary judgment independent of a motion, its statements regarding the care a district court must take before *sua sponte* granting summary judgment remain good law. *See* Fed.R.Civ.P. 56, advisory comm. notes (2010 Amendments) ("Subdivision (f) brings into Rule 56 text a number of related procedures that have grown up in practice.").

[3] We have held that where "the allegedly infringing work fits the description of uses described in § 107," there is a "strong presumption that factor one favors the defendant." *NXIVM,* 364 F.3d at 477 (quoting *Wright v. Warner Books, Inc.,* 953 F.2d 731, 736 (2d Cir.1991)). Resolving all factual disputes in Swatch's favor, we assume here that Bloomberg's use falls outside of the core notion of "news reporting" Congress envisioned when it enacted § 107. We therefore will not apply the presumption.

[4] Indeed, in discussing the relevance of publication to fair use in *Harper & Row,* the Supreme Court indicated that "even substantial quotations might qualify as fair use in a review of a published work or a news account of a speech that had been delivered to the public or disseminated to the press." 471 U.S. at 564. Like the conference call at issue here, a publicly delivered speech would not, by the mere fact of its public delivery, be "publi[shed]" under § 101.

[5] Even the portions of the call Swatch quotes as demonstrating the originality of the executives' statements are overwhelmingly factual in nature. Swatch points to the following passage, for example:

> So we're not looking desperately for someone else, but I can tell you that there are many companies out there who would like to benefit from the products, the[ ] know how, the management capabilities of Swatch Group.
> And you should ask the other companies out there, even big players, if they would not think that— being part of The Swatch Group, they will do much better. Look at the results and margins and what they are doing, look at the regional trends, I think you would find many of them.

Appellant's Br. 9 (quoting J.A. 153 at 37:25–38:43).

End of Document                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit "B"

Focus | **POLITICS**



# BLOG CAUSES RIFT WITHIN STATE GOP

Lawsuit seeks to unmask who's behind the Munger Games, a site with anonymous postings critical of wealthy Republican donor Charles Munger Jr.

**By JOE GAROFOLI**
SAN FRANCISCO CHRONICLE

---

It's easy to see why Palo Alto physicist Charles Munger Jr. received several standing ovations at this month's California Republican Party convention in Anaheim. After tossing more than $1.5 million into state GOP operations this year and nearly $100 million on ballot measures over the past decade, the bow-tie-wearing son of a billionaire is a dominant force in reviving the state party and in re-shaping California politics.

He also is the dominant character in a federal lawsuit that has exposed a major split among California Republicans over the future of the party and Munger's role in it.

Since January, some of Munger's fellow Republicans, finding him insufficiently conservative, have vented their feelings about him anonymously on a blog, the Munger Games. Its subtitle: "Wasting His Patrimony." Munger's father, Charles Munger, is vice chairman of Berkshire Hathaway and a longtime colleague of Warren Buffett.

The blog's icon: a $100 bill bow tie.

"How much damage can one man do to a political party? In the case of Charles Munger Jr. and the California Republican Party," an anonymous poster wrote, "the answer is: a lot."

The Munger Games now is at the center of a federal lawsuit brought on behalf of San Francisco attorney Harmeet Dhillon, the state party's vice chairwoman and a Munger ally. Her goal is to unmask the Munger Games' anonymous bloggers.

## WHY IT MATTERS

**At a time when Republicans are struggling to remain relevant in California, a feud has broken out among some of the most influential leaders over the party's direction.**

On the other side is Newport Beach attorney Mike Schroeder, a former state party chairman and a pillar of the Southern California conservative establishment that long has dominated the party. He is funding the legal defense of the Munger Games – and is the brains behind the website, Dhillon and Munger suspect.

### HOW IT STARTED

Dhillon's attorneys filed suit against "John Doe" last spring in U.S. District Court in San Francisco after the blog used a campaign photo of her from her failed 2008 Assembly race in a post titled, "Meet Harmeet." It detailed her stint a decade ago on the board of the local chapter of the American Civil Liberties Union, political uranium to social conservatives.

Dhillon said the blog had used the photo without permission, violating copyright laws. When she tried to contact the Munger Games to ask that it be removed, she couldn't find out who was running the operation. She wants the court to order the blog's editors to take down the photo.

"But in order for that to occur," Dhillon said, "we're going to have to figure out who that was."

Dhillon has requested subpoenas demanding email traffic belonging to online addresses affiliated with the site and any of Schroeder's emails concerning the blog post.

"I'm not going to tolerate the theft of my intellectual property by people who know better – lawyers and insiders in the party," Dhillon said. "And I will not tolerate this type of warfare


FILE PHOTO: AP
**CHARLES MUNGER JR.:**
Palo Alto physicist has spent millions on GOP operations and ballot measures.


FILE PHOTO: AP
**HARMEET DHILLON:**
State GOP vice chairwoman sued to learn who's behind a blog critical of Munger.


PAUL RODRIGUEZ, THE REGISTER
**MIKE SCHROEDER:**
Newport Beach attorney, former state party chairman who some think is behind the blog.

within the party. At least as long as I have something to do with it, people should fight fair. I'm very happy to participate in the fight. But not anonymously, falsely and with stolen material."

Asked whether he is the anonymous digital puppeteer behind the Munger Games, Schroeder only would say: "I fully support and agree with the principle of the Munger Games."

In court papers, attorneys defending the blog mocked the notion that "an out-of-date publicity photo that has absolutely no commercial value" amounted to intellectual property.

"Munger is a thin-skinned guy," Schroeder said. "He doesn't like that the Munger Games is criticizing him, so he wants to use his wealth to attack anyone who does that."

Jon Fleischman, the Irvine-based proprietor of the conservative website Flashreport.org, said he's had "a lot of conversations with Republicans who are glad that somebody is providing some criticism of Munger."

"Yes, it's great when he writes big checks," Fleischman said. "But it's dangerous for any institution to be so reliant on one person. Munger is on a jihad to get the party to be as conservative as a moderate Republican from Santa Clara County."

### WHY MUNGER SPENDS

Munger says his goal in funding county GOP operations and statewide ballot measures has been to put more power and control with locals and less in the hands of party bosses in Sacramento.

He said criticism doesn't bother him, but that anonymous bashing does. He wants the blog's authors "to make the argument in their own skin."

### WHY THEY'RE ANGRY

Two ballot propositions bankrolled by Charles Munger Jr. in 2010 stand out among things criticized by the anonymous authors of the Munger Games.

● **Redistricting:** A measure that created a citizens panel to draw boundaries for congressional seats, supplanting political parties that always had overseen the effort, left Republicans "with a legislative map that has helped reduce the GOP ... to historic smallness," the website says.

● **Primaries:** A measure that created the system under which the top two finishers in a primary advance to the general election, regardless of party, "has done more than any other single measure to diminishing identification with the GOP while wastefully pitting Republican candidates against each other in general elections in safe seats," according to the site.

---

Schroeder counters that anonymous criticism is an honorable American practice whose roots date to Revolutionary War days.

Legally, both sides could end the confrontation, said Peter Scheer, executive director of the nonprofit First Amendment Coalition. But "there seem to be underlying political motivations at work here."

He called the legal action "kind of a manufactured lawsuit." But he also was dubious about the Munger Games commentators' pleading for the value of anonymous speech.

"I support anonymous speech when it is necessary, but here these are not defenseless people," Scheer said. "It's not like this is Iran or China."

ILLUSTRATION BY DAVID MEDZERIAN, ORANGE COUNTY REGISTER; SHUTTERSTOCK.COM

Exhibit "C"

1/29/14 REUTERS LEGAL 11:00:00

REUTERS LEGAL
Copyright © 2014 Thomson Reuters

January 29, 2014

EFF says California copyright case is political

### Curtis Skinner

(Reuters) - A digital civil rights group has weighed in on a California case where a politician is suing a blogger for using a copyrighted campaign image of her.

The Electronic Freedom Foundation filed an amicus brief in the U.S. District Court for Northern California on Friday supporting the political blog www.mungergames.net.

"Some cases need to end quickly and decisively. By any measure, this is one of them," attorney Matthew Zimmerman and intellectual property director Corynne McSherry, both with the foundation, said in the brief.

The case dates to April 2013 when the vice chairman of the California Republican Party, Harmeet Dhillon, sued the Munger Games blog for publishing a copyrighted picture of her from a past campaign.

Munger Games, according to the EFF, aims to provide information around and criticize the influence of a major Republican campaign contributor and Stanford physicist, Charles Munger Jr. Munger is the son of Warren Buffett business partner Charles Munger.

The blog entry stated that Munger supported Dhillon in her campaign for the Republican post, the EFF said.

Dhillon said in an interview with Reuters Tuesday that the law does not allow the use of a copyrighted, unaltered image, particularly if the publisher benefits financially.

"It's not as simple as saying that 'Harmeet has a viewpoint so I can use her copyrighted images without paying her,'" Dhillon said. "I'm standing up for the rights of property owners to protect their image, particularly when there is a profit motive, which I believe there is."

In a statement posted to the EFF's website on Monday, McSherry said that the case was less legal than it is political.

"This lawsuit is not about copyright infringement but simply a bald attempt to intimidate a political blogger, and the court should shut it down now," she said.

Dhillon, a lawyer who is represented in the case by her own firm Dhillon & Smith, is seeking $250 in damages and a permanent injunction against further infringement, according to the complaint.

FAKE MUSTACHE

The blogger or bloggers of the Dhillon post remain anonymous, despite an August 2013 attempt by Dhillon to subpoena Google for the names associated with the Munger Games Gmail account.

Judge Susan Illston initially granted the request, before reversing the opinion in November.

EFF said in its statement Monday that satirists like Jon Stewart and Steven Colbert routinely use copyrighted images when parodying officials and are protected from copyright litigation.

Dhillon said, in response, that those TV performers generally altered the photographs in some way, thus transforming the image and satisfying the "fair use" exception under copyright law.

David Donahue of Fross Zelnick Lehrman & Zissu, who specializes in copyright and trademark law but is not affiliated with the case, said the defense had a strong case.

"I don't think you have to put a fake mustache on a photograph of a politician to make it transformative for fair use purposes," he said.

Removing the photo from the context of a positive campaign for Dhillon and placing it into the negative and critical context of the blog could meet the "fair use" exception, according to Donahue.

"What's interesting about this case is that the blog amounts to political speech. It really goes to the heart of the First Amendment - someone criticizing a politician and using copyrighted work to aid in that effort," he said.

The case is Dhillon v. Doe 1 et al, U.S. District Court for the Northern District of California, No. 13-cv-01465.

For the plaintiff: Harold Smith, Krista Shoquist and Priya Brandes of Dhillon & Smith.

For the defendants: Rick Cigel of Cigel Law Group and Marc Karlin of Karlin & Karlin.


---- Index References ----

Company: GOOGLE INC

News Subject: (Judicial Cases & Rulings (1JU36); Intellectual Property (1IN75); Information Technology Crime (1IN42); Legal (1LE33); Copyright (1CO88); Trademarks (1TR15))

Industry: (Security (1SE29))

Region: (USA (1US73); California (1CA98); Americas (1AM92); North America (1NO39); U.S. West Region (1WE46))

Language: EN

Other Indexing: (Marc Karlin of Karlin & Karlin; Dhillon & Smith; Cigel Law Group) (David Donahue; Corynne McSherry; Rick Cigel; Charles Munger Jr.; Harmeet Dhillon; Charles Munger; Priya Brandes; Hal Smith; Jonathan Stewart; Catherine Benson; Krista Shoquist; Steven Colbert; Marc Karlin; Susan Illston; Matthew Zimmerman)

Keywords: ip (MCC:OEC); (N2:US); (N2:AMERS); (N2:USA); (MCCL:OVR)

Word Count: 654

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

PROOF OF SERVICE

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

CASE NAME: **HARMEET K. DHILLON v. DOE 1**

The undersigned declares: I am a resident of the United States and am employed in the City and County of Los Angeles, State of California; I am over the age of eighteen years and not a party to the within action; my business address is 10866 Wilshire Boulevard, Suite 400, Los Angeles, California 90024.

On February 4, 2014, I served the following document:

**DECLARATION OF RICK A. CIGEL IN SUPPORT OF DEFENDANT DOE 1'S REPLY BRIEF TO THE MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FRCP 12(C) OR FOR SUMMARY JUDGMENT**

By serving in the manner described below to the interested parties herein and addressed to:

Harold P. Smith, Esq.
Krista L. Shoquist, Esq.
Dhillon & Smith, LLP
177 Post Street, Suite 700
San Francisco, CA 94108

[x] **MAIL:** I caused such envelope(s) to be deposited in the mail at my business address, with postage thereon fully prepaid, addressed to the addressee(s) designated. I am readily familiar with the business practice of collecting and processing correspondence to be deposited with the United States Postal Service on that same day in the ordinary course of business.

[x] **FEDERAL:** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on February 4, 2014 at Los Angeles, California.

/s/ _____
Shelly Lokietz